Rosa J. Evergreen, DC Bar No. 500227
Blake Biles
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 942-5000
Rosa.evergreen@arnoldporter.com
Blake.Biles@arnoldporter.com

Amanda P. Reeves, DC Bar No. 496338
Clayton D. LaForge, DC Bar No. 1033938
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200
amanda.reeves@lw.com
clayton.laforge@lw.com

Peter Gilhuly
Latham & Watkins LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
(213) 485-1234
peter.gilhuly@lw.com

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re:<br><br>JEFFERSON-11th STREET, LLC<br><br>Debtor. | Case No. 22-00059-ELG<br><br>Chapter 11<br><br>Related Docket No. 9 and 31 |

**OBJECTION OF THE TENANTS' ASSOCIATION AND JOINDER TO THE DISTRICT'S OPPOSITION TO DEBTOR'S MOTION FOR TURNOVER OF FUNDS <u>FROM STATE ORDERED RECEIVER PURSUANT TO 11 U.S.C. 543</u>**

The 2724 11th St. N.W. Tenants' Association, Inc. (the "<u>Tenants' Association</u>") by and through its undersigned counsel, hereby submits this objection (the "<u>Objection</u>") and joinder to

the District of Columbia's (the "District") Opposition to Debtor's Motion for Turnover of Funds from State Ordered Receiver Pursuant to 11 U.S.C. § 543 [Docket No.31] (the "Opposition").

**BACKGROUND**

1. The Tenants' Association represents the interests of the tenants in the apartment building located at 2724 11th Street N.W, Washington, D.C. (the "Property"). The Property is subject to rent control laws in the District and the tenants are largely all low-income, and predominantly non-English speakers.

2. On April 4, 2022, Debtor filed its *Motion for Turnover of Funds and Records from State Ordered Receiver Pursuant to 11 U.S.C. § 543* [Docket No. 9] (the "Turnover Motion"). On the date hereof, the District filed its Opposition. The Opposition lays out the long-standing and significant history of the Debtor failing to comply with District laws and its intentional and knowing failure to remediate the Property.

3. The Debtor's attempts in the Turnover Motion to suggest that its failure to address the conditions at the Property is somehow the tenants' fault belies reality, ignores District law in its entirety and overlooks the long history of litigation, wherein the Debtor and its managers (including Ellis Parker), have repeatedly been found liable for their persistent failure to address the conditions at the Property. *See* Turnover Motion, ¶ 12. To the contrary, the Debtor and the Tenants' Association (and the tenants) have been engaged in an alleged "protracted battle" because the Tenants' Association (and the tenants) had no option but to litigate with the Debtor and its principals at each and every turn. *See id.* The Debtor simply refused to comply with District laws or address the housing code violations. Had the Debtor and its managing member actually adopted the appropriate measures to address conditions at the Property, rather than constantly seeking to evade and deny their responsibilities, there would be no need for the

alleged "protected battle." Indeed, the District of Columbia Superior Court has repeatedly admonished the Debtor and its managing member for having "dishonest intent," being "disingenuous," "acting in bad faith" and engaging in "false denials" about the conditions at the Property, as described in detail below. Unfortunately, the Superior Court's admonitions have gone unheeded, as the Turnover Motion is only the latest maneuver in a pattern of evasive and disingenuous behavior wherein the Debtor seeks evade the Superior Court's orders yet again.

4. The Debtor and its managing members have engaged in a long-standing failure to maintain the Property, including failing to remediate indoor mold for years. In 2015, the tenants, represented by the Tenants' Association through counsel, filed an administrative petition with the District of Columbia Office of Administrative Hearings ("OAH") alleging that the Debtor and property management company SCF Management, LLC violated the Rental Housing Act of 1985. A 464-page final order (without exhibits and appendices) was entered in 2017, which found that the tenants had established substantial reductions in specific services and facilities in the Property (a copy of the Order by the District of Columbia Rental Housing Commission affirming the OAH Final Order, together with a copy of the OAH Final Order (without exhibits and appendices) is attached hereto as Exhibit A, appeal by defendants pending of the Rental Housing Commission's Order). The OAH Final Order further determined that the Debtor acted in bad faith, including finding that the Debtor (i) exhibited "dishonest intent" by presenting misleading evidence in the form of improperly tampered with (altered) photographs; (ii) was "disingenuous" in failing to remedy the substantial reduction of services after receiving a letter from the tenants detailing all current violations; and (iii) "demonstrated a heedless disregard of [its] duty to comply with the housing code" by failing to abate rampant pest infestations over a period of three years. *See* OAH Final Order at 447–53.

5. Despite being on notice of and aware of conditions and housing code issues for years, neither the Debtor nor its members addressed or remediated the issues. Instead, they continually sought to evade their obligations. In 2016, certain of the tenants filed a lawsuit bringing claims for damages and injunctive relief, *inter alia*, based on (i) breach of contract for violations of the implied warranty of habitability and (ii) violation of the Air Quality Amendment Act of 2014, D.C. Code § 8-241.04 *et. seq.* (the "Mold Statute"). The D.C. Superior Court granted the tenants' motion for summary judgment on liability under the Mold Statute. *See* Exhibit B, Superior Court of the District of Columbia Order (appeal by defendants pending). The Superior Court found, among other things, in the Superior Court of the District of Columbia Order:

- "[W]hat I view as the fraud or wrong in this case is leaving the LLC so undercapitalized that real renovations, real work couldn't be done based on the capitalization of the LLC to address these housing code violations. And it seems to be that it was quite deliberate that there would be no capital reserve within the LLC to address these types of housing code violations and housing code concerns. . . . And it seems to me that the course of this form of litigation was an attempt by the respondents to avoid responsibility for making the required changes to bring the building up to code.". Pg. 6, n.4.
- "Here, there is no real dispute that defendants were on notice of the plaintiffs' complaints about mold. They were on notice since 2014 . . . [a]nd they also clearly were on notice since 2015 when the tenants brought administrative proceedings against defendants which included allegations about the mold problem in the building." Pg. 10.
- "Defendants acted in bad faith when they refused to acknowledge or to remediate the mold issues in the Building, despite receiving ample notice of the problem over an extended period, encompassing at least two years. Defendants willfully misrepresented the conditions in the building by denying the obvious presence of mold, apparently because defendants sought to avoid their obligation to remediate the mold." Pg. 18.
- "Defendants' repeated, false denials about the mold infestation were misrepresentations that had severe consequences for plaintiffs, who were forced to live in contaminated units." Pg. 19.

6. Ultimately, this continual disregard for the health, safety and welfare of the tenants resulted in, among other things, the Receivership Proceeding[1] and the temporary relocation of tenants. Specifically, given the mold contamination at the Property and the other health and safety issues, the tenants were required to be relocated to other buildings as part of the Receivership Proceeding. In 2018, the Superior Court approved the Receiver's recommendation and the tenants were relocated by the Receiver to units that the Receiver is responsible for renting for the tenants until the Property is remediated. Both the Debtor and Ellis Parker were found personally liable for costs and expenses and were required to pay the differential for the temporary housing. *See* Superior Court of the District of Columbia Order at pg. 8; *see also* Superior Court Order (attached hereto as Exhibit D. Pursuant to this arrangement, the tenants pay their rent as required under DC law for the Property, and the Receiver who secured the temporary housing then uses the rent payments by the tenants for their leases at the Property, together with the funds required to be paid to the Receivership by the Debtor and Ellis Parker, to pay the costs and expenses for the relocated units.

7. During a hearing on August 26, 2021 (the "August Hearing"), the Superior Court found that the Debtor and its management have engaged in "egregious violations of the D.C. Consumer Protection Act, the D.C. Housing Code," been "defensive about what they have done" and displayed "disregard" related to the "conditions that the tenants have been forced to live under." August Hearing Tr., at pgs. 26-27 (the August Hearing excerpts are attached hereto as Exhibit C). The Superior Court has further noted that the reason the tenants had to be relocated was because of the actions of the Debtor and its management: "And the record is replete with

[1] References herein to the Receivership Proceeding refer to the Superior Court proceeding wherein the Superior Court appointed Benjamin Gilmore as the Receiver. *See* Superior Court District of Columbia, Civil Division, Case Numbers 2017 CA 2837 2 and 2016 CA 8084 B.

examples of things that they failed to do. And I think it's important to note that although Mr. Gilmore as the Receiver had to relocate the tenants in order to make the repairs that were necessary to bring the building up to code, that's because of a mold problem that it's respondents that allowed to get to such a dyer [*sic*] level that the mold was everywhere." *Id.* at pg. 27. The Superior Court also explained: "We have a building that was neglected and housing code violations that were pervasive and continuous over a prolonged period of time that ultimately required the relocation of tenants to address the problems just to get them up to code. But we're talking about a period when all of that could have been prevented. We're talking about a period where the water problems could have been addressed in a timely way which would have prevented permeating the entire building into the joists of the building. So I think that's important." *Id.* at pg. 28.

8. The Turnover Motion seeks the very funds that the Superior Court ordered both the Debtor and its managing member, Ellis Parker, pay to the Receiver now be turned over to the Debtor -- the party whom has shown absolute disregard for the health and safety of the tenants for years. Beyond the fact that these are funds ordered by the Superior Court specifically to pay the tenants' relocation costs and expenses and to address the conditions at the Property, and therefore should not be turned over to the Debtor, the funds are also separately and apart from that, simply not property of the estate and are held by the Receiver pursuant to Superior Court orders.

9. The Tenants' Association objects to the Turnover Motion and also joins and incorporates herein the District's Opposition to the Turnover Motion.

## OBJECTION

10. The Tenants' Association asserts that this Court need not even consider the Debtor's arguments under section 543 as the funds at issue are demonstrated by the District in the Opposition, *see* Opposition ¶37, not to be "property of the estate" and are held by the Receiver pursuant to the Superior Court orders and thus the Court can end its analysis there.

11. However, to the extent the Court were to consider section 543, the interests of the tenants are of paramount importance here -- these are low income tenants who have endured years of litigation, fighting for safe and habitable housing. Among other issues, it is critical that the entity or person who is fighting them on these rights not also be the one deciding whether or not to pay the tenants' rent at their relocated units, in essence deciding whether or not the tenants' have a right to temporary housing while the building is remediated.

12. The interests of the creditors (here, the tenants) would absolutely not be better served by turnover of the funds to the Debtor. Courts considering turnover must analyze "whether the interests of creditors would be better served," and the interests of the debtor "are not part of the criteria considered when applying section 543(d)(1)"; accordingly, when looking at the interests of the creditors, which as the Debtor's Schedules themselves highlight is almost exclusively the tenants, it is clear that there is no legitimate basis for turnover. *In re Dill*, 163 B.R. 221, 225 (E.D.N.Y 1994); *see also* 4 Collier on Bankruptcy, ¶ 543.05 at 543–12 (15th Ed.1993) ("section 543(d)(1) does not require an analysis of the interests of the debtor"). More specifically, section 543(d) specifically provides for excusing compliance with subsection (a), (b) or (c) of that section "if the interests of creditors … would be better served by permitting a custodian to continue in possession, custody, or control" of the property. Simply put, this section

specifically provides that courts consider the best interests of the key stakeholders, *other than the debtor,* in determining whether turnover is appropriate.

13. Following that direction here, there is simply no dispute that turnover is not in the best interest of the tenants. After years of having to fight the Debtor, and having the Debtor knowingly ignore significant housing problems, including detrimental mold, the mismanagement by the Debtor excuses the Receiver from turning over to the Debtor the very funds that were court ordered to provide tenants safe, habitable and affordable housing.[2] In fact, a number of courts have excused a receiver from turnover where the properties were not maintained or where there is evidence of mismanagement by the debtor. *See, e.g., In re Dill*, 163 B.R. 221, 225- 27 (E.D.N.Y 1994) (citing cases). This Court should similarly dismiss the Debtor's Turnover Motion in light of Debtor's egregious neglect and mismanagement of the building. The record in the Superior Court cases details numerous examples of the Debtor's mismanagement, including, among many others, findings that the Debtor and its managing member "demonstrated a heedless disregard of [their] duty to comply with the housing code," "willfully misrepresented the conditions in the building," and "properly owe restitution… for failure to maintain the Property in habitable condition," as well as granting injunctive relief against Defendants. *See* OAH Final Order at 451; Superior Court of the District of Columbia Order at 18; Judgment and Injunctive Order (attached hereto as Exhibit E); *see also* Order Appointing Receiver (attached hereto as Exhibit E ("During the term of this Order, the Receiver is the sole person responsible for abating D.C. Code

[2] In similar cases where there is not a receiver, but landlord-tenant issues or related litigation, or the Debtor is suing its key stakeholders, courts have appointed a trustee recognizing the inherent conflict in allowing a Debtor to manage the situation. *See, e.g. In re Taub,* 427 B.R. 208, 227-28 (Bankr. E.D.N.Y. 2010) (*citing In re SunCruz Casinos*, LLC, 298 B.R. 821, 831 (Bankr. S.D. Fla. 2003) (finding conflict of interest where creditor and debtor-in-possession held landlord-tenant relationship)). Here, the tenants agreed to the relocation plan in the Superior Court under the express understanding it would be the Receiver - not the Debtor -- who would be overseeing and attending to their relocated housing.

violations and threats to life, health, safety and security at the Property"). As referenced above, the Superior Court has already found that "the record is replete with examples of things that [Defendants, including Debtor] failed to do."

14. Indeed, the Receiver is the one who entered into temporary leases for the tenants --without such leases the Debtor may have been successful in what appears to be a long-orchestrated unlawful attempt to constructively evict the tenants. It is only because of the Receivership Proceeding that the tenants were finally afforded safe and habitable housing in compliance with District law while they wait for the Property to be remediated so that they can return to their homes. An order has already been entered, following the March 10, 2022 hearing in the Superior Court, providing for the funding for the remediation and repairs for the Property, with a disbursement schedule from April 2022 to September 2022 (a copy of this order is attached hereto as Exhibit F). Throughout the years of litigation, the tenants' position has remained the same -- they want to be able to live in their homes, but have those homes be safe and habitable -- and they have had to fight the Debtor and its principals for years on this -- and when there is finally a plan for the repairs and funding, and on the eve of that happening, the Debtor not only files for bankruptcy but seeks to require turnover of the funds set aside to pay for their temporary housing, that should not be authorized or sanctioned by this court. *See* Excerpt of January 13, 2022 transcript, pg. 19 (attached hereto as Exhibit G) ("tenants' position has been unchanged from the time when the receiver was appointed, which is as soon as feasible, they would like to move back in to their homes").

15. There are innumerable health and safety issues at the Property that need to be addressed. The Debtor and its current management have shown they are both incapable and unwilling to address these issues. It is simply unfathomable that the same individuals who have for years refused to take any action to address the conditions at the Property and thereby forced

the tenants to endure unlawful conditions could now file for bankruptcy and request that this Bankruptcy Court interfere with the orders of the Receivership Proceeding.

16. Finally, the Tenants' Association asserts there is also a question of whether this Court even has subject matter jurisdiction over the Turnover Motion because it raises a *de facto* challenge to the decision of the DC Court in the Receivership Proceeding. The Tenant Association reserves all if its and the tenants' rights and objections but "[t]he Rooker–Feldman doctrine precludes lower federal courts from exercising appellate jurisdiction over final state-court judgments because such appellate jurisdiction rests solely with the United States Supreme Court." *In re Madera*, 586 F.3d 228, 232 (3d Cir. 2009). It applies equally to federal bankruptcy courts. *Id*. In particular, Rooker-Feldman precludes the exercise of jurisdiction "if the federal claim is inextricably intertwined with the state adjudication, meaning that federal relief can only be predicated upon a conviction that the state court was wrong." *In re Knapper*, 407 F.3d 573, 580 (3d Cir.2005). "In other words, Rooker–Feldman does not allow a plaintiff to seek relief that, if granted, would prevent a state court from enforcing its orders." *Id.* at 581 (internal quotation marks omitted); *see also In re Ferren,* 227 B.R. 279, 283 (B.A.P. 8th Cir. 1998)*, aff'd,* 203 F.3d 559 (8th Cir. 2000) (affirming the bankruptcy court's dismissal sua sponte of the action on the basis of Rooker-Feldman doctrine).

17. Here, the Turnover Motion seeks a return of funds paid pursuant to a judgment of the Superior Court. If this Court were to grant the Turnover Motion, the DC Court would potentially be unable to enforce certain of its orders.[3] Accordingly, along with the other arguments here regarding why the Tenants' Association believes the Turnover Motion is

---

[3] The Tenants' Association reserves all rights, remedies and causes of action to assert that Ellis Parker, as already found and determined liable by the Superior Court, is individually and personally liable for all funds and payments required under the Superior Court orders.

inappropriate and does not fall under section 543, the Tenants' Association asserts that Rooker-Feldman deprives the Court of jurisdiction to decide the Turnover Motion and this is another basis for why the Turnover Motion must be denied.

18. The Tenants' Association reserves all of its (and the tenants') rights, interests and entitlements, including, without limitation to assert additional objections, rights, entitlements, or requests for relief, including its rights to seek dismissal, conversion or appointment of a trustee in this case and/or to seek to have the reference withdrawn.

[*Remainder of page intentionally left blank.*]

**WHEREFORE**, for the reasons set forth herein, the Tenants' Association files this objection and requests that the Turnover Motion be denied and that a determination is made that the Receiver is authorized to use the funds in the Receivership Account as already determined and provided for in the Superior Court orders.

Dated: April 25, 2022

Respectfully submitted,

/s/ *Rosa J. Evergreen*

Rosa J. Evergreen, DC Bar No. 500227
Blake Biles
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 942-5000
rosa.evergreen@arnoldporter.com
blake.biles@arnoldporter.com

--and --

/s/ *Amanda P. Reeves*

Amanda P. Reeves, DC Bar No. 496338
Clayton D. LaForge, DC Bar No. 1033938
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200
amanda.reeves@lw.com
clayton.laforge@lw.com

Peter Gilhuly
Latham & Watkins LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
(213) 485-1234
peter.gilhuly@lw.com

*Counsel for 2724 11th St. N.W. Tenants' Association, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of April, 2022, a true and correct copy of the foregoing *Objection of the Tenants' Association and Joinder to the District' Opposition to Debtor's Motion for Turnover of Funds from State Ordered Receiver Pursuant to 11 U.S.C. § 543* was filed and served electronically using the Court's ECF System.

______/s/ Rosa J. Evergreen__
Rosa J. Evergreen