**Nancy L. Alper, Bar No. 411324**
**Senior Assistant Attorney General**
**Office of the Attorney General**
**for the District of Columbia**
**400 6th Street, N.W., 9th Floor**
**Washington, DC 20001**
**Tel: (202) 724-8122**
**Email: Nancy.alper@dc.gov**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **In Re:** | ) | |
| **JEFFERSON – 11TH STREET, LLC,** | ) | **Case No. 22-00059-ELG** |
| | ) | **(Chapter 11)** |
| **Debtor.** | ) | |

**AMENDED OPPOSITION TO DEBTOR'S MOTION FOR TURNOVER OF FUNDS FROM STATE ORDERED RECEIVER PURSUANT TO 11 U.S.C. 543**

**COMES NOW** Defendant District of Columbia ("District"), by and through counsel, the Office of the Attorney General for the District of Columbia, and files its Opposition to Debtor's Motion for Turnover of Funds from State Ordered Receiver Pursuant to 11 U.S.C. § 543. In support thereof, the District states as follows:

## I. PARTIES

(1) The District, a municipal corporation empowered to sue and be sued, is the local government for the territory constituting the permanent seat of the government of the United States. The District files this action through its chief legal officer, the Attorney General for the District of Columbia. The Attorney General has general charge and conduct of all legal business

of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code § 1-301.81(a)(1).

(2) Jefferson-11th Street, LLC ("Debtor"), Debtor herein, located at 2724 11th Street, N.W., Washington, DC (the "Property"), is a single asset real estate limited liability company organized under the laws of the District of Columbia with a principal place of business located in the District. Since 2009 Debtor has owned a 100 percent fee simple interest in the Property which is a two-story apartment building with 26 units.

## III. STATEMENT OF FACTS

### A. Background – A Long History of Litigation

#### 1. Debtor and SCF Management Company Intentionally Failed to Abate Long-Term, Severe Housing Conditions That Rendered the Property Uninhabitable.

(3) For years, starting as early as 2013, tenants at the Property complained of a multitude of deteriorating conditions within their units and the common area of the building. The conditions included mold, water leakages resulting in ceiling collapses, and infestations of rodents, roaches, and bedbugs. Instead of making necessary repairs to comply with the housing code, Debtor and its management company, SCF Management LLC ("SCF Company"), pursued repeated attempts to raise rents through hardship petitions, allowing the building to decay in the meantime. Consistent with the law in the District, tenants objected to the hardship petitions on the grounds that there were serious unabated housing code violations.

(4) Thus, contrary to Debtor's representations in its Motion for Turnover, its attempts to rehabilitate the Property were not thwarted by the tenants. There is a long history of the refusal of Debtor and its owners to maintain the Property in compliance with the District's housing code. Findings made by the District of Columbia Rental Housing Commission ("RHC"), District of Columbia Office of Administrative Hearings and the Superior Court of the District of Columbia

("Superior Court") held that Debtor, and its principle, Elis Parker, willfully allowed the Property to fall into a state of disrepair. So great was the disrepair that the RHC rejected Debtor's substantial rehabilitation petition, OAH ordered Debtor to return tenants' rents, and the Superior Court appointed a receiver and found that Debtor and Mr. Parker committed "[e]gregious violations of the District of Columbia Consumer Protection Procedures Act ("CPPA") and the D.C. Housing Code."[1]

**2. July 2015 Lawsuit Filed by Tenants in the Office of Administrative Hearings Alleging Severe Housing Conditions.**

(5) On July 2, 2015, the tenants filed a petition with the District of Columbia Office of Administrative Hearings ("OAH") alleging that Debtor and SCF Company violated the Rental Housing Act of 1985 by substantially reducing and permanently eliminating services and/or facilities.

(6) An evidentiary hearing took place over the course of sixteen days between February 2, 2016, and May 20, 2016, during which fourteen tenants testified as to the past and then-current conditions within their units and the common areas and how often they reported those conditions to property management.

(7) Administrative Law Judge Erika Pierson issued a final order on May 11, 2017, which totaled more than five hundred (500) pages, and included extensive findings of fact. A copy of the Order is attached hereto and made a part hereof as District Exhibit No. 1. Judge Pierson found that there "have been excessive and prolonged violations of the housing regulations that have affected Tenants' health, safety, and security, and the habitability of the [Property]."[2]

[1] August 26, 2021, Transcript of Decision and Order by Judge Pan. *See* District Exhibit No. 15.
[2] May 11, 2017, Order at 457.

(8) Indeed, Judge Pierson made extensive factual findings[3] showing that the Property suffered from housing code violations throughout the time period between 2013 and 2016. These violations ranged from rodent, bedbug, and roach infestations (*see* SOF ¶¶147-149) to damaged doors (SOF ¶106), broken kitchen appliances (SOF ¶49), leaking sink faucets (SOF ¶86), and windows with broken glass (SOF ¶60(b)). Judge Pierson found that Debtor and SCF Company failed to abate these violations for many months, even years. (*See, e.g.,* SOF ¶¶66(c), 81, 92.) In fact, a significant number of these violations remained unabated at the time of the OAH hearing in May 2016. (*See, e.g.,* SOF ¶¶121, 142, 154.)

(9) In addition, Judge Pierson concluded that between 2013 and 2016, all tenants at the Property suffered from a substantial reduction of services and/or facilities. Further, she found that tenant complaints, both written and oral, were largely ignored and Debtor and SCF Company were generally unresponsive to the requests of both the tenants and the Latino Economic Development Center.[4] When repairs were made, Judge Pierson found that they "amounted to patch work" and did not address the underlying problems.[5] Judge Pierson found that the most egregious example of bad faith of Debtor and SCF Company was their "failure to abate ongoing roach and rodent infestations over a period of three years" even though the evidence demonstrated that they knew about these conditions.[6]

(10) Judge Pierson held that Debtor and SCF Company jointly and severally were liable and acted willfully and in bad faith in failing to abate the conditions and housing code violations present at the Property. (SOF ¶¶166, 171.)

[3] All references to "SOF" with paragraph numbers are findings of fact made by Judge Pierson in her May 11, 2017, Order, attached as District Exhibit No. 1.
[4] *Id.* At 448-49.
[5] *Id.* at 449.
[6] *Id.* at 451.

(11) Even though Debtor and SCF Company were on notice from these evidentiary hearings of the conditions at the Property in 2016, they refused to make repairs or address these conditions. Indeed, from the close of the evidentiary record in the OAH proceedings in May 2016 through the appointment of the Receiver by the Superior Court in November 2017, Debtor and SCF Company failed to abate the most serious conditions at the Property, including mold, water leakages, and infestations of rodents, roaches, and bedbugs.

### 3. Inspections Conducted at the Property Between OAH Filing and District's Filing of Consumer Protection Case Against Debtor and SCF Company in April 2017.

#### a. Inspections of Property by Arrowhead Consulting Company

(12) Debtor and SCF Company also received notice of ongoing issues at the Property through various inspections conducted at the Property.

(13) William Spearman of Arrowhead Consulting conducted three rounds of inspections for the presence of mold at the Property between March 2016 and June 2017. Mr. Spearman found mold present in the five units that he inspected.

(14) As a result of Debtor and SCF Company's ongoing failure to remediate mold at the Property, tenants filed suit against Debtor and SCF Company in November 2016 alleging violations of the District's mold statute. *See Efrain Espinal et al. v. Jefferson-11th Street, LLC et al.*, Case No. 2016 CA 008084 B (D.C. Super. Ct. Nov. 3, 2016).

(15) Mr. Spearman conducted his third round of inspections between May 2017 and June 2017, after the tenants' mold suit was filed. Although Debtor and SCF Company had been on notice of the presence of mold from the tenants' lawsuit, Mr. Spearman still found elevated levels of mold in all units that were inspected. His report also emphasized that the conditions within each unit inspected had "deteriorated further" since his prior round of inspections. He

attributed the deterioration of conditions to ineffective repair attempts that did not properly address water and mold issues within the units.

**b. Inspections of Property by DCRA**

(16) Housing inspectors from the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA") also conducted multiple rounds of inspections at the Property beginning in June 2016, one month after the OAH evidentiary hearings concluded.

(17) Following the June 2016 inspections, DCRA cited more than 100 housing code violations. Notices of Violation ("NOVs") issued to Debtor following these inspections identified many of the same conditions that were identified during the OAH evidentiary hearings, including pest and rodent infestations, water damage to walls and ceilings, broken appliances, and damaged doorframes and kitchen cabinets. DCRA also identified issues with radiators in two units.

(18) DCRA inspectors returned to the Property to conduct further inspections in July 2017. The NOVs issued to Debtor again identified rodent and pest infestations in multiple units, as well as water damage to ceilings and walls, among other ongoing conditions. These same issues were identified in the same units in the June 2016 NOVs. The DCRA inspectors testified in Superior Court at the show cause hearings regarding implementation of a Receivership at the Property held in the fall of 2017 that they saw repeated violations of the same housing conditions throughout several rounds of inspections at the Property, including continuing and ongoing infestations of bedbugs and other pests.

**4. April 2017 Lawsuit Filed by the District Office of Attorney General In Superior Court Alleging Severe Housing Conditions, Seeking Appointment of Receiver, and Requesting Injunctive Relief and Damages.**

(19) Debtor and SCF Company's continuing refusal to make repairs to these ongoing conditions led the District to seek relief in Superior Court. Accordingly, on April 24, 2017, the

District filed suit against Debtor, and SCF Company[7] in Superior Court, Case No. 2017 CA 002837 2, alleging that Debtor and SCF Company continuously failed to abate the above-mentioned conditions. The District sought the appointment of a Receiver pursuant to the Tenant Receivership Act, D.C. Code § 42-3651.01, *et seq*., and requested the issuance of a permanent injunction, damages and other equitable relief. The District also alleged violations of the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901, *et seq*.

(20) On June 29, 2017, the Superior Court issued an Order consolidating the District's case with the lawsuit filed by the tenants against Debtor and SCF Company in November 2016. A copy of the June 29, 2017, Order is attached hereto and made a part hereof as District Exhibit No. 2.

(21) Although Debtor and SCF Company were again put on notice of the persistent rodent and pest infestation, as well as water damage and mold issues, by the District's lawsuit, Debtor and SCF Company still failed to make the needed repairs resulting in the continuation of their violations of the District housing code.

**a. Hearing in Superior Court on District's Lawsuit Seeking Appointment of Receiver.**

(22) On September 20, 2017, September 29, 2017, and October 27, 2017, the Superior Court held show cause hearings on the District's petition for the appointment of a receiver pursuant to the Tenant Receivership Act ("TRA"), D.C. Code §§ 42-3651.02(a)-(b).

(23) Over the course of the three days of evidentiary hearings, tenants, DCRA housing inspectors, and Mr. Spearman[8] all testified about the continuing and ongoing illegal conditions at

---

[7] Additional defendants in the District's lawsuit were Ellis Parker, then managing member of Jefferson-11th Street LLC, and Stanley C. Ford, Sr., managing member of SCF Company.

[8] Mr. Spearman, who conducted three rounds of inspections for mold at the Property from April 2016 through June 2017, testified "The water intrusion and mold growth issues within each of the units either stayed the same or got progressively worse each time I inspected the units." District Exhibit No. 3 (9/20/17 Hr'g Tr.) at 78:1-3. Any attempts to remediate the mold were superficial and did not properly address the underlying issues. *Id.* 78:20-24

the Property. A copy of the September 20, 29 and October 27, 2017, Transcripts are attached hereto and made a part hereof as District Exhibit No. 3.

(24) Two tenants, Vanessa Benitez and Rosetta Archie, testified that Debtor and SCF Company failed to abate even the most serious housing conditions. Ms. Benitez testified that she experienced ongoing infestations of bedbugs and rodents in her unit. Although Ms. Benitez reported these infestations multiple times to Debtor and SCF Company, bedbugs were still in her unit the night before she testified. Ms. Benitez also photographed a mouse on her stove the week of the hearing.[9]

(25) Ms. Archie, who also endured various vermin infestations in her unit, testified to the recurring ceiling leaks in her unit. She testified that Debtor and SCF Company's failure to make appropriate repairs resulted in her ceiling collapsing multiple times, causing both personal harm and extensive damage to personal property within the unit.[10]

**b. Superior Court's Findings and Order.**

(26) At the conclusion of the evidentiary hearings, the Superior Court found that the conditions at the Property included unremediated mold, severe recurring ceiling leaks, and continued infestations of rodents, roaches, and bedbugs. The Court concluded that the Property had been "operated in a manner that demonstrates a pattern of neglect for a period of 30

("The repairs had already started to fail. Not three weeks after the repairs had been made, the tile was starting to fail and the drywall was actually starting to bend outward because of the water getting behind the tile.")

[9] Vanessa Benitez testified that she had experienced bedbugs in her units since 2012. District Exhibit No. 3 (9/20/17 Hr'g Tr.) at 113:14-114:9. She informed Stan Ford eight times of the bed bug infestation in her unit yet suffered from an infestation during the entirety of her tenancy *Id.* at 112:18-24. ("At night when I'm sleeping, they [are] always biting me or my son.") Ms. Benitez testified that she informed Stan Ford eight times about the mice infestation in her unit. *Id.* at 118:12-17. She found mice droppings "everywhere" in her unit, including in her clothes and saw a mouse in her unit the night before she testified. *Id.* at 118:1-119:5.

[10] Rosetta Archie testified that she suffered from repeated ceiling collapses, mold, rats and mice, and cockroaches. District Exhibit No. 3 (9/20/17 Hr'g Tr.) at 135:8-14. Since Defendant Ford became the property manager, Ms. Archie reported the mice infestation three to four times a year, yet the infestation continued unabated. *Id.* at 139:18-140:13. Defendants' failure to repair water leaks in Ms. Archie's ceiling led to multiple ceiling collapses that resulted in physical harm to others residing in her unit and extensive damage to personal property. *Id.* at 141:3-150:9.

consecutive days, and such neglect poses a serious threat to the health, safety, or security of the tenants," and that Debtor and SCF Company's proposed plan for rehabilitation was not sufficient to address these serious threats. *See* District Exhibit No. 3 at 124:7-15 (Oct. 27, 2017, Transcript containing the conclusion of the Receivership hearings).

(27) As a result of its findings, the Superior Court ordered that a Receiver should be appointed at the Property, and on November 17, 2017, the Superior Court appointed Benjamin Gilmore as the Receiver. A copy of the Order Appointing Receiver is attached hereto and made a part hereof as District Exhibit No. 4. The Court ordered the Receiver to prepare a report by January 2, 2018, that would include an assessment of the housing code violations and threats to the health, safety, and security at the Property; an estimate of the costs to make the repairs; and a timeline for making the repairs. *See* District Exhibit No. 4 at 3.

(28) Further, the Court determined that in addition to Debtor, Mr. Parker and SCF Company were liable for an initial bond in the amount of $35,000.00 or deposit that amount in the Receiver's bank account, as well as having up to $15,000.00 available within 72 hours for emergencies. *See* District Exhibit No. 4 at 3.

**5. Receiver Gilmore's Initial and Supplemental Report on Conditions at the Property and Recommendations.**

(29) During his initial inspection of the Property, the Receiver, Benjamin Gilmore, identified over 150 housing code violations, many of which mirrored the violations cited by DCRA. These included the ongoing problem with rodent and pest infestations, as well as continuing problems with wall damage and peeling paint.

(30) As ordered by the Superior Court, *see infra*, District Exhibit No. 4 at 3, Mr. Gilmore filed his initial report on January 2, 2018, attached hereto and made a part hereof as District Exhibit No. 5. The Receiver's Initial Report made clear that Debtor and SCF Company made no

effort to abate even the most serious of the housing conditions. The Receiver's Initial Report documented the following conditions at the Property:

- **Lack of heat:** "There were a number of serious deficiencies noted immediately. First among them was a lack of heat. . . . [I]t became clear that no unit within the Property had heat." Ex. 9, Receiver Benjamin Gilmore's Initial Report Describing Conditions at 2724 11th Street, N.W. ("Receiver's Rep.") (January 2, 2018) at 2.

- **Pest infestations:** "There is a pervasive pest infestation throughout the Property. Numerous residents have reported bedbugs and some kind of rodent infestation within their units – either mouse or rat; and cockroach sightings are an everyday occurrence. Inspections have confirmed those reports…." *Id.* at 2-3.

- **Water infiltration and mold contamination:** "The building's envelope is incapable of keeping water out and – at least for several units and the basement – leaking pipes appear to be contributing to damp conditions. Water infiltration and interior leaks, in turn, are the root cause of crumbling stucco and plaster, peeling paint, and mold contamination." *Id.* at 3. The Report also noted that there was no evidence that any mold remediation had occurred despite testimony regarding mold at the OAH hearing, the mold inspections conducted by William Spearman, and the tenants' suit filed against Defendants under the mold statute. *Id.* at 3-4.

(31) On February 9, 2018, the Receiver filed a Supplemental Report, attached hereto and made a part hereof as District Exhibit No. 6, recommending that given the extent of the mold contamination at the Property, the tenants should be relocated to other buildings. On March 23, 2018, the Superior Court accepted and approved the Receiver's recommendation in part based upon the tenants' statement that they would be willing to move out of the Property under the auspices of the Receiver, not Debtor or its the owner, Mr. Parker.

(32) On March 30, 2018, the Superior Court issued an Order adopting the Receiver's proposed plan for the Property which required that the tenants be moved out of the Property and relocated to different rental apartment buildings. The Court ordered Debtor to pay the Receiver $147,000.00 to begin the initial phase of renovating the Property and $1.875 million for the completion of the Abatement Plan by May 7, 2018, based upon Debtor's representations that

Debtor had the funds to make the payments. A copy of the March 30, 2018, Order is attached hereto and made a part hereof as District Exhibit No. 7.

(33) Simply put, for years, Debtor, Ellis Parker, and SCF Company knew of housing code violations and other serious issues at the Property impacting tenants. They were put on notice repeatedly by tenant complaints, lawsuits, testimony at court hearings, expert reports, inspections, and ultimately, the lawsuit filed by the District against Debtor, Ellis Parker, and SCF Company. Nevertheless, Debtor, Ellis Parker, and SCF Company knowingly and intentionally failed to make repairs and left tenants to live in unsafe, unhealthy, and uninhabitable conditions despite claiming to have sufficient funds to maintain the Property and to rehabilitate it.

**6. Other Rulings by Superior Court Over the Past Five Years Finding Debtor and SCF Company Engaged in Egregious Housing Code Violations and Issued Various Orders Addressing Conditions at the Property And Conduct of Debtor and SCF Company.**

(34) Because Debtor did not timely fund the Receiver's Plan as ordered, the Superior Court conducted a show cause hearing on May 25, 2018, regarding the funding of the receivership.

(35) At the hearing, the Superior Court adopted the District's proposed findings of fact and conclusions of law filed on February 9, 2018, attached hereto and made a part hereof as District Exhibit No. 8, and found that Ellis Parker was the managing member of Debtor and had binding decision-making authority with respect to the decisions regarding whether Debtor was complying with the District's housing code. The Court found that Parker's "refusal to provide or arrange for funds to repair the Property is a direct cause of the pattern of neglect that has led to the health, safety, and security issues at the Property." District Exhibit No. 8, Par. No. 66 at 13. The Court based this finding in part on Ellis Parker's deposition testimony when he admitted he "absolutely" had the funds to repair the property but simply did not want to do it and referred to tenants as the "bloody tenants" for simply seeking to live in habitable apartments. The

deposition transcript of Ellis Parker is attached hereto and made a part hereof as District Exhibit No. 9. *See* District Exhibit No. 9 at 105:25; 123:4-5. Accordingly, the Court concluded that Ellis Parker is personally liable under the TRA and also found that Mr. Parker has personal liability under the CPPA.

(36) On May 29, 2018, the Superior Court issued its Order, attached hereto and made a part hereof as District Exhibit No. 10. In its Order, the Court stated that Ellis J. Parker is jointly and severally liable for payments due to the Receiver from Debtor. The Court ordered Debtor and Ellis Parker to pay the Receiver $1.875 million by the close of business on June 8, 2018.

(37) On June 8, 2018, the Receiver received a wire transfer into his Receivership account for $1.875 million from Francis Hill Parker, the son of Ellis Parker. A redacted copy of the wire transfer is attached hereto and made a part hereof as District Exhibit No. 11. On the same date, Receiver Benjamin Gilmore filed a Praecipe in Superior Court reporting that he had received $1.875 million to fund the abatement plan at the Property from Francis Hill Parker, part owner of the Property and son of Ellis Parker. *See* District Exhibit No. 12.

(38) On September 19, 2019, the Superior Court granted the District's Motion for Partial Summary Judgment and found Debtor and SCF Company liable for committing unlawful trade practices in violation of Sections 28-3904 (a), (d), (e), and (dd) of the CPPA. In so finding, the Superior Court treated the District's Statement of Material Facts Not In Dispute, which had been filed with its Motion for Partial Summary Judgment as to Liability, as undisputed and incorporated by reference into the Court's ruling.[11] A copy of the September 19, 2019 Transcript containing a transcript of the hearing and the Court's rulings is attached hereto and made a part hereof as District Exhibit No. 13.

[11] *See* District Exhibit No. 13 ("9/19/19 Hr'g Tr.") at 51:19-59:1.

(39) Further, the Superior Court held that there was no genuine issue of material fact that CPPA violations had clearly occurred at the Property.[12] The Court based its holding on the "robust record on mold that we've developed, including … expert testimony;"[13]; "evidence in the record of water leakage that was never addressed," which led to issues such as the repeated ceiling collapses in one tenant's unit;[14] and "evidence in the record of windows and doors that were not fixed and posed a safety threat."[15] The Court also cited to the "well-developed administrative law record on the vermin, the pests, including roaches, mice, and other rodents in the units, bedbugs also."[16]

(40) The Superior Court noted that the administrative law proceedings, which were entered in the record without objection, "support[ed] findings of the types of infractions that violate [D.C. Official Code §] 16-3305.1."[17]

(41) Concluding that violations of the CPPA include "any flagrant, fraudulent, or willful violation of a housing regulation in Title 14, which includes both the housing code and implied warranty of habitability, and that would have to constitute an imminent danger to the health or safety of any tenant or occupant of a housing unit or housing accommodation,"[18] the Superior Court found that there was no genuine issue of material fact that such violations had occurred at the Property.[19]

(42) The Superior Court issued another Order granting the District's Motion for Summary Judgment on Damages and Fees, on July 23, 2020, the Superior Court issued another Order, attached hereto and made a part hereof as District Exhibit No. 14. In granting the

[12] *See* District Exhibit No. 13 (9/19/19 Hr'g Tr.) at 56:6-57:1.
[13] *See* District Exhibit No. 13 (9/19/19 Hr'g Tr.) at 57:14-15.
[14] *See* District Exhibit No. 13 (9/19/19 Hr'g Tr.) at 58:5-9.
[15] *See* District Exhibit No. 13 (9/19/19 Hr'g Tr.) at 58:9-11.
[16] *See* District Exhibit No. 13 (9/19/19 Hr'g Tr.) at 57:11-13.
[17] *See* District Exhibit No. 13 (9/19/19 Hr'g Tr.) at 57:18-21.
[18] *See* District Exhibit No. 13 (9/19/19 Hr'g Tr.) at 57:2-8.
[19] *See* District Exhibit No. 13 (9/19/19 Hr'g Tr.) at 57:9-11.

District’s Motion, then Superior Court Judge, now District Court Judge Florence Pan (“Judge Pan”) found as follows:

> What I view as the fraud or wrong in this case is leaving the LLC (Debtor) so undercapitalized that real renovations, real work couldn’t be done based on the capitalization of the LLC to address these housing code violations. And it seems to be that it was quite deliberate that there would be no capital reserve within the LLC to address these types of housing code violations and housing code concerns. And it seems to me that the course of this form of litigation was an attempt by the respondents (Debtor, Ellis Parker and SCF Company) to avoid responsibility for making the required changes to bring the building up to code.

District Exhibit No. 14 at 6, n. 4.

(43) Judge Pan concluded by finding that:

> Defendants (Debtor, Ellis Parker, and SCF Company) acted in bad faith when they refused to acknowledge or remediate the mold issues in the Building, despite receiving ample notice of the problem over an extended period, encompassing at least two years. Defendants (Debtor, Ellis Parker, and SCF Company) willfully misrepresented the conditions in the building by denying the obvious presence of mold, apparently because defendants sought to avoid their obligation to remediate the mold. . . . Defendants’ (Debtor, Ellis Parker, and SCF Company) repeated, false denials about the mold infestation were misrepresentations that had severe consequences for plaintiffs, who were forced to live in contaminated units.

District Exhibit No. 14 at 18 - 19.

(44) On August 26, 2021, Judge Pan rendered an oral ruling and granted the District’s motion for a permanent injunction against Debtor, its managing member, Mr. Parker, and SCF Company. *See* August 26, 2021, Transcript with excerpts attached hereto and made part hereof as District Exhibit No. 15. Specifically, Judge Pan stated in relevant part as follows:

> And I have been supervising this case for a long time and so I am very familiar with the facts and the circumstances that underlie the District's request for permanent injunctive relief. . . . I'll start by saying that I think there have been egregious violations of the

> D.C. Consumer Protection Act and the D.C. Housing Code. And I think the record is replete with requests for repairs and complaints about conditions that simply went unaddressed. . . . We have a building that was neglected and housing code violations that were pervasive and continuous over a prolonged period of time that ultimately required the relocation of tenants to address the problems just to get them up to code. But we're talking about a period when all of that could have been prevented. We're talking about a period where the water problems could have been addressed in a timely way which would have prevented permeating the entire building into the joists of the building.

District Exhibit No. 15 at 26 – 28, 46.

(45) On September 28, 2021, the Superior Court issued a written decision, attached hereto and made a part hereof as District Exhibit No. 16, ordering permanent injunctive relief because Debtor and SCF Company have repeatedly shown, despite notice and complaints, a refusal to adhere to District law and abate deteriorating conditions at the Property.

(46) Overall, the record of the litigation ensuing over the past seven years demonstrates Debtor and SCF Company's deliberate indifference to the Property and its tenants' wellbeing which left the Property in shambles, requiring the Receiver to take over the Property and displace and relocate all tenants for several years, just to make repairs to bring the Property into compliance with the District's housing laws.

**7. Receiver Relocated Tenants to Several Other Buildings Located in the District**

(47) Based upon the Receiver's inspections of the Property that mold had gotten into and contaminated the joists of the building, it was determined that the building needed to be taken down to its studs in order to repair the plumbing and remove the contaminated drywall. And as a result of the condition of the building and what was needed to abate the contamination on the Property, it was determined that the tenants had to be moved out of the Property and relocated to other rental apartment buildings.

(48) Pursuant to the Superior Court Order issued on March 30, 2018, wherein the Court approved Receiver Gilmore's recommendation to move the tenants out of the Property and relocate them to other rental apartment buildings, *see supra* Par. No. 32 at 11, on July 20, 2018, the Receiver filed his Proposed Relocation Budget, attached hereto and made a part hereof as District Exhibit No. 17.

(49) On February 12, 2019, the Receiver filed an Amended Relocation Budget, attached hereto and made a part hereof as District Exhibit No. 18. By Order of the Superior Court issued on May 30, 2019, attached hereto and made a part hereof as District Exhibit No. 19, the Court approved the Amended Relocation Budget and ordered Debtor and Ellis Parker to pay $270,773.00 in relocation expenses and rent differentials.

(50) As part of the planned relocation, the Receiver entered into Temporary Relocation and Occupancy Agreements ("Agreements") with several housing providers, including the Dorchester House Associates, LLC; Van Metre Oaklawn Terrace Apartments, LLC; Van Metre Richman Towers Apartments, LLC; and Van Metre Park Marconi Apartments, LLC. See District Exhibit No. 20. Pursuant to the Agreements, the tenants were permitted to occupy the temporary units while the Receiver repaired the Property. Once the repairs were completed, the tenants would vacate their temporary units and return to their permanent apartments at the Property.

(51) Also pursuant to the Agreements, the tenants were only required to pay the rent that they had paid at the Property, while Debtor and Ellis Parker, who were found by Superior Court to be jointly and severally liable, were required to pay the rent differential between the permanent units and the temporary units. As part of his obligations under the Order for the Appointment of Receiver, the Receiver combines the two payments, one from the tenants and the

other from Debtor and Ellis Parker, and pays the various temporary housing providers the total amount of the rent.

(52) The rationale for the Agreements providing that the Receiver will be the lessor and make the rent payments directly to the housing provider is that absent the Agreements many tenants would not qualify for replacement apartments.

(53) Accordingly, as ordered by the Superior Court, the funds held in the Receivership account are designated to be used to pay the rent differential, as well as to address the health and safety issues at the Property, on behalf of the tenants who are creditors in this bankruptcy case.

**B. Debtor's Bankruptcy Filing**

(54) On March 31, 2022, Debtor filed its petition under Chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code"), 11 U.S.C. §§ 101 *et seq*. Along with its petition, Debtor filed its Form 202 Declaration Under Penalty of Perjury for Non-Individual Debtors; Form 204 Chapter 11 . . . List of Creditors Who Have the 20 Largest Unsecured Claims; Summary of Assets and Liabilities for Non-Individuals; Form 207 Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy; and Bankruptcy Schedules A/B (Assets – Real and Personal Property), D (Creditors Who Have Claims Secured by Property), E/F (Creditors Who Have Unsecured Claims), Schedule G (Executory Contracts and Unexpired Leases), and Schedule H (Your Codebtors). Docket Entry No. 1.

(55) In addition, Debtor filed Disclosure of Compensation of Attorney for Debtor which disclosed that the source of compensation was a $35,000.00 retainer paid by Debtor with $20,238.00 "deducted prior to petition being filed, for pre-filing invoices and the filing fee. Docket Entry No. 1 at 41.

(56) On April 11, 2022, Debtor filed Amended Schedules A/B, D, E/F, and G. In addition, Debtor filed an Amended Form 207 Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy; an Amended Summary of Assets and Liabilities for Non-Individuals; and an Amended Form 204 Chapter 11 . . . List of Creditors Who Have the 20 Largest Unsecured Claims; Summary of Assets and Liabilities for Non-Individuals. Docket Entry No. 11.

(57) Of particular note, Debtor in both the Form 207 Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy, Docket Entry No. 1, Part 10, Par. No. 18 at 36, and the Amended Form 207, Docket Entry No. 11, Part 10, Par. No. 18 at 28-29, responds "NO" to the question whether Debtor "[w]ithin 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred." Included in the definition of financial accounts or instruments are "check, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses . . . and other financial institutions."

(58) Also of note is that Debtor has no secured lenders holding a mortgage on the Property held by Debtor.

(59) Debtor claims on Schedule A/B, Docket Entry No. 1, Part 1, Par. No. 3 at 14 and Amended Schedule A/B, Docket Entry No. 11, Part 1, Par. No. 3 at 6, that part of its property is a bank account held by Receiver with the amount of money in the Receiver's account as of March 31, 2022, being $531.267.15 and as of April 11, 2022, being $486,470.16.

(60) On April 4, 2022, Debtor filed its *Motion for Turnover of Property of Funds and Records from State Ordered Receiver Pursuant to 11 U.S.C. § 543* ("Motion for Turnover"). Docket Entry No. 9. An Amended Notice of Hearing and Opportunity to Object to the Motion of Turnover was filed by Debtor on April 11, 2022. Docket Entry No. 12.

(61) As set forth below, the District Objects to Debtor's Motion for Turnover.

## IV. ARGUMENT

### A. The Best Interests of the Creditors Are Served in this Case By Excusing the State Court Ordered Receiver from Turning Over the Funds in His Receivership Account.

(62) Section 543 of the Bankruptcy Code ("Bankruptcy Code"), 11 U.S.C. § 543, requires a custodian of property appointed before a bankruptcy case is filed to deliver to the trustee or debtor-in-possession, and account for property that he has had possession, custody, or control of as a custodian. A state court receiver is a "custodian" within the meaning of Section 101(11) of the Bankruptcy Code.

(63) However, Section 543(d)(1) of the Bankruptcy Code, 11 U.S.C. § 543(d)(1), authorizes a bankruptcy court to excuse a custodian from these requirements as follows:

> After notice and hearing, the bankruptcy court – (1) may excuse compliance with subsection (a), (b), or (c) of this section if the interests of creditors and, if the debtor is not insolvent, of equity security holders would be better served by permitting a custodian to continue in possession, custody, or control of such property.

(64) As the bankruptcy court held in *In re Franklin*, 476 B.R. 545, 551 (Bankr. N.D. Ill. 2012), a bankruptcy court pursuant to Section 543(d)(1) of the Bankruptcy Code, 11 U.S.C. § 543(d)(1), "may excuse compliance with [Section 543 of the Code] 'if the interests of creditors . . . would be better served by permitting a custodian to continue in control of such property. . . ."

(65) In *In re Franklin*, LLC, *supra* at 551, the bankruptcy court analyzed the following factors in determining whether to excuse a state-appointed receiver from turnover: "(1) the likelihood of reorganization, and whether funds held by the receiver are required for reorganization; (2) whether there were instances of mismanagement by the debtor; (3) whether turnover would be injurious to creditors; and (4) whether the debtor would actually use the

property for benefit of its creditors. " *See also In re Falconridge*, LLC, 2007 WL 3332769 at *7 (Bankr. N.D. Ill. November 8, 2007).

(66) In analyzing a request for excuse from turnover, as stated by the bankruptcy court in *In re Bryant Manor, LLC*, 422 B.R. 278, 289 (Bankr. D. Kan. 2010), a bankruptcy court must examine the following: "(1) the debtor's likelihood of reorganization; (2) the probability that funds required for reorganization will be available; and (3) whether the evidence shows mismanagement of the property by the debtor." See also *In re Falconridge, LLC*, 2007 WL 3332769 at *7 (Bankr. N.D. Ill. November 8, 2007).

(67) However, as the *Falconridg*e court stated, "[r]egardless of what factors are used to aid the court in its decision, the paramount and sole concern is the interests of all the creditors." In re Falconridge, LLC, 2007 WL 3332769 at 7.

(68) Given the voluminous record and litigation history of Debtor, the factors set forth by both the *Bryant Manor* and *Franklin* courts are met in this bankruptcy case and the state-appointed Receiver should be excused from turning over the funds in his Receivership account.

(69) Thus, with regard to mismanagement of the Properties, *Bryant Manor* is particularly analogous and instructive here. In *Bryant Manor*, the bankruptcy court excused the state court-appointed receiver from the turnover requirements of Section 543 and authorized the receiver to continue to manage the debtor's multi-family property, because it would be in the best interest of creditors. The *Bryant Manor* court identified a number of factors that evidenced the debtor's mismanagement of the property, including the following:

- Debtor's failure to maintain the property;
- Debtor's failure to treat water damage or mold;
- Debtor's failure to maintain safety equipment;

• Debtor's failure to address other safety issues.

(70) All of these issues are present at Debtor's Property in this case. As described in great detail throughout the Statement of Facts and as demonstrated by the District's exhibits, each judicial forum that took evidence and received testimony about Debtor's handling of the Property, including the District of Columbia Rental Housing Commission, the District Office of Administrative Hearings and the Superior Court of the District of Columbia, found Debtor engaged in gross mismanagement of the Property in which the tenants suffered pest and rodent infestations, water damage to walls and ceilings, collapsing ceilings, broken appliances, and damaged doorframes and kitchen cabinets. (71) Indeed, both OAH and the Superior Court found that Debtor acted in bad faith, made misrepresentations regarding the mold contamination and pest infestations, and was willfully undercapitalized so that no real renovations could be undertaken to address the housing code violations. *See supra* at Par. Nos. 10, 42 – 45; *see also* District Exhibit Nos. 1, 14, and 15.

(71) With regard to the likelihood of reorganization that both the *Bryant Manor* and *Franklin* courts discuss and the availability of funds to reorganize, Debtor has no funds to reorganize and there is no likelihood of reorganization. As stated *supra* Par. No. 42 at 14, Debtor was deliberately undercapitalized so that no rehabilitation of the Property could be accomplished. Debtor itself in its Statement of Financial Affairs, Docket Entry No. 1, Part 10, Par. No. 18 at 37, as well as in its Amended Statement of Financial Affairs, Docket Entry No. 11, Part 10, Par. No. 18 at 29, states that one year prior to its filing a petition under Chapter 11 of the Bankruptcy Code, it has no financial account or instruments, including no check, savings, money market, or other financial accounts. Accordingly, there is no likelihood that Debtor will reorganize.

(72) With regard to whether turnover would be injurious to the creditors and whether Debtor would actually use the funds for the benefit of the creditors, the record developed in the litigation involving Debtor demonstrates unequivocally that the funds would not be used for the benefit of the creditors, the vast majority of whom are tenants, and that turnover would be injurious to the wellbeing of the creditors. Indeed, as the record shows and the Superior Court has found multiple times, Debtor for many years has acted in bad faith and was deliberately indifferent to the Property and its tenants' wellbeing.

(73) As stated *supra* Par. No. 51 at 16, as ordered by the Superior Court, the funds held in the account of the Receiver are necessary to remain in the Receivership account since they are used to pay the rent differential on behalf of the tenants, who are creditors in this bankruptcy case, as well as address the health and safety issues at the Property.

(74) As the *Falconridge* court held the paramount and sole concern is what is in the best interests of the creditors. Since the creditors in this bankruptcy case are the tenants and the District, and the funds in the Receivership account have been ordered and designated by the Superior Court as funds to be used to pay the rent differential on behalf of the tenants and to address the rehabilitation of the Property, turnover of the monies in the Receivership account should be excused and the funds should be utilized as directed by the Superior Court.

WHEREFORE, the District prays that the Court deny Debtor's Motion for Turnover of Funds from the State Ordered Receiver; excuse the State Ordered Receiver from turning over the funds held in his Receivership account; and for such other and further relief as the Court deems just.

Date: April 28, 2022.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

DAVID FISHER
Deputy Attorney General

/s/ William Burk
WILLIAM BURK, D.C. Bar No. 325274
Chief, Land Acquisition and Bankruptcy Section

/s/ Nancy L. Alper
NANCY L. ALPER, D.C. Bar No. 411324
Senior Assistant Attorney General
Land Acquisition and Bankruptcy Section
400 6th Street, N.W., 9th Floor
Washington, D.C. 20001
(202) 724-8122
nancy.alper@dc.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of April, 2022, I caused a copy of the foregoing **Opposition to Debtor's Motion for Turnover of Funds from State Ordered Receiver Pursuant to 11 U.S.C. § 543** to be filed and served electronically using the Court's ECF System.

/s/ Nancy L. Alper
NANCY L. ALPER, D.C. Bar No. 411324