**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re:<br>JEFFERSON-11th STREET, LLC<br>Debtor. | Case No. 22-00059-ELG<br>Chapter 11 |

**TENANT ASSOCIATIONS' MOTION TO DIMISS THE BANKRUPTY CASE, OR IN ALTERNATIVE, ABSTAIN**

The Tenants' Association (defined below), through counsel, files this *Motion to Dismiss the Bankruptcy Case, or in Alternative, Abstain* (the "Motion to Dismiss"), and state as follows:

**OVERVIEW**[1]

The Jefferson 11th Street bankruptcy filing should be dismissed for cause because it was not filed in good faith, does not serve a valid bankruptcy purpose, and was filed to obtain a tactical litigation advantage against the District, the Tenants' Association, and the tenants that have been litigating with the Debtor for many years, culminating in the Receivership Proceeding to require the Debtor, its principals, and SCF Management to comply with D.C. laws and regulations and to address significant health and safety issues at the Property. The Debtor, SCF Management, and Ellis J. Parker knowingly and intentionally failed to make repairs to the Property for a period dating back many years, and knowingly left the tenants to live in unsafe, unhealthy, and uninhabitable conditions. Bankruptcy is not -- and this Court should not sanction it here -- a refuge for an owner who has knowingly violated the D.C. laws and regulations that were enacted to protect the health and safety of D.C. tenants, and who left a company

[1] Capitalized terms used but not otherwise defined in this overview have the meanings ascribed to them elsewhere in this Motion to Dismiss.

intentionally undercapitalized in furtherance of the same. For the reasons discussed below, the bankruptcy case should be dismissed for cause or, in the alternative, this Court should abstain from hearing the case pursuant to section 305 of the Bankruptcy Code.

## BACKGROUND

### A. The Parties

1. The District, a municipal corporation empowered to sue and be sued, is the local government for the territory constituting the permanent seat of the government of the United States. The District files this motion through its chief legal officer, the Attorney General for the District of Columbia. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District, and is responsible for upholding the public interest. D.C. Code § 1-301.81(a)(1).

2. The 2724 11th Street NW Tenants' Association, Inc. (the "Tenants' Association") represents the interests of the tenants who live in the apartment building located at 2724 11th Street N.W, Washington, D.C. (the "Property"). The Property is subject to rent control laws in the District, and the tenants are largely low-income, and predominantly non-English speakers.

3. Jefferson-11th Street, LLC (the "Debtor") is a single-asset real estate limited-liability company organized under the laws of the District of Columbia, with a principal place of business located in the District. Since 2009, the Debtor has owned a 100 percent fee simple interest in the Property which is a two-story apartment building with 26 units. Ellis J. Parker and his two sons, Ellis S. Parker and Francis H. Parker, share jointly in the ownership of the Property.

4. On March 31, 2022, the Debtor filed a petition for bankruptcy, following many years of litigation with the District, the Tenants' Association and the tenants regarding the horrendous conditions at the Property. There is no bank or lender with a lien on the Property. In

fact, the Debtor itself in its Schedules of Assets and Liabilities (the "Schedules") reflects that it believes the Property is worth $5 million. *See* Schedules, at pg. 13.

5. Over the years, rather than fix the Property in compliance with D.C. laws, the Debtor, its management company, SCF Management LLC ("SCF Management"), and its member, Ellis J. Parker, have engaged in ongoing litigation to evade and avoid their responsibilities to the tenants and the District to comply with D.C. laws and regulations.

### B. State Court Litigation History Leading to the Receivership and Relocation of Tenants

6. The Debtor has had an ongoing indifference to housing code violations it created. The state court history demonstrates the ongoing efforts of the Superior Court of the District of Columbia (the "Superior Court"), the Tenants' Association, and the District to remedy the Property. For years, starting as early as 2013, tenants at the Property complained of a multitude of deteriorating conditions within their units and the common areas of the building. The conditions included mold, water leakages resulting in ceiling collapses, and infestations of rodents, roaches, and bedbugs. The Debtor, SCF Management, and Ellis J. Parker have engaged in a long-standing failure to maintain the Property, including failing to remediate indoor mold for years.

7. In July 2015, the tenants, represented by the Tenants' Association through counsel, filed an administrative petition with the District of Columbia alleging that the Debtor and SCF Management violated the Rental Housing Act of 1985. In 2017, a 464-page Final Order (without exhibits and appendices, attached hereto as Exhibit 1) was entered by the Administrative Law Judge (the "ALJ"),[2] who found that the tenants had proven substantial

[2] An evidentiary hearing took place over the course of sixteen days between February 2, 2016, and May 20, 2016, during which fourteen tenants testified as to the past and then-current conditions within their units and the common areas and how often they reported those conditions to property management.

reductions in hundreds of specific services and facilities for many years and throughout the Property. The ALJ ordered rent refunds to the tenants in all 15 occupied units, for a total of $212,778.16, plus rollbacks in rent levels (ranging among the 15 units from $15 to $265 per month) because of the "excessive and prolonged violations of the housing regulations that have affected Tenants' health, safety, and security, and the habitability of the Housing Accommodation." The ALJ also found that the Debtor's and SCF Management's failure to address certain code violations was "willful," and therefore imposed a civil penalty of $10,000 on the Debtor and SCF Management, the maximum amount authorized by law. Further, the Final Order determined that the Debtor and SCF Management acted in bad faith, including finding that the Debtor and SCF Management (i) exhibited "dishonest intent" by presenting misleading evidence in the form of improperly tampered with (altered) photographs; (ii) were "disingenuous" in failing to remedy the substantial reduction of services after receiving a letter from the tenants detailing all current violations; and (iii) "demonstrated a heedless disregard of [its] duty to comply with the housing code" by failing to abate rampant pest infestations over a period of three years. *See* Final Order at 447–59.

8. The Debtor and SCF Management appealed the ALJ's Final Order to the three-ALJ D.C. Rental Housing Commission ("RHC"), which took briefing and oral argument from the parties. The RHC issued its final Decision and Order in February 2020 -- almost five years after the tenants' filed their administrative petition -- and upheld the ALJ's July 2017 Final Order in all respects, except for a partial reduction in monetary damages that the ALJ had awarded to one of the tenants. *See* Exhibit 1 (attaching the "RHC's Decision and Order"). The Debtor and SCF Management thereafter appealed the RHC Decision and Order to the District of Columbia

Court of Appeals, where briefing has been completed, no oral argument will be held, and the parties currently await the Court of Appeals decision.

9. Notwithstanding the ALJ's and RHC's overwhelming findings of bad faith and willful non-compliance by the Debtor and SCF Management, both the ALJ's Final Order and the RHC's Decision and Order have been stayed because of the Debtor's and SCF Management's appeals of those orders.

10. Despite being on notice of and aware of conditions and housing code violations for years, neither the Debtor nor SCF Management addressed or remediated the horrendous violations, but instead continually sought to evade and avoid their obligations. In 2016, certain of the tenants filed a lawsuit bringing claims for damages and injunctive relief, based on, *inter alia*, (i) breach of contract for violations of the implied warranty of habitability and (ii) violation of the Air Quality Amendment Act of 2014, D.C. Code § 8-241.04 *et. seq*. (the "Mold Statute") (such litigation is referred herein as the "Mold Litigation"). The Superior Court granted the tenants' motion for summary judgment on liability under the Mold Statute. *See* Exhibit 2, Superior Court of the District of Columbia Order (appeal by defendants pending). The Superior Court found, among other things, in the Superior Court of the District of Columbia Order:

- "[W]hat I view as the fraud or wrong in this case is leaving the LLC so undercapitalized that real renovations, real work couldn't be done based on the capitalization of the LLC to address these housing code violations. And it seems to be that it was quite deliberate that there would be no capital reserve within the LLC to address these types of housing code violations and housing code concerns. . . . And it seems to me that the course of this form of litigation was an attempt by the respondents to avoid responsibility for making the required changes to bring the building up to code." Pg. 6, n.4.

- "Here, there is no real dispute that defendants were on notice of the plaintiffs' complaints about mold. They were on notice since 2014 . . . [a]nd they also clearly were on notice since 2015 when the tenants brought administrative proceedings against defendants which included allegations about the mold problem in the building." Pg. 10.

- "Defendants acted in bad faith when they refused to acknowledge or to remediate the mold issues in the Building, despite receiving ample notice of the problem over an extended period, encompassing at least two years. Defendants willfully misrepresented the conditions in the building by denying the obvious presence of mold, apparently because defendants sought to avoid their obligation to remediate the mold." Pg. 18-19.

- "Defendants' repeated, false denials about the mold infestation were misrepresentations that had severe consequences for plaintiffs, who were forced to live in contaminated units." Pg. 19.

11. The Debtor's, SCF Management's, and Ellis J. Parker's continued refusal to make repairs and to fix these ongoing conditions led the District to seek relief in the Superior Court for appointment of a receiver (the "Receivership Proceeding"). On April 24, 2017, the District filed suit against the Debtor and SCF Management in the Superior Court, Case No. 2017 CA 002837 2, alleging that the Debtor and SCF Management continuously failed to abate the above-mentioned conditions. The District sought the appointment of a Receiver pursuant to the Tenant Receivership Act, D.C. Code § 42-3651.01, *et seq*., and requested the issuance of a permanent injunction, damages and other equitable relief. The District also alleged violations of the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901, *et seq*.[3]

12. Although the Debtor, SCF Management, and Ellis J. Parker were on notice of the persistent rodent and pest infestation, as well as water damage and mold issues, by the various lawsuits and notices given to them as discussed above, they still failed to make the needed repairs, resulting in the continuation of their violations of the District housing code.[4] Over the

[3] On June 29, 2017, the Superior Court issued an Order consolidating the District's case with the Mold Litigation case. A copy of the June 29, 2017 Order is attached hereto as Exhibit 3.

[4] Housing inspectors from the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA") also conducted multiple rounds of inspections at the Property beginning in June 2016, one month after the ALJ evidentiary hearings concluded. Following the June 2016 inspections, DCRA cited more than 100 housing code violations. Notices of Violation ("NOVs") issued to the Debtor following these inspections identified many of the same conditions that were identified during the ALJ evidentiary hearings, including pest and rodent infestations, water damage to walls and ceilings, broken appliances, and damaged doorframes and kitchen cabinets. DCRA also identified issues with radiators in two units. The DCRA inspectors testified in Superior Court at the show cause

course of the three days of evidentiary hearings in the Superior Court, tenants, DCRA housing inspectors, and Mr. Spearman[5] all testified about the continuing and ongoing illegal conditions at the Property. A copy of the September 20, September 29 and October 27, 2017 transcripts are attached hereto as Exhibit 4.

13. At the conclusion of the evidentiary hearings, the Superior Court found that the conditions at the Property included unremediated mold, severe recurring ceiling leaks, and continued infestations of rodents, roaches, and bedbugs. On November 17, 2017, the Superior Court appointed Benjamin Gilmore as the receiver (the "Receiver" and "Receivership").[6] A copy of the Order Appointing Receiver is attached hereto as Exhibit 5 (the "Receivership Order").[7]

14. Under the D.C. Code, the Receiver shall "take charge of the operation and management of the [property] and assume all rights to possess and use the building . . . that the owner or property management would have if the receiver had not been appointed." D.C. Code

---

hearings regarding implementation of a Receivership at the Property held in the fall of 2017 that they saw repeated violations of the same housing conditions throughout several rounds of inspections at the Property, including continuing and ongoing infestations of bedbugs and other pests. *See, e.g.* Exhibit 4.

[5] Mr. Spearman, who conducted three rounds of inspections for mold at the Property from April 2016 through June 2017, testified "[t]he water intrusion and mold growth issues within each of the units either stayed the same or got progressively worse each time I inspected the units." *See* Exhibit 4 (9/20/17 Hr'g Tr.) at 78:1-3. Any attempts to remediate the mold were superficial and did not properly address the underlying issues. *Id.* 78:20-24 ("The repairs had already started to fail. Not three weeks after the repairs had been made, the tile was starting to fail and the drywall was actually starting to bend outward because of the water getting behind the tile.").

[6] On September 20, 2017, September 29, 2017, and October 27, 2017, the Superior Court held show cause hearings on the District's petition for the appointment of a receiver pursuant to the Tenant Receivership Act ("TRA"), D.C. Code §§ 42-3651.02(a)-(b). At the conclusion of the hearings, the Superior Court made findings of fact and held that the Property had been "operated in a manner that demonstrates a pattern of neglect for a period of 30 consecutive days, and such neglect poses a serious threat to the health, safety, or security of the tenants." The Court also found that "the Respondents' abatement plan was insufficient to abate the conditions alleged in the petition." *See* Receivership Order attached hereto as Exhibit 5, at pg. 1.

[7] The Receivership Order vested the Receiver with "all powers and duties as conferred in D.C. Code § 42-3651.06." Receivership Order, ¶1. In addition, the Receivership Order prohibits any party from "doing any act or thing whatsoever to interfere with the Receiver . . . ." Receivership Order, ¶20.

§ 42-3651.06(a)(1). The Receiver also has "the power to collect all rents and payments for use and occupancy. D.C. Code § 42-3651.06(a)(3); *see also* Receivership Order, ¶8. The Receiver also "[a]ssume[s] all rights of the owner to enforce or avoid terms of a lease, mortgage, secured transactions, and other contracts related to the rental housing accommodation and its operations." D.C. Code § 42-3651.06(a)(7). If the Superior finds, "after notice and hearing, that the owner of the rental property currently lacks sufficient funds to pay for rehabilitation of the rental housing accommodation," it may "authorize" the Receiver to "[s]ell the property for a fair-market price to an owner capable of maintaining the property." *See* § 42-3651.06(j)(1)(B).

15. This continual disregard for the health, safety and welfare of the tenants also resulted in, among other things, the temporary relocation of tenants by the Receiver. On January 2, 2018 the Receiver filed his Initial Report, which made clear that the Debtor and its managers made no effort to abate the housing conditions, and on February 9, 2018, the Receiver filed a Supplemental Report (each attached hereto as Exhibit 6) recommending that, given the extent of the mold contamination at the Property, the tenants should be relocated to other buildings. On March 23, 2018, the Superior Court accepted and approved the Receiver's recommendation in part based upon the tenants' statement that they would be willing to move out of the Property under the "auspices of the [R]eceiver," ***not the Debtor or the Parkers***. *See* Exhibit 19 at 66. Ultimately, the tenants were relocated by the Receiver to units that the Receiver is responsible for renting for the tenants until the Property is remediated.[8] Both the Debtor and Ellis J. Parker were found personally liable for costs and expenses and were required to pay the differential for the temporary housing. That is, the tenants pay to the Receiver their rent as

[8] On February 12, 2019, the Receiver filed an Amended Relocation Budget. Exhibit 8. By Order of the Superior Court issued on May 30, 2019, attached hereto and made a part hereof as Exhibit 9, the Superior Court approved the Amended Relocation Budget and ordered the Debtor and Ellis J. Parker to pay $270,773.00 in relocation expenses and rent differentials.

required under D.C. law for the Property, and the Receiver who secured the temporary housing then uses the rent payments by the tenants for their leases at the Property, together with the funds required to be paid to the Receivership by the Debtor and Ellis J. Parker, to pay the costs and expenses for the relocated units.

16. As part of the Receivership Proceeding, the Receiver and the Debtor each were afforded the opportunity to propose to the Superior Court rehabilitation plans for the Property. The Court ultimately found that the Debtor's and SCF Management's proposed plan for rehabilitation was not sufficient to address the serious conditions at the Property and health threats those conditions posed. *See* Receivership Order. On March 30, 2018, the Superior Court issued a Consent Order adopting the Receiver's proposed plan (the "Receivership Plan") for the Property and ordering the Debtor to pay the Receiver $147,737.50 to begin the initial phase of renovating the Property, and a total of $1.875 million for the completion of the Receivership Plan by May 7, 2018 (a copy of the March 30, 2018 Order is attached hereto as Exhibit 7).

17. As set forth above, for years, the Debtor, Ellis J. Parker, and SCF Management knew of housing code violations and other serious issues at the Property impacting tenants. They were put on notice repeatedly by tenant complaints, lawsuits by the tenants and the Tenants' Association, testimony at court hearings, expert reports, inspections, and ultimately the lawsuit filed by the District that culminated in the Receivership Proceeding. The Debtor, Ellis J. Parker, and SCF Management knowingly and intentionally failed to make repairs, and left tenants to live in unsafe, unhealthy, and uninhabitable conditions.

### C. Receivership Funding and Ellis J. Parker's Personal Liability and Liability of SCF Management

18. Because the Debtor did not timely fund the Receivership Plan as ordered on March 30, 2018, the Superior Court conducted a show cause hearing on May 25, 2018, regarding

the funding of the receivership. At the hearing, the Superior Court adopted the District's proposed findings of fact and conclusions of law filed on February 9, 2018,[9] attached hereto as Exhibit 10 ("Findings of Individual Liability"), and found that Ellis J. Parker was the managing member of Debtor and had binding decision-making authority with respect to the decisions regarding whether the Debtor was complying with the District's housing code. The Court found that Parker's "refusal to provide or arrange for funds to repair the Property is a direct cause of the pattern of neglect that has led to the health, safety, and security issues at the Property." *Id* at ¶ 66. The Court based this finding in part on Ellis J. Parker's deposition testimony when he admitted he "absolutely" had the funds to repair the property but simply did not want to do it and referred to tenants as the "bloody tenants" for simply seeking to live in habitable apartments. The deposition transcript of Ellis J. Parker is attached hereto and made a part hereof as Exhibit 12. *See* Exhibit 12 at 105:25; 123:4-5. Accordingly, the Court concluded that Ellis J. Parker is personally liable under the TRA, and also found that Mr. Parker has personal liability under the CPPA, along with the Debtor and SCF Management.

19. On May 29, 2018, the Superior Court issued its Order, which Order stated that Ellis J. Parker is jointly and severally liable for payments due to the Receiver. *See* Exhibit 11. ("respondent Ellis J. Parker is jointly and severally liable for funding the Receiver's costs"). The Court ordered the Debtor and Ellis J. Parker to pay the Receiver $1.875 million by the close of business on June 8, 2018. On June 8, 2018, the Receiver received a wire transfer into his Receivership account for $1.875 million from Francis Hill Parker, the son of Ellis J. Parker. (A redacted copy of the wire transfer is attached hereto as Exhibit 13).

[9] *See* Exhibit 11 (Superior Court order "adopt[ing] and rely[ing] upon the proposed findings of facts and conclusions of law submitted by the District of Columbia on February 9, 2018").

20. In addition to the Debtor's liability, the Superior Court has found SCF Management liable for committing unlawful trade practices in violation of Sections 28-3904 (a), (d), (e), and (dd) of the CPPA. In so finding liability of the Debtor, Ellis J. Parker, and SCF Management, the Superior Court treated the District's Statement of Material Facts Not In Dispute, which had been filed with its Motion for Partial Summary Judgment as to Liability, as undisputed and incorporated by reference into the Superior Court's ruling.[10] (A copy of the September 19, 2019 Transcript of the hearing and the Court's rulings is attached hereto as Exhibit 14). Further, the Superior Court held that there was no genuine issue of material fact that CPPA violations had clearly occurred at the Property.[11] *Id.* at 51:19-59:1.

21. In granting the District's Motion, then Superior Court Judge, now District Court Judge, Florence Pan ("Judge Pan") found as follows, *inter alia*, as follows:

> What I view as the fraud or wrong in this case is leaving the LLC [the Debtor] so undercapitalized that real renovations, real work couldn't be done based on the capitalization of the LLC to address these housing code violations. And it seems to be that it was quite deliberate that there would be no capital reserve within the LLC to address these types of housing code violations and housing code concerns. And it seems to me that the course of this form of litigation was an attempt by the respondents [the Debtor, Ellis J. Parker and SCF Management] to avoid responsibility for making the required changes to bring the building up to code.

Exhibit 2 at 6, n. 4.

22. Judge Pan concluded by finding that:

> Defendants [the Debtor, Ellis J. Parker, and SCF Management] acted in bad faith when they refused to acknowledge or remediate the mold issues in the Building, despite receiving ample notice of the problem over an extended period, encompassing at least two years. Defendants [the Debtor, Ellis J. Parker, and SCF management] willfully misrepresented the conditions in the building by denying the obvious presence of mold, apparently because defendants sought to avoid their

[10] *See* Exhibit 14 ("9/19/19 Hr'g Tr.") at 51:19-59:1.

[11] *See* Exhibit 14 (9/19/19 Hr'g Tr.) at 56:6-57:1.

> obligation to remediate the mold. . . . Defendants' [the Debtor, Ellis J. Parker, and SCF Management] repeated, false denials about the mold infestation were misrepresentations that had severe consequences for plaintiffs, who were forced to live in contaminated units.

Exhibit 2 at 18 -19.

23. On August 26, 2021, Judge Pan rendered an oral ruling and granted the District's motion for a permanent injunction against the Debtor, SCF Management, and Ellis J. Parker. *See* August 26, 2021 transcript with excerpts attached hereto as Exhibit 15. Specifically, Judge Pan stated in relevant part as follows:

> And I have been supervising this case for a long time and so I am very familiar with the facts and the circumstances that underlie the District's request for permanent injunctive relief. . . . I'll start by saying that I think there have been egregious violations of the D.C. Consumer Protection Act and the D.C. Housing Code. And I think the record is replete with requests for repairs and complaints about conditions that simply went unaddressed. . . . We have a building that was neglected and housing code violations that were pervasive and continuous over a prolonged period of time that ultimately required the relocation of tenants to address the problems just to get them up to code. But we're talking about a period when all of that could have been prevented. We're talking about a period where the water problems could have been addressed in a timely way which would have prevented permeating the entire building into the joists of the building.

*Id.* at 26 - 28, 46.

24. On September 28, 2021, the Superior Court issued a written decision ordering permanent injunctive relief. *See* Exhibit 16 (the "Injunctive Order"). The provisions of the Injunctive Order were applied to, *inter alia*, the Debtor and its officers, agents, and affiliates. Ellis J. Parker and SCF Management, including Stanley C. Ford (of SCF Management) and his agents, employees, and assigns. Among other things, this order provided that "Defendants shall not make any statements that mislead consumers concerning their willingness and ability to supply consumers with housing in compliance with the District's housing laws at the Property"

and "Defendants Stanley C. Ford, Sr. and SCF Management LLC shall not engage in any property management or other activities in connection with the Property." *Id*. at pgs. 4, 7.

25. In reviewing of the history of this case, the record of the litigation ensuing over the past seven years demonstrates the Debtor's, SCF Management's, and Ellis J. Parker's deliberate indifference to the Property and its tenants' well being, which left the Property in shambles, requiring the Receiver to take over the Property and displace and relocate all tenants for several years, just to make repairs to bring the Property into compliance with the District's housing laws.

26. It is only because of the Receivership Proceeding that the tenants were finally afforded safe and habitable housing in compliance with District law while they wait for the Property to be remediated so that they can return to their homes. In particular, an order already has been entered, following a March 10, 2022 hearing in the Superior Court, providing for the Debtor and Ellis J. Parker to pay the remaining $2,410,821.70 in funding necessary for remediation and repairs of the Property, including a disbursement schedule from April 2022 to September 2022 (a copy of this April 20, 2022 order is attached hereto as Exhibit 17).

**D. Debtor's Bankruptcy Filing**

27. On March 31, 2022, Debtor filed its petition under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"). Along with its petition, the Debtor filed its Schedules. Docket Entry No. 1 (and Amended Schedules at Docket No. 11). The Tenants' Association, the tenants and the District are the only significant parties in interest in this case, and the Debtor has no secured lenders holding a mortgage on the Property. *Id*. The Debtor itself in its Schedules reflects that it believes the Property is worth $5 million. The non-insider debt is the judgments owed to the District, the Tenants' Association, and the tenants. *Id*.

28. The Debtor also indicated that it does not have any bank accounts. The Debtor further indicated that it did not have Property that "needs immediate attention," *see* pg. 3 of Schedules, and that it was not "a party in any judicial or administrative proceeding under environmental law," *see id.* at pg. 37, notwithstanding the District's proceeding and the Mold Litigation. Once again, this highlights the Debtor's indifference to the conditions at the Property and intentional refusal to address the conditions therein.

29. Notwithstanding that SCF Management has been found liable with the Debtor and Ellis J. Parker in the Superior Court action, and that the Injunction Order precludes them from engaging in "activities in connection with the Property," it is SCF Management's contractor that the Parkers asked to gain access to and to board up the Property from the Receiver following the filing of bankruptcy. At the 341 meeting, held on April 28, 2022, Francis Hill Parker testified that while the Debtor had listed a claim of $950,000 for a negligence cause of action against SCF Management on the Schedules, the Parkers still regularly use SCF Management as the management company for other properties that the Parkers own. *See* pg. 16 of Schedules. In addition, notably the bankruptcy Petition listed the SCF Management office address as the Debtor's "Principal place of business." *See* pg. 1. And the Schedules listed SCF Management as holding the Debtor's books, records, and financial statements. Schedules at pg. 38.

30. In addition, on the Schedules, the Debtor listed it had paid its proposed counsel a retainer, but after objections were filed with respect to the retention of counsel, McNamee Hosea filed a Supplemental Verified Statement [Docket No. 25], asserting that it was "paid a $35,000.00 retainer paid [sic] by the Debtor from funds lent to it by its principals." At the 341 meeting, there was a suggestion that the Debtor's principals may have borrowed those funds from a different LLC they own. Indeed, given the lack of clarity regarding the differing LLCs

owned by the Debtor's principals, and the alleged loans that the principals and/or these LLCs have provided to the Debtor, the Office for the United States Trustee is requiring the Debtor to provide a listing of these alleged loans and continued the 341 meeting.

31. One of these alleged transactions related to a sale of 811 Jefferson Street. According to the Schedules, the Debtor sold property in 2020 for $1.3 million. Francis Hill Parker stated at the 341 meeting, that, notwithstanding the ongoing litigation and Receivership, those proceeds were immediately taken by the Parkers and distributed to themselves — highlighting further the Parkers' undercapitalization of the Property. In addition, Francis Hill Parker has previously testified in 2018 "we have no bank accounts . . . its set up as a limited liability corporation." Tr. pg. 23 (excerpts attached hereto as Exhibit 18). Flouting the Superior Court case, Francis Hill Parker also testified in 2018, "Well, dad says the LLC has no money, its bankrupt. What the judge, she can't order me to pay something when there's no money. There's nothing that she can do." *Id.* at pg. 59. Discussing the arrangement whereby his father and stepmother received the profits from the various LLCs, and in response to the question of whether "any money was put in reserve for the property," Francis Hill Parker testified "No, ma'am. We were told not to do that." And in response to the question "why was that," the answer was "Because of this. But, seriously, we have been told that on all of the LLCs." Pgs. 71-72. Francis Hill Parker further acknowledged that any alleged loans to the Debtor were not created contemporaneously, but rather were prepared in case of a potential bankruptcy: "We did those because, and apparently if you are going to file for bankruptcy you are going to have to show when money was lent or ---" *Id.* at pg. 87; *see also* Exhibit 10, Findings of Individual Liability, ¶46-48. In other words, both the actions of the Parkers and their own statements evidence that any time there were profits they withdrew all of the funds, intentionally leaving the

Property without a bank account or other reserves. *See also* Findings of Individual Liability, ¶ 43-4.

## RELIEF REQUESTED

### I. Debtor's Chapter 11 Case Should Be Dismissed for Cause Because It Was Not Filed in Good Faith

32. Chapter 11 cases are "subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith, and the burden is on the bankruptcy petitioner to establish [good faith]." *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 118 (3d Cir. 2004)); *see also In re Franklin Mortg. & Inv. Co., Inc.*, 143 B.R. 295 (Bankr. D.D.C. 1992) (dismissing Chapter 11 case for cause under section 1112(b) of the Bankruptcy Code). Whether the good faith requirement has been satisfied is a "fact intensive inquiry" in which the court must examine "the totality of facts and circumstances" and determine where a "petition falls along the spectrum ranging from the clearly acceptable to the patently abusive." *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999); *see also Franklin Mortg.*, 143 B.R. at 299 ("[B]ad faith may be inferred from the surrounding circumstances. The court's evaluation of the debtor's motive in filing its petition is central to the determination of good faith."). Courts "focus[] on two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose . . . and (2) whether the petition is filed merely to obtain a tactical litigation advantage." *Integrated Telecom Express*, 384 F.3d at 119.

33. The factual record is replete with examples of the bad faith actions of the Debtor and its owners and, consistent with this general course of dealing, the instant Chapter 11 case bears all the hallmarks of a bad faith Chapter 11 filing. First, this Chapter 11 case lacks a valid bankruptcy purpose because the Debtor is plainly not in financial distress. The Debtor's own

Schedules admit that it is balance sheet solvent and otherwise financially healthy, with minimal non-insider debt other than judgments owed to the District, the Tenants' Association and the tenants. To the extent that such judgments are straining the Debtor, [the District and the Tenants' Association] submits that the Debtor's owners are more than capable of contributing, and indeed have been held individually liable as the Debtor's alter ego for abuse of the Debtor's corporate form. *See* Findings of Individual Liability. Moreover, should the Debtor seek to pursue a sale of the Property, including free and clear of the Tenant's leases as is the suspected ultimate goal, such a strategy is not a valid bankruptcy purpose because it would benefit only the Debtor's owners at the expense of its creditors (*i.e.*, the tenants), in addition to being yet another gross violation by the Debtor and its owners of the tenant's rights.

34. Second, the commencement of this Chapter 11 case represents an overt attempt by the Debtor and its owners to obtain a tactical litigation advantage over proceedings in the Superior Court, including with respect to the Receiver. This is not speculation, the Debtor has already filed a turnover motion seeking to wrest control of the funds already set aside for the Property from the Receiver in favor of the Debtor and its owners, who the Superior Court found to have committed egregious violations of the District's consumer protection and housing laws. To permit such a strategy to succeed would undermine the District's police and regulatory powers and countenance the Debtor and its owners long-standing bad faith and flagrant violations of the tenant's rights. This Court should reject such a result and should dismiss this Chapter 11 case for cause.

**A. <u>Debtor's Chapter 11 Case Lacks a Valid Bankruptcy Purpose</u>**

35. A debtor filing for Chapter 11 must demonstrate good faith by establishing that its Chapter 11 case serves a valid bankruptcy purpose. *See Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828-29 (9th Cir. 1994) ("The purpose of Chapter 11 reorganization is to assist

financially distressed business enterprises by providing them with breathing space in which to return to a viable state."); *In re Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir. 1985) ("[I]f there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its *raison d'etre* . . . ."). Put another way, the central inquiry is whether the filing "preserv[es] a going concern" or "maximiz[es] the values of the Debtor's estate." *15375 Mem'l Corp. v. Bepco, L.P. (In re 15375 Mem'l Corp.)*, 589 F.3d 605, 619 (3d Cir. 2009) (citing *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999)); *see also In re Rent-A-Wreck of Am., Inc.*, 580 B.R. 364, 383 (Bankr. D. Del. 2018) ("One of the purposes of chapter 11 is to 'maximize property *available to satisfy creditors*.' The good faith inquiry, therefore, is 'particularly sensitive' where the 'petition seeks to distribute value directly from a creditor to a company's shareholders.'") (emphasis in original) (quoting *Integrated Telecom Express*, 384 F.3d at 129).

36. A Chapter 11 filing, therefore, is ordinarily not justified in the context of a solvent and financially healthy company because there is generally no bankruptcy purpose to be accomplished. *See SGL Carbon*, 200 F.3d at 166 ("[C]ourts have recognized that if a petitioner has no need to rehabilitate or reorganize, its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed."); *Furness v. Lilienfield*, 35 B.R. 1006, 1013 (D. Md. 1983) ("Chapter 11 was designed to give those teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liabilities.").

37. Even a company with significant debts may be found to be proceeding in bad faith in filing bankruptcy, however, if it cannot identify how taking that drastic step will add to or preserve value for the estate that would not otherwise be available to creditors outside

bankruptcy. In *15375 Mem'l*, for instance, the Third Circuit Court of Appeals rejected the debtor's proffered justifications for its filing as they were all benefits that could equally have been achieved outside bankruptcy and without incurring the added burdens of a bankruptcy filing. 589 F.3d at 620-25. The Third Circuit therefore concluded that the debtor's Chapter 11 case was commenced in bad faith as an attempt to obtain a tactical advantage over its creditors. *Id.* Thus, where a company that is fully capable of meeting its obligations does choose to file bankruptcy and incur those additional—and unnecessary—costs and burdens, there is a strong presumption that it is doing so in order to try to obtain some form of impermissible tactical litigation advantage.[12]

38. Such a strategy is the quintessential form of bad faith filing. *See 15375 Mem'l*, 589 F.3d at 625 ("[F]iling a Chapter 11 petition merely to obtain tactical litigation advantages is not within the legitimate scope of the bankruptcy laws"); *see also United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.* (*In re Timbers of Inwood Forest Assocs., Ltd.*), 808 F.2d 363, 373 (5th Cir.1987) (en banc), *aff'd*, 484 U.S. 365 (1988) (observing that if a Chapter 11 plan does not have a rehabilitative purpose, the "statutory provisions designed to accomplish the reorganizational objectives become destructive of the legitimate rights and interests of creditors"); *In re Little Creek Dev. Co.,* 779 F.2d 1068, 1072 (5th Cir. 1986) (explaining that benefits of Chapter 11 should only be given to debtors with "clean hands"); *see also* 7 Collier on

[12] While there may be unique factors that can justify a filing by a debtor that, at first glance, seems to be able to satisfy its debts as they come due, such cases are unusual. For instance, an extraordinarily large judgment might compel a need for temporary bankruptcy relief even if the debtor is otherwise capable of paying its bills, as was the case with Texaco, which faced a $12 billion judgment that exceeded its capacity to obtain appeal bond funding. *In re Texaco, Inc.*, 76 B.R. 322, 324-25 (Bankr. S.D.N.Y. 1987). Absent such unusual facts, however, when a financially stable debtor seeks to utilize bankruptcy, it is reasonable to assume that it is not just trying to maintain the status quo, but rather to gain advantages over its creditors not contemplated by the Bankruptcy Code.

Bankruptcy at 1112–22 (stating that dismissal is appropriate when costs of Chapter 11 are not justified).

39. Accordingly, courts regularly dismiss bankruptcy cases filed by financially healthy companies that have no real need to avail themselves of the protections and associated costs of Chapter 11. *See SGL Carbon*, 200 F.3d at 166 ("Courts, therefore, have consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11."); *Furness*, 35 B.R. at 1011-13 ("There must be real debt and real creditors; otherwise the basic purposes of Chapter 11 would be thwarted"). A debtor need not wait until it is the last throes of its operational survival, but that does not open the door to premature filing where there are no current reorganizational needs. *See In re Coastal Cable T.V., Inc.,* 709 F.2d 762, 764 (1st Cir. 1983) ("One [basic bankruptcy] principle is that a person in bankruptcy, while not necessarily insolvent, see 11 U.S.C. § 109, must at least owe debts.").

40. The Debtor in the instant case is clearly solvent and not in financial distress. The Debtor's Schedules demonstrate that the Debtor is balance sheet solvent and carrying little debt, other than insider debt and partially liquidated judgments owed to the District, the Tenants' Association and the tenants. The Debtor, through the Receiver, also had $486,470.16 in cash on hand as of January 31, 2022. Moreover, while we understand the Debtor has said it will be filing motion for authority to incur debt, it is notable that the Debtor has not, to date, filed any motion seeking financing in this Chapter 11 case to fund either operational costs or the fees of professionals the Debtor is seeking to retain.

41. The Superior Court has also held the Debtor's owners jointly and severally liable with the Debtor for damages associated with the Property. *See* Findings of Individual Liability.

The Superior Court recognized that the Debtor is the alter ego[13] of the Debtor's owners who are, in their own words, "very wealthy." (The deposition transcript of Ellis J. Parker is attached hereto and made a part hereof as Exhibit 12). Indeed, as discussed above with respect to the retainer to the Debtor's counsel, the Debtor's owners appear to be funding the Debtor's Chapter 11 professionals on its behalf. These facts demonstrate that the Debtor is not in financial distress and is further evidence of the Debtor and its owner's bad faith.[14] Moreover, to the extent the Debtor was to argue to the contrary and suggest the Debtor is in financial distress, the evidence makes clear that such financial distress is of its own making. The Parkers intentionally depleted the funds from the Debtor and left it undercapitalized.

42. Upon information and belief, the Debtor's true goal in this Chapter 11 case is to consummate a sale of the Property free and clear of the Tenant's leases, with the vast majority of proceeds going solely to the Debtor's owners in light of the Debtor's paucity of real debt.[15] Such an overt attempt to transfer value from a creditor to a debtor's owners cannot be countenanced and is not a valid bankruptcy purpose, and would represent a manifestly unjust conclusion to this

---

[13] The District Court judge summarized the Debtor's owner's malfeasance as follows:

> What I view as the fraud or wrong in this case is leaving the LLC so undercapitalized that real renovations, real work couldn't be done based on the capitalization of the LLC to address these housing code violations. And it seems to be that it was quite deliberate that there would be no capital reserve within the LLC to address these types of housing code violations and housing code concerns. And it seems to me that the course of this form of litigation was an attempt by the respondents to avoid responsibility for making the required changes to bring the building up to code.

*See* Exhibit 2, Superior Court of the District of Columbia Order, pg. 6, n.4.

[14] In addition, at the 341 meeting held on April 28, 2022, Francis Hill Parker, one of the principals and managing members of the Debtor, testified that the principals (himself, his father and his brother) regularly "lent money" to the Debtor to cover any expenses incurred by the Debtor, which further evidences that there is no true lack of assets available to the Debtor in this case.

[15] On April 11, 2022, the Debtor filed the *Application for Approval of Employment of Carol Blumenthal and Blumenthal, Cordone & Erklauer PLLC as Special Counsel to the Debtor* [Docket No. 16], in which the Debtor states that it requires special counsel to assist with, among other things, "[c]ounseling in regards to lease negotiations, including termination of leases."

matter for the tenants, who the Debtor has already wronged greatly. If the Debtor were not attempting to sell "free and clear" of the leases there is simply no reason why the sale of the Property could not proceed outside of bankruptcy. The court's decision to dismiss the Chapter 11 case in *Rent-A-Wreck* is squarely on point here, where a financially healthy debtor sought to use the Chapter 11 process to reject an executory contract purely for the benefit of the Debtor's owner. 580 B.R. 364.[16] The bad faith on display in the case is even more apparent here, and this Court should therefore dismiss the Debtor's Chapter 11 case for cause.

### B. <u>Debtors' Chapter 11 Case Was Filed to Obtain a Tactical Litigation Advantage</u>

43. Dismissal of a Chapter 11 case for lack of good faith is warranted where "the purpose of the petition [is] not primarily to reorganize or respond to financial crisis but instead [is] to gain unfair advantage" in litigation. *In re Antelope Techs.*, Inc., 431 F. App'x. 272, 275 (5th Cir. 2011) (affirming dismissal of petition that was "filed to gain an advantage in . . . shareholder litigation rather than for reorganization"). Numerous courts have recognized that "it constitutes bad faith to file bankruptcy to impede, delay, forum shop, or obtain a tactical advantage regarding litigation ongoing in nonbankruptcy forum—whether that nonbankruptcy forum is a state court or a federal district court." *In re Silberkaus*, 253 B.R. 890, 905 (Bank.

---

[16] The court characterized the case as follows:

> "Here, Debtors' purpose in filing these cases is nothing more than a straightforward attempt to take value that belongs to [franchisee] and give it to [affiliate]. The filing of the petition does not create (or preserve) value that is lost outside of bankruptcy. It is true that the value of the Los Angeles territory cannot be exploited by Debtors outside of bankruptcy, but the value of the Los Angeles territory (and, thus, the Rent–A–Wreck trademark) exists to be exploited by [franchisee]. In filing the bankruptcy petitions to reject [franchisee's] franchise agreement, Debtors seek to redistribute the value of exploiting the trademark in the Los Angeles territory from [franchisee] to [affiliate]. Given Debtors' solvency and the paucity of unaffiliated debt, the primary, if not sole, beneficiaries of that value would be [parent] and [parent's owner], not the creditors of these estates."

*Id.* at 383.

C.D. Cal. 2000) (collecting cases), *aff'd*, 336 F.3d 864 (9th Cir. 2003). Courts have further recognized that the timing of a debtor's petition and related circumstances may provide important context as to whether a Chapter 11 case has been commenced as a litigation tactic. *See In re HBA East, Inc.*, 87 B.R. 248, 259-60 (Bankr. E.D.N.Y. 1988) (Where "the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith.").

44. At the same time, it is clear that "a bankruptcy case filed for the purpose of avoiding a regulatory scheme is not filed in good faith and should be dismissed." *See In re NRA of Am.*, 682 B.R. 262, 277-78, 280-82 (Bankr. N.D. Tex. 2021) (dismissing case that the NRA concededly filed in response to regulatory actions by New York Attorney General seeking its dissolution; debtor had no financial need to file bankruptcy but saw case as way to obtain a "fair, level playing field;" court held that using bankruptcy to take that remedy off the table was an attempt to obtain unfair litigation advantage); s*ee also Sunshine Grp., LLC v. City of Dana Point (In re Sunshine Grp., LLC)*, 2020 WL 1846940, **6-9 (9th Cir. BAP Apr. 10, 2020) (holding that filing bankruptcy as a way to avoid state court rulings on scope of receivership to abate health and safety issues was abusive litigation tactic); *In re Forest Hill Funeral Home & Mem'l Park-East, LLC*, 364 B.R. 808, 822-23 (Bankr. E.D. Okla. 2007) (finding cause for dismissal under section 1112(b) because the case was not filed in good faith for several reasons, including that it was filed to evade the regulatory authority of the state of Tennessee); *In re First Plus Fin. Enters., Inc.*, 99 B.R. 751, 755-56 (Bankr. W.D. Tex. 1989) (case dismissed under section 1112(b) where "the obvious purpose in this case is to use the

Chapter 11 filing as a litigation strategy and leverage in order to defeat the Texas regulatory scheme for the receivership and conservatorship of insolvent life insurance companies").

45. In addition to the "good faith" considerations noted above, it should be noted that several statutory provisions make explicitly clear that Congress intends to allow police and regulatory authorities to exercise their statutory obligations unhampered by bankruptcy proceedings to the greatest extent possible while still implementing the reorganizational goals of the Bankruptcy Code. These provisions begin with section 362(b)(4) of the Bankruptcy Code, which excepts from the automatic stay:

> the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power.

46. That language is itself an expansion the original pre-1994 language, which initially only excepted such actions from the protections in sections 362(a)(1) and (2). Section 362(b)(1) provides even broader protection for criminal actions brought against a debtor. Consequently, while a case is pending, a governmental unit is authorized to continue all of its investigatory and enforcement activities up to and including obtaining and enforcing a final judgment, with the sole exception being that the government may not enforce a monetary judgment outside the overall process of the allocation of the estate. *See Halo Wireless, Inc. v. Alenco Commc'ns Inc.* (*In re Halo Wireless, Inc.*), 684 F.3d 581, 587-88 (5th Cir. 2012) (Section 362(b)(4) assists in discouraging debtors from submitting bankruptcy petitions for the

purpose of evading impending governmental efforts to enjoin or deter ongoing debtor conduct that would threaten the public safety and welfare)).[17]

47. Additionally, 28 U.S.C. § 959(b) requires a debtor in possession to "manage and operate" its property "according to the valid requirements of the valid laws of the State . . . in the same manner that the owner or possessor would be bound to do," and 28 U.S.C. § 1452(a) allows for the removal of any cause of action to the bankruptcy court except for, among other things, a "civil action by a governmental unit to enforce such governmental unit's police or regulatory power."

48. The addition of those jurisdictional provisions underscore that not only are governmental units free to continue their police and regulatory actions, despite a bankruptcy filing, but that they are also entitled to continue those actions in the designated forum and subject to their own procedural mechanisms and that a debtor is not expected to be allowed to force such matters into the bankruptcy forum, even if the debtor might prefer that environment. As a result, where a debtor seeks to use bankruptcy to interfere with those protections and to try to demand the ability to force a governmental unit into another forum on its own timetable, it is not acting in accordance with the goals and policies that Congress has created; it is acting in direct defiance of them.

49. In commencing the instant Chapter 11 case, the Debtor is seeking to obtain an inappropriate tactical litigation advantage by undermining the District's regulatory scheme that it has been enforcing through Superior Court proceedings dating back for over half a decade. To that end, the Debtor has already filed the *Motion for Turnover of Funds and Records from State*

[17] Moreover, under section 1141(d)(6), if that police and regulatory action deals with a fraud debt owed to the governmental unit, even a corporation may not discharge it. But, under section 1192, a small business debtor that qualifies for treatment under Subchapter V may be entitled to a broader discharge.

*Ordered Receiver Pursuant to 11 U.S.C. § 543* [Docket No. 9], which would wrest control of funds held by the Receiver for the Property from the Receiver and vitiate numerous orders of the Superior Court designed to remedy the Debtor and its owner's gross health and safety violations. By way of background, the statutory mandate for the Receiver to manage and control the Property is quite broad, as the Receivership Appointment Order and Injunction Order issued by the Superior Court vest the Receiver with "all powers and authorities conferred in D.C. Code Section 42-3651.06." The Debtor's Chapter 11 strategy even goes beyond this, however, as noted above. This court should reject the Debtor and its owners attempt to shirk responsibility and should dismiss this case for cause.

50. Moreover, what is clear is that the bankruptcy filing is an attempt to subvert the liability of the Parkers. The Parkers have left the Debtor undercapitalized, after taking money out of the company whenever it was available, and are trying to use the bankruptcy to stop the Receivership Proceeding to benefit Ellis J. Parker, as he is also personally liable if the Receivership Proceeding continues. This begs the obvious question - why is the Debtor in bankruptcy and Ellis J. Parker is not? And if Ellis J. Parker has not filed bankruptcy, he can pay the fees and expenses ordered to rehabilitate the Property and there is no basis or justification for the bankruptcy. Ellis J. Parker did everything he could in the Receivership Proceeding to attempt to not have to disclose his finances — the filing of the bankruptcy is more of the same; it was filed as a tactical attempt to shield Ellis J. Parker personally. *In re Cedar Short Resort, Inc.*, 235 F.3d 375, 379 (8th Cir. 2000); *see also In re Rognstad*, 121 B.R. 45, 50 (Bankr. D.Hawaii 1990) ("Congress has never intended that bankruptcy be a refuge for the irresponsible, unscrupulous or cunning individual."); *see also In re Davis Heritage GP Holdings, LLC*, 443 B.R. 448, 462 (Bankr. N.D. Fla. 2011) ("Chapter 11 was not designed for the purpose of

protecting assets and interests of non-debtor parties under the guise of a legitimate plan of reorganization.").

## II. Under Section 305 of the Bankruptcy Code, The Court Should Abstain From Hearing This Case and Grant the Motion to Dismiss

51. Alternatively, the Court should exercise its discretion to abstain from exercising its jurisdiction over this matter. Federal Court abstention from hearing cases which are pending in State Court is well accepted. Abstention recognizes that the United States operates on the basis of Federalism, that the Federal and state governments have overlapping powers and jurisdictions, and that it is important that each constituent part work to avoid needless and inefficient conflicts. It is based on the notion of comity and a respect for state functions, and a belief that our Federal system works best if the States are able to perform their functions in their own way without collisions of authority.

52. Here, the Court should grant the Motion to Dismiss under section 305 of the Bankruptcy Code, which provides that the court "may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if … the interest of creditors and the debtor would be better served by such dismissal or suspension[.]" *See In re First Plus Fin. Enters., Inc.*, 99 B.R. 751, 755 (Bankr. W.D. Tex. 1989) (abstention warranted where purpose was to do indirectly what debtor could not do directly; *i.e.*, to defeat the imposition of regulatory receivership and conservatorship of assets of a subsidiary that was itself ineligible for bankruptcy). The legislative history recognizes "that there are cases in which it would be appropriate for the court to decline jurisdiction." *Id.* at 754 (internal citations omitted). This is such a case.

53. Courts that consider abstention typically look towards seven factors: "(1) economy and efficiency of administration; (2) whether another forum is available to protect the

interests of both parties or there is already a pending proceeding in a state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving the equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought." *In re Korean Radio Broad., Inc.*, No. 19-46322-ESS, 2020 WL 2047990, at *7 (Bankr. E.D.N.Y. Mar. 31, 2020). "In addition, if the bankruptcy court is being used as a forum to resolve what is essentially a two-party dispute, this factor may also be considered in deciding whether to apply § 305(a)." *In re Argus Grp. 1700, Inc.*, 206 B.R. 737, 755 (Bankr. E.D. Pa. 1996), *aff'd sub nom. Argus Grp. 1700, Inc. v. Steinman*, 206 B.R. 757 (E.D. Pa. 1997).

54. These are simply factors, that do not carry equal weight. Therefore, the decision "must be made on a case-by-case basis." *In re Skymark Properties II, LLC*, 597 B.R. 391, 398 (Bankr. E.D. Mich. 2019) ("The decision to dismiss under § 305 is discretionary[.]"); *see also Matter of Fitzgerald Group*, 38 B.R. 16, 17 (Bankr. S.D.N.Y. 1983).

**A. <u>Abstention Serves the Interests of Economy and Efficiency</u>**

55. In deciding whether to dismiss a petition under section 305(a), "efficiency and economy of administration are primary considerations." *In re Michael S. Starbuck, Inc.*, 14 B.R. 134, 135 (Bankr. S.D.N.Y. 1981); *see also In re Century/ML Cable Venture*, 294 B.R. 9, 38 (Bankr. S.D.N.Y 2003) ("Of these, at least in this district, the first is a primary consideration."). Relevant for our purposes, where there is a receiver appointed by a state court, "courts have considered the length of the time that the receiver has acted under a receivership order, what the

receiver has done, and the impact of these considerations on the other relevant factors." *In re Skymark Properties II*, 597 B.R. at 399-400.

56. Where, as here, state court receivership proceedings have been pending for years, efficiency concerns weigh in favor of section 305 dismissal. *See In re Sun World Broadcasters, Inc*., 5 B.R. 719, 721 (Bankr. M.D. Fla. 1980) (dismissing case where state-court receivership had been pending for four years because it was "too late in the game to switch playing fields."). It should therefore come to no surprise that courts have dismissed bankruptcy cases where a state-court receiver had already been appointed to manage an asset or property, particularly where the receivership has been in place for a prolonged period of time. *See, e.g., In re O'Neil Vill. Pers. Care Corp.*, 88 B.R. 76, 80 (Bankr. W.D. Pa. 1988) (dismissal where "case is already under the control of the receiver, appointed and monitored by the learned state court judges"); *In re Starlite Houseboats, Inc.*, 426 B.R. 375, 389 (Bankr. D. Kan. 2010) (dismissing the bankruptcy case under §305(a)(1) where a "state court receivership had been pending for approximately eight months when [the bankruptcy] case was filed," and the court finding that "the interests of creditors and the [d]ebtor would be served by the dismissal of the case" because "continuation of the state court receivership proceeding, which [was] well underway, [was] preferable to starting anew in [the bankruptcy] court"); *In re Michael S. Starbuck, Inc.*, 14 B.R. at 135 (dismissing involuntary Chapter 11 case under section 305(a)(1) where a receivership had been operating for approximately 14 months).

57. Moreover, here, the Receiver, under the supervision of the Superior Court obtains the rental income from the tenants to allow the displaced tenants to live in acceptable housing and to pay for the Superior Court-ordered rehabilitation of their residential apartment building. *In re Skymark Properties II*, 597 B.R. 391 (Bankr. E.D. Mich. 2019), is persuasive in this regard.

There, the court found significant that the debtor's tenants "strongly oppose[d]" the debtor being restored to control and management of the properties. *Id.* at 401. The court also found relevant that one of the tenants had so strongly opposed the debtor's management that the tenant filed a case which led to the appointment of the receiver. *Id.* So too here. All of the tenants filed an action challenging the conditions in the building, which they won and which eventually led to the Attorney General seeking and obtaining the appointment of the Receiver. The tenants also support the work of the Receiver and oppose the petition. As in *Skymark*, the Court should permit the Receiver to continue the work that he is doing under the Superior Court's close supervision.

58. And similar to *In re O'Neil Village Personal Care Corp*., 88 B.R. 76 (Bankr. W.D. Pa. 1988), this Court cannot allow the Debtor to manage the Property for all the reasons set forth above. In deciding to dismiss, the Bankruptcy Court there commented: "[W]e have a state court-appointed receiver who is supervising the operation and management of the Debtor. . . . It is clear from the testimony that this Court could not and would not return management of the debtor-in-possession to its principals" and thus the court decided it would "not interfere with what appears to be a very workable situation." *Id.* at 80.

59. This reasoning applies with equal force here. The Debtor and its current management have shown they are both incapable and unwilling to address the health and safety issues at the Property. Notably, the appointment of the Receiver was ordered by the Superior Court specifically after it found that management was knowingly not addressing the health and safety issues at the building. For illustrative examples of this, one just has to review the Findings of Individual Liability and Injunction Order (attached as Exhibits 10).

60. Likewise, in *In re* RHA *Stroud, Inc.*, the court also found dismissal under section 305 was warranted where a receiver had already been selected by the state court, there were state law issues to be determined, and the state court action could oversee these issues. *See In re RHA Stroud, Inc.*, No. 20-13482-SAH, 2020 WL 7787034, at *18-19 (Bankr. W.D. Okla. Dec. 30, 2020). There can be no ambiguity that the Debtor has already both admitted an unwillingness to protect the tenants' interests and been found to be incapable. Indeed, at his deposition, Mr. Hill Parker testified that he "absolutely" had the funds to repair the property but simply did not want to do it and referred to tenants as the "bloody tenants" for simply seeking to live in habitable apartments. *See* Exhibit 12 at 105:25. The Debtor's principals cannot wrestle back control of the Property through the instant bankruptcy filing: the Debtor is "not entitled to have the Bankruptcy Court hear [its] complaints merely because [it is] disgruntled with the process in the State Court." *See In re RHA Stroud, Inc.*, 2020 WL 7787034, at *19 (citation omitted).

### B. Whether Another Forum Is Available, Whether Federal Proceedings Are Necessary, and Whether There Is An Alternative Means of Achieving The Equitable Distribution of Assets

61. Courts have grouped the analysis of the second, third, fourth, fifth, and sixth factors, "because they touch upon the availability of an alternate forum to efficiently achieve an equitable distribution." *In re Newbury Operating LLC*, No. 20-12976-JLG, 2021 WL 1157977, at *11 (Bankr. S.D.N.Y. Mar. 25, 2021). Here, the appropriate relief may be sought in Superior Court, where seven years of litigation have already ensued and to which the Receiver must report to this day. When the only asset in question is Debtor's single asset property, and the Receivership court has already set forth a remediation plan for the Property, the Property can be remediated pursuant to the plan that has been approved and accomplish the very goals of this Chapter 11 filing. If the Debtor wishes to sell the Property, it can also do that under the guidance of the Superior Court and Receivership Proceeding. *See* Tenant Receivership Act, § 42-

3651.06(j)(1)(B) (stating the Superior Court may "authorize" the Receiver to "[s]ell the property for a fair-market price to an owner capable of maintaining the property").

62. In other words, the federal bankruptcy proceeding is unnecessary. The Superior Court has the means, after providing notice and holding a hearing, to authorize the equitable distribution of assets by overseeing the sale of the Property. *See In re Newbury Operating LLC*, 2021 WL 1157977, at *11 ("A suitable alternate forum will be deemed to exist if in that forum 'there are pending arrangements that will equitably satisfy the creditors and not be unduly burdensome or prejudicial to the debtor, so that continuation of the bankruptcy proceeding will be 'duplicitous and uneconomical.'" (quoting *In re Navient Solutions*, LLC, Case No. 21-10249, 2021 WL 857114, at *14 (Bankr. S.D.N.Y. March 8, 2021)).

63. The interest of the creditors would also be better served by dismissal. *See In re First Plus Fin. Enters., Inc.*, 99 B.R. at 755. Here, the Receiver was directed and empowered by the Superior Court's Order to remediate the Property and effectuate the District's goal of protecting the public health, safety, and welfare. However, given the instant filing, remediation efforts have halted, the Property must be boarded up, and it essentially sits abandoned. The displaced tenants cannot return to the Property. The bankruptcy has only served to delay the remediation of the Property, which just furthers the goal that the Debtor has been trying for years and was finally enjoined from doing by the Superior Court.

**C. <u>Purpose of the Bankruptcy Proceeding</u>**

64. As for the seventh and final factor, the Debtor filed for bankruptcy as a litigation tactic. As noted above, the Debtor filed its Chapter 11 in bad faith solely to avoid or delay the Receiver's remediation efforts and underlying enforcement action by the District. As a result, the purpose for which the bankruptcy was filed is an improper attempt to gain a tactical advantage over the already long-pending receivership proceeding (which was filed to protect the

tenants) and an improper attempt to evade the District's laws regarding safe and habitable housing for the tenants. This has the effect of improperly interfering with the District's regulatory processes.

65. Here, the current Property is uninhabitable, and thus the tenants are currently residing in temporary, alternative housing while they wait for the Property to be remediated, so that they can move back to their homes. Under the Superior Court's relocation order, the Receiver is directed to pay for the tenant's rent differential from funds that the Debtor and Ellis Parker were ordered to pay the Receiver. *See* Exhibit 9 (ordering "Respondents to pay the Receiver $270,773.00 to fund relocation expenses and rent differentials"). The Superior Court has also already approved the Receiver's remediation plan for the Property, as well as entered an order providing for the requisite funding for such plan. *Id.*

66. It is therefore plain that the Debtor's intent and goal of the bankruptcy is to frustrate the Receiver from accomplishing this mission, and the Court should not allow or sanction such behavior. *See In re First Financial Enterprise, Inc.*, 99 B.R. 751, 755 (Bankr. W.D. Tex. 1989) (bankruptcy court, under section 305 abstained from retaining jurisdiction where the debtor's and sole shareholder's obvious purpose in filing for Chapter 11 protection was an attempt to halt a state court receivership and conservatorship).

67. Under like circumstances, courts do not hesitate to dismiss and abstain where the obvious purpose of the Chapter 11 case is to interfere with state court proceedings or regulatory process. *See, e.g.*, *In re Sunshine Grp*., LLC, No. 2:19-BK-12760-ER, 2020 WL 1846940, at *7 (B.A.P. 9th Cir. Apr. 10, 2020) (unpublished) (". . . Debtor filed the case as a litigation tactic to avoid the state court rulings."); *Matter of Win-Sum Sports, Inc.*, 14 B.R. 389, 394 (Bankr. D. Conn. 1981) (dismissing action under section 305 where debtor was "seeking to use the

bankruptcy court as an alternate approach to state court procedures to resolve intra-company" dispute); *In re Silver Spring Ctr.*, 177 B.R. 759, 760 (Bankr. D.R.I. 1995) ("Because the Debtor thinks it would be happier in the Bankruptcy Court, does not entitle it to be here.").

68. Finally, dismissal under section 305 is also warranted where the case is essentially a two-party dispute where adequate state court remedies are already available outside the bankruptcy context. This factor alone strongly militates in favor of dismissing this case under Section 305(a)(1). *See In re Macke Intern. Trade, Inc.*, 370 B.R. 236, 247 (B.A.P. 9th Cir. 2007) (focusing on the totality of the circumstances and finding that the fact that the bankruptcy was essentially a two-party dispute supporting dismissal); *In re Spade*, 258 B.R. 221, 229 (Bankr. D. Colo. 2001) (dismissing the case and recognizing it was "little more than a two-party" dispute between the creditor and debtor).

69. At bottom, the instant case is just "the most recent 'battlefield,' and the bankruptcy court the current venue, in a long-running, two-party dispute." *In re Korean Radio Broad., Inc.*, 2020 WL 2047990, at *8. On one hand, we have the District and the tenant advocates working to provide safe and habitable housing to the tenants (*i.e.*, to compel the property owner to ameliorate numerous violations of District law), and, on the other, the Debtor and its owners seeking to evade their responsibility to do so at every turn. There is no secured party or other significant creditors: the only significant creditors are the tenants and the District, also weighing in favor of dismissal. *See In re Sunshine Grp., LLC*, 2020 WL 1846940, at *4 (affirming dismissal based, *inter alia*, on finding that bankruptcy case was really a "two-party dispute over the competing plans to rehabilitate the Property [after finding of building code violations] which had already been the subject of significant argument before the state court.").

70. The abstention doctrine established by the Supreme Court in *Younger v. Harris*, 401 U.S. 37 (1971) and its progeny further support a decision by this Court to exercise abstention under Section 305. In *Younger,* the Supreme Court held that to promote comity between federal and state courts, federal courts must abstain from deciding a case to avoid interference with state court proceedings. *Id.* at 44-45. The doctrine applies in the context of bankruptcy proceedings. *See, e.g., Superior Court v. Heincy*, 858 F.2d 548, 549 (9th Cir. 1988).

71. While it was originally applicable to state criminal cases, the doctrine has been extended to three categories of cases: "(1) parallel, pending state criminal proceedings, (2) state civil proceedings that are akin to criminal prosecutions, and (3) state civil proceedings that implicate a State's interest in enforcing the orders and judgments of its courts." *Herrera v. City of Palmdale,* 918 F.3d 1037, 1043 (9th Cir. 2019).

72. As a threshold issue, application of the *Younger* doctrine is permissible here because the Superior Court action is a civil enforcement proceeding brought by a state Attorney General. It therefore falls squarely within the second category of cases for *Younger* abstention. In *Sprint Communications, Inc. v. Jacobs,* 571 U.S. 69, 70 (2013) (citations omitted), the Court explained:

> Our decisions applying *Younger* to instances of civil enforcement have generally concerned state proceedings "akin to a criminal prosecution" in "important respects"…. Such enforcement actions are characteristically initiated to sanction the federal plaintiff, i.e., the party challenging the state action, for some wrongful act… In cases of this genre, a state actor is routinely a party to the state proceeding and often initiates the action…. Investigations are commonly involved, often culminating in the filing of a formal complaint or charges.

*73.* It is well accepted that civil enforcement matters brought by a state Attorney General to enforce state consumer protection laws are civil proceedings appropriate for *Younger* abstention. *Cedar Rapids Cellular Telephone L.P. v. Miller*, 280 F.3d 874 (8th Cir. 2002);

*Monster Beverage Corp. v. Herrera*, No. ED-CV-1300786-VAP-OPX, 2013 WL 2131740 (C.D. Cal. Dec 16, 2013) *aff'd*, 650 Fed Appx. 344 (9th Cir. 2016); *Backpage.com, LLC v. Hawley*, No. 4:17-CV-1951 PLC, 2017 WL 726868 (E.D. Mo. Nov 28, 2017).

74. Like these cases, the District's case is a fundamental law enforcement matter. The District is invoking its right and obligation under housing and consumer protection laws to protect consumers, including the tenants in Debtor's building, from pervasive and egregious housing conditions and unfair and deceptive practices that endanger the health and safety of DC residents. The District exercises discretion in bringing cases and brought this particular case not only because of significant consumer protection concerns, but also because, after investigation by DC housing inspectors, serious and longstanding housing code violations were found in the Property. Thus, there was substantial potential harm that could be done to the building tenants.

75. As to whether abstention is warranted, under *Younger* and its progeny, three conditions must be met. Namely, the state civil action must (1) be ongoing; (2) implicate important state interests; and (3) provide an adequate opportunity to raise constitutional challenges. *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 32 (1982).

76. First, there is no dispute that the state proceeding is ongoing. The Debtor remains subject to the control by the Receiver of the Property. To this day, the Receiver continues to submit reports to the court on his activities. The Superior Court, as recently as March 10, 2022, entered an order granting the Receivership payment of fees and out-of-pocket expenses related to the Property for the period of August 15, 2021 to February 28, 2022. *See* Exhibit 17 (Order Granting Receiver's Seventeenth Motion for Payment of Fees and Out-of-Pocket Expenses (Mar. 10, 2022)).

77. Second, the Receivership proceeding implicates important District interests. The Superior Court's action has been necessary to protect the tenants against unhealthful and illegal housing conditions as well as unfair and deceptive trade practices. Among other things, the Attorney General charged, and the Superior Court found, that the Debtor was aware of the illegal conditions in the apartment building and not only failed to abate those conditions for months, if not years, but lied to the tenants about the building's conditions, knowingly making false statements that the conditions were safe and lawful. The Superior Court found that the Debtor knowingly and intentionally minimized, marginalized and suppressed providing truthful information to the tenants. By not disclosing the illegal housing conditions to the tenants, the Debtor and its principals put the tenants and people who visited them in their apartments at risk of serious illness.

78. For purposes of the *Younger* analysis, it is important to highlight the overwhelming interest of the state in assuring the public health and safety particularly when it comes to their living space. "The interest in public health and safety…is most powerfully extant in the context of residential leases[.]" *Saravia v. 1736 18th Street., N.W. Ltd. P'ship,* 844 F.2d 823, 826 (D.C. Cir. 1988). "It is well-established that "[i]t is a traditional exercise of the States' police powers to protect the health and safety of their citizens" *Tinius v. Choi*, No. CV21-0907 (ABJ), 2022 WL 899238, at *10 (D.D.C. Mar. 2, 2022) (internal quotes and citation omitted); *Fox v. D.C.*, 851 F. Supp. 2d 20, 31 (D.D.C 2012) ("[T]he District has a general police power, which gives it the authority to enact measures to protect the health, safety, welfare, and morals of the community".). On this issue, the Supreme Court has said:

> Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens. Because these are primarily, and historically,…matters of local concern, the States traditionally have had great latitude under their police powers to legislate as

> to the protection pf the lives, limbs, health, comfort, and quiet of all persons."
>
> *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 475 (1996) (internal quotation marks omitted).

79. In addition, the State's interest in protecting consumers/tenants from unfair and deceptive trade practices cannot be overstated. *See Communications Telesystems Int'l v. California Pub. Util. Comm'n,* 196 F.3d 1011 (9th Cir. 1999) (upholding *Younger* abstention as important state interests involved protection of consumers from unfair business practices); *Cedar Rapids* 280 F.3d at 879-80 (a state "has an important interest in enforcing its consumer protection statutes" and "protecting the public from deceptive business practices"; *Marathon Petroleum Co. LLC v. Stumbo*, 528 F. Supp. 2d 639 (*Younger* abstention motion granted on basis of state's strong interest in protecting consumers and administering consumer protection statues); *Williams v. Lubin,* 516 F. Supp. 2d 535 (D. Md. 2007) (state has important interest to protect consumers).

80. Finally, the ongoing Superior Court action provides an adequate opportunity to raise constitutional challenges, thereby satisfying the final condition for the application of the *Younger* doctrine. Put differently, the Debtor can litigate any Constitutional claim in state court.[18] *See Juidice v. Vail,* 430 U.S. 327, 337 (1977) (holding that *Younger* requires no more

[18] Notably, the Debtor previously filed a case in federal district court against, among others, both the D.C. government and the Receiver appointed by the Superior Court. *See Jefferson-11th Street, LLC v. District of Columbia*, No. 1:19-cv-01416, 2020 WL 3035038 (D.D.C. June 5, 2020). In the Complaint, the Debtor complained that, *inter alia*, the Receiver and its renovation of the Property violated the Fifth Amendment to the U.S. Constitution as a taking of private property without just compensation, and as a deprivation of Debtor's Property without due process of law. In granting the Defendants' motion to dismiss, the District Court stayed these two claims until the Superior Court litigation concluded, specifically granting the Debtor the option either "to raise its constitutional claims in the Superior Court or, once that case has concluded, resurrect those claims in federal court." *Id*. at *2. This way, the Debtor would not otherwise be barred by the statute of limitations from resurrecting its constitutional claims in federal court once the state proceedings concluded. Even if this Court finds *Younger* abstention to be warranted, the Debtor therefore faces no bar to litigating its constitutional claims either in state court or in federal court.

than an opportunity for the presentation of federal constitutional claims in the state proceeding); *Middlesex,* 457 U.S. at 431 (1982) ("Minimal respect for the state processes, of course, precludes any presumption that the state courts will not safeguard federal constitutional rights."); *Moore v. Sims,* 442 U.S. 415, 430-32 (1979) (state courts are competent to adjudicate federal constitutional claims). State courts are presumed to be an adequate venue in which to assert federal challenges 'in the absence of unambiguous authority to the contrary."' *Morning Hill Foods, LLC v. Hoshijo*, 259 F. Supp. 3d 1113 (D. Haw. 2017).

81. For all the reasons set forth above, this Court should exercise its discretion and abstain under section 305.[19]

[19] Even if the court does not dismiss the case entirely ─ which the court should do ─ a substantial suspension of the proceedings (for a period until the Property is remediated and the tenants are able to be relocated back to their units) would be appropriate. *See, e.g., In re Picacho Hills Utility Co., Inc*., No. 11-13-10742-TL, 2013 WL 1788298, at *10 (Bankr. D.N.M. 2013) (following approach taken in *In re Mazzacone*, 183 B.R. 402 (Bankr. E.D. Pa. 1995), *aff'd* 200 B.R. 568 (E.D. Pa. 1996), the court suspended all proceedings for a period of time to allow certain actions to be resolved outside of bankruptcy court). If this Court chooses not to dismiss the case altogether at this point — which we believe it should — at the very least it should provide for all proceedings in this matter to be suspended for a period until the Property is in compliance with the laws of the District and the tenants have been relocated back to the Property, all as already established by the process set forth in the Superior Court case.

**WHEREFORE**, for the reasons set forth herein, Tenants' Association requests that this Court dismiss the Chapter 11 case and enter the proposed order attached hereto, or in the alternative, abstain.

Dated: May 3, 2022

Respectfully submitted,

/s/ Rosa J. Evergreen

Rosa J. Evergreen, DC Bar No. 500227
Blake A. Biles, DC Bar No. 441679
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 942-5000
rosa.evergreen@arnoldporter.com
blake.biles@arnoldporter.com

--and --

/s/ *Amanda P. Reeves*

Amanda P. Reeves, DC Bar No. 496338
Clayton D. LaForge, DC Bar No. 1033938
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200
amanda.reeves@lw.com
clayton.laforge@lw.com

Peter Gilhuly
Latham & Watkins LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
(213) 485-1234
peter.gilhuly@lw.com

*Counsel for 2724 11th St. N.W. Tenants' Association, Inc.*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been served via the Court's Electronic Filing System on May 3, 2022 on all parties requesting notice in this proceeding.

__/s/ Rosa J. Evergreen___
Rosa J. Evergreen, DC Bar No. 500227