# EXHIBIT 1

**DISTRICT OF COLUMBIA RENTAL HOUSING COMMISSION**

RH-TP-15-30,690

*In re*: 2724 11th Street, N.W.

Ward One (1)

**SCF MANAGEMENT and**
**JEFFERSON 11th STREET, LLC**
Housing Providers/Appellants

v.

**2724 11th STREET, N.W. TENANTS' ASSOCIATION, INC.**
Tenants/Appellees

**DECISION AND ORDER**

February 18, 2020

**SPENCER, CHIEF ADMINISTRATIVE JUDGE:** This case is on appeal to the Rental Housing Commission ("Commission") from a final order issued by the Office of Administrative Hearings ("OAH"),[1] based on a petition filed in the Rental Accommodations Division ("RAD") of the Department of Housing and Community Development ("DHCD"). The applicable provisions of the Rental Housing Act of 1985, D.C. Law 6-10, D.C. OFFICIAL CODE §§ 42-3501.01 *et seq.* (2012 Repl.) ("Act"), the District of Columbia Administrative Procedure Act, D.C. OFFICIAL CODE §§ 2-501 *et seq.* (2012 Repl.) ("DCAPA"), and the District of Columbia Municipal Regulations ("DCMR"), 1 DCMR chapters 28 & 29 (2016) and 14 DCMR chapters 38-44 (2004), govern these proceedings.

---

[1] OAH assumed jurisdiction over tenant petitions from the Rental Accommodations and Conversion Division ("RACD") of the Department of Consumer and Regulatory Affairs ("DCRA") pursuant to the OAH Establishment Act, D.C. OFFICIAL CODE § 2-1831.01 -1831.03(b-1)(1) (2007 Repl.). The functions and duties of RACD were transferred to DHCD by § 2003 of the Rental Housing Operations Transfer Amendment Act of 2007, D.C. Law 17-20, D.C. OFFICIAL CODE § 42-3502.04B (2010 Repl.).

## I. PROCEDURAL HISTORY

On July 2, 2015, tenants/appellees 2724 11th Street, N.W. Tenants' Association, Inc. ("Tenants" or "Tenants' Association"), representing 15 residents of 2724 11th Street, N.W. ("Housing Accommodation"), filed tenant petition 30,690 ("Tenant Petition") with the RAD against housing providers/appellants SCF Management and Jefferson 11th Street, LLC ("Housing Providers"). Tenant Petition at 1-4; R. at Tab 1. In the Tenant Petition, the Tenants alleged that the Housing Providers violated the Act as follows:

1. Services and/or facilities provided as part of my/our rent have been permanently eliminated.
2. Services and/or facilities provided as part of my/our rent have been substantially reduced.

*Id.* at 3. Over 16 days between February 2, 2016 and May 20, 2016, evidentiary hearings were held before Administrative Law Judge Erika Pierson ("ALJ").

On May 11, 2017, the ALJ issued a final order in which she found that the Tenants' rental units and several common elements of the Housing Accommodation had conditions that substantially violated the housing code or otherwise constituted substantial reductions in related services or facilities and that the Housing Provider, in bad faith, failed to abate the violations. 2724 11th St., N.W. Tenants' Assoc. v. SCF Mgmt., 2015-DHCD-TP 30,690 (OAH May 11, 2017) ("Final Order") at 460-64; R. at Tab 96.[2] The ALJ awarded the Tenants monetary relief to include rent refunds, rent rollbacks, and treble damages and imposed civil fines against the Housing Providers for willfully violating the Act. *Id.*

---

[2] Given the length of the Final Order, the Commission dispenses with its usual practice to recite the findings of fact and conclusions of law made by the ALJ.

The Housing Providers filed a notice of appeal from the Final Order with the Commission on July 13, 2017 ("Notice of Appeal"). In the Notice of Appeal, the Housing Providers, represented by counsel, listed 126 claims of error by the ALJ. *See* Notice of Appeal at 1-25. On April 17, 2018, the Housing Providers filed a brief ("Housing Providers' Brief") consolidating the 126 listed claims of error into nine distinct claims, discussed under six issue headings, regarding the legal standards applied by OAH. Housing Providers' Brief at 1 n.1. The Tenants filed a responsive brief on May 15, 2018 ("Tenants' Brief"). The Commission held a hearing on June 20, 2018. Hearing CD (RHC June 20, 2018) at 11:05.

## II. ISSUES ON APPEAL

1. Whether OAH erred in awarding the Tenants rent refunds for a period prior to April 17, 2015, when the Tenant Petition did not expressly make a claim for refunds for that time period and no motion to amend the Tenant Petition was made.

2. Whether OAH erred in awarding the Tenants rent refunds for housing code violations that the ALJ stated were "mild."

3. Whether OAH erred in awarding a rent refund to the Tenants of Units 1 and 8 despite the lack of evidence of the rents charged for those units.

4. Whether OAH erred in concluding that Tenant Benitez was a tenant of Unit 5 and that the Tenants' Association has standing to seek an award of a rent refund on her behalf.

5. Whether OAH erred in finding that the Housing Providers acted in bad faith in failing to abate the housing code violations.

6. Whether OAH erred in finding that the Housing Providers willfully violated the Act.

## III. DISCUSSION

The Commission's standard of review of a final order is contained in 14 DCMR § 3807.1, and provides as follows:

> The Commission shall reverse final decisions of the [OAH] which the Commission finds to be based upon arbitrary action, capricious action, or an abuse of discretion,

> or which contain conclusions of law not in accordance with the provisions of the Act, or findings of fact unsupported by substantial evidence on the record of the proceedings before the [OAH].[3]

"Substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as able to support a conclusion." Fort Chaplin Park Assocs. v. D.C. Rental Hous. Comm'n, 649 A.2d 1076, 1079 n.10 (D.C. 1994); Allen v. D.C. Rental Hous. Comm'n, 538 A.2d 752, 753 (D.C. 1988); Hardy v. Sigalas, RH-TP-09-29,503 (RHC July 21, 2014); Marguerite L. Corsetti Trust v. Segreti, RH-TP-06-28,207 (RHC Sept. 18, 2012).

The Commission gives deference to the ALJ's factual findings, and it will not disturb those findings if they are supported by substantial evidence on the record. *See* Selk v. D.C. Dep't. of Emp't. Servs., 497 A.2d 1056, 1058 (D.C. 1985); Washington Cmtys. v. Joyner, TP 28,151 (RHC Jul. 22, 2008); 424 Q St. Ltd. P'ship. v. Evans, TP 24,597 (RHC July 31, 2000). "[T]he relevant inquiry is whether the [ALJ's] decision was supported by substantial evidence, not whether an alternative decision might also have been supported by substantial evidence." Gary v. D.C. Dep't of Emp't. Servs., 723 A.2d 1205, 1209 (D.C. 1998) (quoting McEvily v. D.C. Dep't of Emp't. Servs., 500 A.2d 1022, 1024 n.3 (D.C. 1985)); *see* Notsch v. Carmel Partners, LLC, RH-TP-06-28,690 (RHC May 16, 2014) (explaining that where an ALJ's findings are supported by substantial evidence, the findings will not be overturned even if substantial evidence exists to the contrary). However, the Commission will review the ALJ's legal conclusions under the Act *de novo*. United Dominion Mgmt. Co. v. D.C. Rental Hous. Comm'n, 101 A.3d 426, 430-31 (D.C. 2014).

---

[3] As noted *supra* at n.1, jurisdiction over hearings arising under the Act was transferred from the Rent Administrator to OAH.

The Act provides that a tenant may be awarded a rent refund if "the related services or related facilities supplied by a housing provider for a housing accommodation or for any rental unit in the housing accommodation are substantially increased or decreased." D.C. OFFICIAL CODE § 42-3502.11; *see also* D.C. OFFICIAL CODE § 42-3509.01(a) (housing provider shall be held liable if he or she "knowingly . . . substantially reduces or eliminates related services previously provided for a rental unit"); 14 DCMR § 4211.6-.9 (requiring rent reduction to "reflect[] the monthly value of the decrease in related services"). "Related services" are defined by the Act to include services "required by law . . . including repairs [and] maintenance." D.C. OFFICIAL CODE § 42-3501.03(27). The Commission has consistently held that "failure to provide services required by the housing code constitutes a reduction in services under the Act." Kuratu v. Ahmend, Inc., TP 28,985 (RHC Dec. 27, 2012); *see, e.g.*, Palmer v. Clay, RH-TP-13-30,431 (RHC Oct. 5, 2015); Caesar Arms. LLC v. Lizama, RH-TP-07-29,063 (RHC Sept. 27, 2013); Cascade Park Apartments v. Walker, TP 26,197 (RHC Jan. 14, 2005). A tenant seeking a rent refund must meet a three-prong test by proving: (1) that a related service or facility was substantially reduced; (2) the duration of the reduction; and (3) that the housing provider had notice of the reduction. *See* 1773 Lanier Place N.W. Tenants' Ass'n v. Drell, TP 27,433 (RHC Sept. 9, 2009).

**1. Whether OAH erred in awarding the Tenants rent refunds for a period prior to April 17, 2015, when the Tenant Petition did not expressly make a claim for refunds for that time period and no motion to amend the Tenant Petition was made**

In the Final Order, the ALJ awarded rent refunds based on housing conditions that existed at any point during the three-year statute of limitations period prior to the filing of the Tenant Petition through the date the evidentiary record closed, *i.e.*, from July 2, 2012 to May 20,

2016. Final Order at 7.[4] The Housing Providers contend that the ALJ erred in doing so because the Tenants included a statement in the narrative portion to the Tenant Petition that they were seeking a "100% refund of rent from April 17, 2015 onward." *See* Tenant Petition attach. 1 at 4. Reviewing the Tenant Petition and the course of the litigation of the issues during the evidentiary hearing, we affirm.

As noted above, the Tenant Petition form was checked to allege that the Housing Providers had reduced and eliminated related services and facilities in the Housing Accommodation. *See* Tenant Petition at 4. In the complaint details attached to the Tenant Petition, the Tenants stated that they sought the 100% refunds in addition to prospective relief and "such other relief as to which each Petitioning Tenant may be entitled." Tenant Petition attach. 1 at 4. The claim for a "100% refund" was plainly based on the allegation in the same narrative portion that "the units have no rental value in their current state." *Id.* (citing Bernstein v. Fernandez, 649 A.2d 1064 (D.C. 1991)). The Tenants further alleged that 224 specific, deficient conditions, spanning 15 rental units, existed at the time of filing, but they did not allege any particular dollar value for any individual condition. *Id.* at Ex. 8 (summary chart). The significance of the April 17, 2015 start date for the refunds was that, on that date, the Latino Economic Development Center ("LEDC") sent a letter on behalf of the Tenants (referenced in the allegations and attached to the Tenant Petition), which detailed the conditions in the various rental units. *See* Drell, 27,433 (housing provider must have notice of condition for award of rent refund). Although the Tenants further specified that they "reserve[] the right to supplement this

---

[4] *See* D.C. OFFICIAL CODE § 42-3502.06(e) ("No petition may be filed with respect to any rent adjustment, under any section of this chapter, more than 3 years after the effective date of the adjustment[.]"). The Commission has consistently held that tenant may be awarded a rent refund for violations of the Act that continue past the date of filing a tenant petition, so long as there is evidence in the record. Palmer, RH-TP-13-30,341 (RHC Oct. 2, 2015) at 29.

Petition before, at or after the hearing," no formal motion to amend was made. Tenant Petition attach. 1 at 4.

During the 16 days of the evidentiary hearing, extensive testimony and other evidence of housing conditions and notice to the Housing Providers dating back to July 2012 was admitted. Nonetheless, in the Housing Providers' Closing Brief, R. at Tab 90, they asserted that "any relief granted is limited to the period beginning April 17, 2015" because the Tenants never sought to amend the Tenant Petition and they had no notice that the claims against them in this Tenant Petition may have arisen before that date. Housing Providers' Closing Brief at 35. The Housing Providers maintain on appeal that the ALJ erred by awarding rent refunds for proven reductions in services predating the LEDC letter, characterizing those reductions as "additional claims" and relying primarily on Parreco v. D.C. Rental Hous. Comm'n, 885 A.2d 327 (D.C. 2005), to argue that they did not have adequate notice of such claims. Housing Providers' Brief at 5-8.

The Commission is satisfied for two reasons that the ALJ did not err in awarding rent refunds for proven reductions in services prior to April 17, 2015. First, the Tenant Petition gave the Housing Providers sufficient notice of the factual predicate for the issues to be litigated and does not expressly limit the scope of the Tenants' requested relief. Second, even if the Tenant Petition itself did not provide sufficient notice, the Housing Providers implicitly consented to the litigation of claims arising as far back as permitted by the statute of limitations.

**a. Sufficiency of notice**

The District of Columbia Court of Appeals ("DCCA") has stated that "[a] petition must give a defending party fair notice of the grounds upon which a claim is based, so that the defending party has the opportunity to adequately prepare its defense and thus ensure that the claim is fully and fairly litigated." Parreco, 885 A.2d at 334 (citing Autocomp, Inc. v. Publishing Computer Serv., Inc., 331 A.2d 338, 340 (D.C. 1975)); *see also* Watergate Improvement Assocs.

v. Pub. Serv. Comm'n, 326, A.2d 778, 786 (D.C. 1974) ("Review of the sufficiency of notice in administrative proceedings . . . is not the adequacy of the original notice or pleading but is the fairness of the whole procedure."); Ozburn-Hessey Logistics, LLC v. Nat'l Labor Relations Bd. ("NLRB"), 939 F.3d 777, 785-87 (6th Cir. 2019) (relevant due process considerations to adequacy of notice include explicit statements, close connections of subject matter, and common sense); Pergament United Sales, Inc. v. NLRB, 920 F.2d 130, 135 (2d Cir. 1990) ("The primary function of notice is to afford respondent an opportunity to prepare a defense by investigating the basis of the complaint and fashioning an explanation of events that refutes the charge of unlawful behavior."). The Commission has previously observed that petitions alleging reductions in related services or facilities should be liberally construed in light of the simplicity of the tenant petition form and the remedial purposes of the Act. *See* Burkhardt v. Klingle Corp., RH-TP-10-29,875 (RHC Sept. 25, 2015) at 40-44 (ALJ erred in stating "checking the services and facilities box is insufficient to place Housing Provider on notice" where petition alleged several specific reductions "as part of the ongoing demolition and construction activities" and "other housing code and fire code violations").

As noted, the Housing Providers rely heavily on Parreco. In Parreco, the DCCA held that a housing provider did not have notice of or consent to the litigation of a claim that a rent increase was unlawful on the grounds that notice of the rent increase was not properly given to the tenant. In that case, the tenant had only complained in his petition that the rent was "too high," and the testimony elicited at the hearing only went to the issue of the housing provider's "reason for the rent increase." 885 A.2d at 333-34. "Given the multitude of reasons why a tenant could complain that rent is unjustifiably high, and the specific reasons listed on the petition form (e.g., retaliation, discrimination, poor condition of apartment)," the DCCA

determined that the housing provider could not be expected or required to anticipate that inadequate notice of the rent increase would be argued at the hearing. *Id.*

The Commission is satisfied that the issue in Parreco is distinguishable from the issues raised in this case. The Tenant Petition here clearly sets out facts, and explicitly makes claims, that housing code violations and other conditions constituted reductions in related services or facilities, and the facts set out plainly allege that the conditions had existed for a long time. Unlike the complex requirements for implementing rent increases (particularly under the rent ceiling system in place at the time of Parreco), there are not a "multitude of reasons" under the Act why housing conditions may result in a rent refund to a complaining tenant. *See* D.C. OFFICIAL CODE § 42-3509.01(a) ("Any person who knowingly . . . reduces or eliminates related services . . . shall be held liable"); Drell, 27,433; *see also infra* at 18-20 (discussing legal standards for substantial reductions in services). The "additional" claims here are the essentially same as those the Housing Providers concede were raised in the Tenant Petition, *i.e.*, deficient housing conditions, only earlier in time. The Tenants did not, by contrast, attempt to make, nor did the ALJ award refunds for, any new claims with different elements, such as rent increases illegally implemented while substantial housing code violations existed. *See* D.C. OFFICIAL CODE § 42-3502.08(a)(1)(A).

Instead, contrary to the Housing Providers' arguments that they lacked notice of the time period of the claims, the written allegations in the Tenant Petition begin by describing the Housing Providers' neglect as ongoing since approximately 2012. Tenant Petition attach. 1 at 1-2 (citing news stories published in 2014 describing complaints made "for the past two years or so" and alleging those conditions "still visible today"). The Tenant Petition also included letters from several Tenants to the Housing Providers describing deficient housing conditions existing

in 2014. Tenant Petition tenancy documents for Unit 2, 4, & 21. The Housing Providers therefore had express notice that the factual basis of the Tenant Petition predated April 17, 2015.[5] Furthermore, the Housing Providers acknowledge elsewhere in their appeal that they had long been aware of the conditions at the Housing Accommodation and the Tenants' complaints. *See* Housing Providers' Brief at 19 (owners "have tried for several years, without success, to reach an agreement with the tenants on a negotiated plan" for a substantial rehabilitation; "[t]hroughout that period, repairs were being made in the building and in tenants' units as problems arose and were reported"). In this context, it would defy common sense for a respondent party to think that the hundreds of conditions alleged by the Tenants in their petition arose all at once in early 2015 or that the LEDC letter was the only notice of those conditions that the Tenants would rely on in pursuing rent refunds. *See* Ozburn-Hessey, 939 F.3d at 786-87.[6]

---

[5] The Tenants also state that, on November 19, 2015, long before the evidentiary hearing, they served the Housing Providers with a request for production of documents "from July 1, 2012, to the date of your response (the 'relevant time period')." It was apparently served on the Housing Providers and accompanied a subpoena issued by OAH on November 5, 2015. *See* R. at Tab 21; Tenants' Brief Attachment B at 9 (certificate of service stating "a subpoena with a copy of the foregoing . . . was served" on Housing Providers' counsel).

If found in the record, such a request would strongly support the conclusion that the Housing Providers had adequate notice of the claims against them. *See* Ozburn-Hessey, 939 F.3d at 786 (email from NLRB General Counsel to respondent "vitiates [respondent's] claim that it did not have sufficient notice"). However, the Tenants' request for production was provided as an attachment to the Tenants' Brief on appeal. The record, as transmitted to the Commission by OAH, does not include a copy of the request for production. Nor does the record contain any indication that the Housing Providers objected to the scope of the discovery request or subpoena. Because it is not clear that the Commission may rely on this extra-record evidence on appeal, and because we find sufficient notice of the claims anyway, we do not rely on it at this time.

[6] The Housing Providers also argue that, by the voluntary dismissal of a prior tenant petition (TP 30,391), the Tenants "chose to abandon their pre-April 17, 2015 claims." Housing Providers' Brief at 8. Because that dismissal was without prejudice, the Commission cannot see how it would impose, or reasonably be interpreted to impose, any limit to the Tenants' claims in this case. As the Tenants explained in their Reply to Respondents Closing Brief, at 2; R. at Tab 93, and we agree, the only claims they may have "abandoned" by voluntarily dismissing TP 30,391 were those dating back to May 2010, the applicable statute of limitations period based on that petition's filing date.

Moreover, the Commission, its rules, and the rules of OAH do not and have never required pleading of damages in a tenant petition. The amount of rent refunds based on reductions in services and facilities are committed to the sound discretion of the presiding ALJ. *See* 14 DCMR § 4211.6-.9; *infra* at 21. Similarly, pleadings for housing conditions claims in the Superior Court are also construed liberally and do not require specific allegations of damages, only "sufficient information to outline the legal elements of a viable claim for relief or to permit inferences to be drawn from the complaint that indicate that these elements exist." Pajic v. Foote Props., LLC, 72 A.3d 140, 147-48 (D.C. 2013) (quotations omitted) (counterclaim for breach of implied warranty of habitability sufficiently plead by alleging failure to timely repair air conditioning and hole in ceiling). Additionally, it is well-established and common practice under the Act that claims of housing code violations may be litigated, and refunds awarded, for the entirety of the three-year period preceding the filing of a tenant petition. *See, e.g.*, Majerle Mgmt. v. D.C. Rental Hous. Comm'n, 768 A.2d 1003, 1009 n.13 (D.C. 2001), *vacated in part*, 777 A.2d 785 (D.C. 2001); Jenkins v. Moy, TP 22,104 (RHC Nov. 30, 1994). The fact that the relief requested in the Tenant Petition included 100% rent refunds after the LEDC letter was sent (a novel claim in the context of the Act's rent stabilization program that the Tenants appear to have abandoned at some point before OAH) is not an express disclaimer of the right to any other relief that would clearly follow under the Act from the conditions alleged.

At the evidentiary hearing, as described in detail *infra* at 14-15 & n.10, the Housing Providers did not object to the admission of testimony or other evidence predating the LEDC letter based on lack of notice; rather, they objected only on statute of limitations grounds. This lack of objection demonstrates that the Housing Providers reasonably understood the Tenants to be requesting all refunds allowable under the Act. The Housing Providers assert now that the

facts alleged in the Tenant Petition and litigated at the hearing that predate April 17, 2015 were relevant, or should be treated as relevant, only to remedies running from that date forward, such as the substantiality of lost services, treble damages, and civil fines. Housing Provides' Brief at 8.[7] Given the close connection between these issues and the underlying claims of deficient housing conditions, the Commission is satisfied that the Housing Providers had notice that both pre- and post-April 2015 reductions in services would be raised and that there was no prejudice in litigating or awarding all possible remedies. "Both require the [respondent] to mount similar, if not identical, defenses." Ozburn-Hessey, 939 F.3d at 786. Even if the evidence was introduced only to show, for example, bad faith or that the conditions existed at least by April 17, 2015, the relevant defenses and rebuttal evidence would be the same as to defend against the underlying claims, *i.e.*, that a condition was not substantial, that it did not exist for the claimed time period, or that the Housing Providers lacked notice of the condition during the claimed time period. *See* Drell, 27,433; *see also infra* at 44 (duration may show bad faith in addition to substantiality of loss).

**b. Consent to litigation**

The Commission has previously determined that the OAH Rules are silent on whether a tenant petition may be amended by consent, without a motion by the petitioner,[8] but that the

---

[7] We note that there is a contradiction between the Housing Providers current position and the nature of their objections below based on the statute of limitations. As they presently describe the purposes for which evidence was admitted, evidence of violations existing before July 2, 2012 would also be relevant to bad faith, etc. within the scope of the claims being litigated, just as evidence before April 15, 2017 is relevant to enhancements of any claims arising after that date. However, the Housing Providers raised blanket objections to the admission of any evidence predating 2012, acknowledging that to be the relevant time period for claims in this case.

[8] The amendment of a tenant petition by motion is governed by OAH Rule 2929.6, which provides as follows:

> A party may amend a petition to add additional allegations after the petition has been transferred to OAH, but before the hearing concludes, by moving to amend the petition with the presiding administrative law judge. The movant shall set forth the allegations to be added and the factual basis for those allegations. No written motion to amend will be considered unless it recites that the

Superior Court Rules of Civil Procedure ("Super. Ct. Civ. R.") act as appropriate guidance on the issue. Bettis v. Horning Assocs., RH-TP-15-30,658 (RHC July 20, 2018) at 35-36. Specifically, Super. Ct. Civ. R. 15(b) ("Rule 15(b)") provides:

> When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move – at any time, even after judgment – to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

(emphasis added). *See* Charlery v. D.C. Dep't of Consumer & Reg. Affs., 970 A.2d 280, 284 (D.C. 2009) (finding matter tried by implied consent before OAH); Moore v. Moore, 391 A.2d 762, 768 (D.C. 1978) ("The clearest indications of a party's implied consent to try an issue lie in the failure to object to evidence, or in the introduction of evidence which is clearly apposite to the new issue but not to other matters specified in the pleadings."); Kuhn v. Civil Aeronautics Bd., 183 F.2d 839, 841-42 n.3 (D.C. Cir. 1950) ("The applicability of that rule, or its rationale, to an administrative proceeding where there is even less attempt at formalism follows *a fortiori*."). When an issue is raised and litigated before or at an evidentiary hearing without objection, even if the tenant petition is not formally amended, an ALJ is *mandated* to address the issue in his or her final order. Moore, 391 A.2d at 768; Bettis, RH-TP-15-30,658 at 36.

Based on its review of the record, the Commission is satisfied that the Housing Providers consented to the litigation of claims for reductions in related services predating April 17, 2015.

---

> movant sought to obtain the consent of parties affected, and that such consent was granted or denied, including the identity of the party or parties who declined to consent.

1 DCMR § 2929.6. The Housing Providers appear to conflate OAH Rule 2929.5 and .6. *See* Housing Providers' Brief at 7. OAH Rule 2929.5 refers to motions to "expand the scope of a proceeding," while OAH Rule 2929.6 refers to motions to "amend a petition to add additional allegations." The Tenants counter that motions to "expand the scope of a proceeding" refer only to the addition of tenants who were not originally parties to a petition. *See* Tenants' Brief at 27-28. In either case, the crux of the Housing Providers' argument is that they were not provided with an opportunity to oppose a motion to modify the claims in the Tenant Petition, thus denying them due process. For the reasons described herein, the Commission is satisfied that no motion was required to address the Tenants' claims predating April 17, 2015.

On the first day of the evidentiary hearing, counsel for the Housing Providers objected to a question about a Tenant's experience "since living at" the Housing Accommodation. Hearing Transcript (OAH Feb. 2, 2016) at 65:16-24. The exchange proceeded, in relevant part, as follows:

> Carol Blumenthal [counsel for Housing Providers]: Your Honor, I object. <u>This petition will have a relevant period of time</u>.
>
> Judge Erika Pierson: Sustained. <u>Limit it to the three years</u> preceding the [filing of the petition].[9]
>
> Amanda Reeves [counsel for Tenants]: Yes.
>
> Carol Blumenthal: Your Honor, I will object to that as well.
>
> Judge Erika Pierson: <u>Or, is that not the timeframe</u>?
>
> Carol Blumenthal: Your Honor, a certificate of compliance for the housing crew [sic] was issued by the District of Columbia Government in May 29, 2014. Pursuant to DCM[R] 4216.6 [sic – 4216.5]. No complaints of substantial violations to the housing codes about conditions that occurred and were abated more than 12 months earlier –
>
> . . .
>
> Judge Erika Pierson: I'll allow the question to stand.
>
> Amanda Reeves: Okay. So I can rephrase my question though. Briefly, Ms. Arias, how has your experience been since living at 2724 Eleventh Street <u>limited to July 2012 to the present</u>?
>
> Carol Blumenthal: Your Honor, I have a <u>further objection</u>.
>
> Judge Erika Pierson: What's your objection?
>
> Carol Blumenthal: Of <u>unfair surprise</u>, Ms. Arias says that she lives in apartment Number 11. We had asked for a process from coun[sel] as to what units? How we were doing units in what order. <u>Unit 11 was not listed for today</u> or tomorrow.
>
> Amanda Reeves: Oh, Your Honor, sorry. We had provided that we would be providing testimony as to the common new areas and that's what Ms. Arias

---

[9] *See* Hearing CD (OAH Feb. 2, 2016) at 12:57-12:58.

will be testifying to today. She'll be testifying later at trial regarding her individual unit. I was just establishing that she lives in the building and where she lives.

Carol Blumenthal: All right. But then I object to the form of the question, which was how has your experience been? And it did not limit it to the common areas.

Judge Erika Pierson: You may ask specifically about the common areas.

*Id.* at 65:21-67:19 (emphasis added).

The Housing Providers, having squarely had the opportunity at the outset of the hearing to object to the litigation of conditions existing before April 17, 2015 for any number of reasons, did not object on the grounds that such claims were outside the scope of the Tenant Petition. The Housing Providers' one objection to the time period was based on the purported abatement of some conditions in May 2014. The Housing Providers' only related objection to the question based on surprise or lack of notice was based on the scope of the conditions as being within common areas or a single unit. The Commission's review of the record does not reveal, nor do the Housing Providers point to, any objection in the remaining 16 days of hearings to the introduction of evidence of housing conditions that existed prior to April 2015; rather, all objections were based on the three-year statute of limitations.[10]

The Housing Providers did not argue until their closing brief before OAH that the Tenants' permissible recovery is limited to the period after April 17, 2015. Respondents'

[10] *See, e.g.*, Hearing Transcript (OAH Feb. 2, 2016) at 94:18-95:6 (Housing Providers' objection to tenant testimony of broken door lock existing for "four or five years," without objection to follow-up question as to "the last three years since July 2012"); Hearing Transcript (OAH Feb. 3, 2016) at 90, 93-94 (Housing Providers' objection to tenant testimony of repairs in 2006, without objection to follow-up question as to "the last 3 years"); Hearing Transcript (OAH Apr. 21, 2016) at 11:21-12:7 (Housing Providers' objection to timeframe of question of building manager as to interactions with owner, without objection to follow-up question as to "the last three years"); *id.* at 73:15-75:18 (Housing Providers' objection to admission of document dated 2010 as outside "relevant period of time," without objection to subsequent admission of document dated May 29, 2013); Hearing Transcript (OAH Apr. 27, 2016) at 20:8-21:22 (Housing Providers' motion to admit document showing extermination services dating to July 2013 and question to exterminator about frequency of service "in the last three years"); *id.* at 184-89 (Housing Providers' motion to admit maintenance records dated from December 7, 2012 to October 9, 2014).

Closing Brief at 4-5, 35; R. at Tab 92. Their argument after the hearing and again on appeal is that evidence predating April 17, 2015 would be relevant to the existence or notice of housing code violations that *continued* to exist after that date but that the evidence was therefore not, as stated in Parreco, "clearly apposite to the new issue" of any reductions in services going back as far as July 2, 2012; rather it related "to other matters specified in the pleadings" such as bad faith or fines. Housing Providers' Brief at 7-8; *see* Parreco, 885 A.2d at 334 (quoting Moore, 391 A.2d at 768 (applying Rule 15(b))).

The Commission is satisfied that evidence of the substantiality, duration, and notice of housing code violations and reductions in related services prior to April 17, 2015 was "clearly apposite" to claims for rent refunds on any date not barred by the statute of limitations or otherwise precluded. *See* Drell, TP 27,433. Nothing in the record reflects, nor is it reasonable to assert, that earlier evidence was admitted only for the narrow purpose of proving that conditions existing after April 17, 2015 were allowed to persist in bad faith or warranted fines. The Housing Providers' objections before OAH, in fact, never mentioned bad faith or asserted that the admission of any evidence should be only for a limited purpose and were consistent with the view that all evidence was being admitted in order to prove claims arising as far back as the statute of limitations permitted. *See supra* n.10. The Housing Providers repeatedly objected to evidence of events that occurred or conditions that existed prior to July of 2012, based *solely* on the three-year statute of limitations. *Id.* Moreover, the introduction of their own evidence predating April 17, 2015, attempting to prove, among other things, that repairs were made or attempted, further show consent to the litigation of claims dating back as far as permitted under the statute of limitations.

As described, such evidence could also be relevant to proving bad faith, which the Housing Providers assert constitutes an "other matter[] specified in the pleadings." However, viewing the pleadings formalistically, as the Housing Providers urge, we observe that the Tenant Petition did not actually specify that the Tenants were seeking trebled refunds or allege that the Housing Providers had acted in bad faith; rather, it was a claim that the Housing Providers reasonably knew to expect from the facts plead and issues litigated. In any case, given the extent to which a housing providers' defenses or rebuttal evidence to any claims or additional remedies at issue in this case are related, if not nearly identical, the Commission remains unpersuaded that the Housing Providers were denied, fundamentally, "the opportunity to adequately prepare its defense and thus ensure that the claim is fully and fairly litigated." Parreco, 885 A.2d at 334. Having had that opportunity, whether evidence predating the LEDC letter might have been apposite to additional remedies is a "hypertechnical distinction without legal consequences." Pergament, 920 F.2d at 135.

Finally, to claim that the Housing Providers consented to the litigation of the existence and notice of deficient housing conditions before April 17, 2015, but not to whether refunds could be awarded for that time period, exalts form over substance. *See* Parreco, 885 A.2d at 334 ("Rule 15(b) 'is an attempt to favor substance over form'"). If the Tenants had introduced no evidence of notice of housing conditions other than the April 17, 2015 LEDC letter, their refunds would have to be limited to the period after that date. *See* Drell, TP 27,433. But the Housing Providers did not object to the admission of evidence of earlier notice of housing conditions and, instead, introduced rebuttal evidence attempting to show that such conditions were repaired. Asserting after the fact that the pleadings did not request refunds that are supported by the admitted evidence on the record places an artificial limit on the "result of the trial of that issue."

Super Ct. Civ. R. 15(b). To borrow an analogy, the Commission will not render 16 days of testimony about conditions predating April 2015 "meaningless the way that 'Game of Thrones' rendered the entire Night King storyline meaningless in its final season." Banks v. Northern Trust Corp., 929 F.3d 1046, 1054 (9th Cir. 2019).

Accordingly, the Final Order is affirmed on this issue.

**2. Whether OAH erred in awarding the Tenants rent refunds for housing code violations that the ALJ stated were "mild"**

In the Final Order, the ALJ awarded rent refunds to the Tenants for substantial reductions in related services and facilities due to violations of the housing code. The ALJ generally applied the following formula to determine the monthly value of the reductions:

| | |
|---|---|
| Infestations | $35 |
| Severe Conditions | $30 |
| Moderate Conditions | $20 |
| Mild Conditions | $5 - $15 |

Final Order at 15.[11] The Housing Providers contend that the ALJ erred in awarding rent refunds for "mild" conditions because such conditions cannot be "substantial" within the meaning of the Act. Housing Providers' Brief at 11-12. While we recognize that the terminology used by the ALJ is potentially confusing, the record shows that the ALJ's use of the terms "mild," "moderate," and "severe" were findings as to damages calculations, not conclusions as to whether the Act was violated by substantial reductions in services, and we therefore affirm.

[11] The ALJ also awarded refunds in certain instances that departed from this formula, such as a 50% reduction in rent for Unit 22 due to a "severe" collapse of the kitchen ceiling. *See* Final Order at 318. Under the Act, an ALJ is afforded wide latitude in determining the value of a reduction in services based on his or her "knowledge, expertise, and discretion," and "scientific precision" is not required. Williams v. Thomas, TP 28,530 (RHC Sept. 27, 2013) (quoting Kemp v. Marshall Heights Cmty. Dev., TP 24,786 (RHC Aug. 1, 2000)). The Housing Providers, in their discussion of this issue, do not challenge the ALJ's valuation of any specific violation, the valuation of any category of violations, or the categorization of any specific violation.

The Act defines a "substantial violation" of the housing code as "the presence of any condition, the existence of which . . . may endanger or materially impair the health and safety of any tenant or person occupying the property." D.C. OFFICIAL CODE § 42-3501.03(35). By rulemaking, the Commission has determined that substantial violations of the housing code include, but are not limited to, 20 specific conditions enumerated in 14 DCMR § 4216.2(a)-(t).[12] Although that rule directly relates to "substantial compliance with the housing code," as a prerequisite for a rent increase or petition for a rent increase, the Commission has consistently applied the standard of what constitutes a "substantial violation" to claims of substantial reductions in related services. *See, e.g.*, Bettis, RH-TP-15-30,658 at 20-21 (ALJ erred in determining that violation covered by 14 DCMR § 4216.2 was not proven to be substantial); Drell, TP 27,433 ("A tenant is not required to show that housing code violations listed above in 14 DCMR § 4216.2 (2004) threaten the tenant's health, safety[,] or welfare."); Covington v. Foley Props., Inc., TP 27,985 (RHC June 21, 2006) ("a tenant need only show the existence of the violations to meet the 'substantial' test under 14 DCMR § 4216.2").

However, substantial reductions in related services or facilities are not limited to substantial violations of the housing code or to conditions that may endanger tenants' health and safety. *See* D.C. OFFICIAL CODE § 42-3501.03(27); Bettis, RH-TP-15-30,658 at 29 (clean windows are required by housing code and therefore a "related service" without health and safety

[12] The Housing Providers' Brief appears to question the validity of the catchall "aggregation" provision in 14 DCMR § 4216.2(u), but the Commission's review of the Final Order does not reveal any instance in which the ALJ found that a "large number of housing code violations" were substantial merely "because of the number of violations." The Final Order recites the entirety of 14 DCMR § 4216.2 at the outset but does not refer back to paragraph (u) any other point.

risk). The Commission has stated, with respect to a "health and safety" requirement for substantial reductions in services or facilities:

> While this is a useful test it is not exclusive. It is entirely possible that there could be substantial reductions in services and facilities even where that test is not fully met and even though the alleged violation did not constitute a violation of the housing regulations. A substantial reduction of services or facilities under § 211 [of the Act] and a violation of the housing regulations under § 208 [of the Act] are not synonymous.

Washington Realty Co. v. 3030 30th St. Tenant Ass'n, TP 20,749 (RHC Jan. 30, 1991); *see also* Interstate General Corp. v. D.C. Rental Hous. Comm'n, 501 A.2d 1261, 1263 (D.C. 1985) ("The question of substantiality simply goes to the degree of loss. The degree of the loss here is substantiated by the length of time that the tenants were without service[.]"); Bettis, RH-TP-15-30,658 at n.24 ("For the purposes of determining *whether a rent increase is valid*, 'substantial compliance' with or a 'substantial violation' of the housing code must be a material health and safety risk to a tenant. . . . For the purposes of determining *whether related services have been substantially reduced*, however, a health and safety risk may be sufficient, but it is not necessary[.]").[13]

On appeal, the Housing Providers list 24 specific rent refunds for conditions that the ALJ found were "mild" or "very mild" and for which they contend rent refunds are therefore erroneous. Housing Providers' Brief, Appendix A at xxiv-xxvi. Of those listed conditions, two kinds are clearly *per se* substantial violations of the housing code: defective toilets and loose or peeling lead-based paint. *See* 14 DCMR § 4216.2(h) & (j). Moreover, all listed conditions were

---

[13] The Housing Providers cite Parreco, 885 A.2d at 337, to argue that a substantial reduction in related services must be a substantial violation of the housing code to violate the Act. Housing Providers' Brief at 11. That decision quoted D.C. OFFICIAL CODE § 42-3501.03(35), the definition of "substantial violation," as a *possible* definition of a substantial reduction in services; however, "related services" are plainly defined in paragraph (27), and the Court did not discuss or purport to limit its prior holding in Interstate General, 501 A.2d at 1263, that "substantiality simply goes to the degree of loss" of a related service.

proven to have existed (and the Housing Providers were proven to have been on notice) for at least 13 months and for as long as 39 months. Housing Providers' Brief, Appendix A at xxiv-xxvi; *see* Final Order at 123, 148, 213, 235, 257, 276, 298, 319, 340, 370, & 420. The Commission is satisfied that the length of time the Tenants experienced these reductions in services is sufficient for the ALJ to find that they were substantial. *See* Interstate General, 501 A.2d at 1263 (degree of loss may be substantiated by length of reduction); *see, e.g.*, Bettis, RH-TP-15-30,658 (intercom broken for over a year; windows not cleaned for at least 4 years).

After determining that a tenant has met the three-prong test to show a substantial reduction in services, the second logical step is to determine the monthly value of the service. *See* Drell, TP 27,433; *cf.* Tenants of 1754 Lanier Place, N.W. v. 1754 Lanier, LLC, RH-SF-15-20,126 (RHC Mar. 25, 2016) (in housing provider's petition to reduce related services, first step is to determine if reduction is permissible, second step is to determine monthly value based on "knowledge, expertise, and discretion" of ALJ). In this context, it is apparent to the Commission that the ALJ's description of the various conditions as "very mild" through "severe" reflects her exercise of discretion to determine the monthly value of the reduction in service. *See* Williams v. Thomas, TP 28,530 (RHC Sept. 27, 2013), *supra* n.11 (ALJ afforded wide latitude in determining value of reduced services); Final Order at 15 (table of monthly values for levels of severity). The Housing Providers' argument conflates the two separate determinations that the ALJ made, although we acknowledge that the label "mild" is a less-than perfectly distinct term when "substantiality" is a related issue. Nonetheless, given the substantiality of the reductions, whether as a matter of law or due to their long existence, the fact that the ALJ's ultimate valuation of the reduced service was relatively low does not negate her initial determination that the service was substantially reduced. There is no inherent conflict between a reduction in

services having a low monthly value and yet being a "substantial reduction" of related service, and the ALJ's determinations of substantiality were supported by substantial evidence and in accordance with the Act.

Accordingly, the Final Order is affirmed on this issue.

**3. Whether OAH erred in awarding a rent refund to the Tenants of Units 1 and 8 despite the lack of evidence of the rents charged for those units.**

In the Final Order, the ALJ determined that the Tenants in Units 1 and 8 experienced substantial reductions in related services and facilities with maximum, total monthly values of $80 and $235, respectively, based on conditions in their own units and in common areas of the Housing Accommodation. Final Order at 466, 476. The penalties provision of the Act, D.C. OFFICIAL CODE § 42-3509.01(a), provides that a rent refund may be awarded for an unauthorized reduction in related services in "the amount by which the rent exceeds the applicable rent charged or for treble that amount (in the event of bad faith)."[14] The Housing Providers assert on appeal that the ALJ erred because no record evidence established the "applicable rent charged" for Units 1 and 8, and therefore the ALJ could not properly determine the amount by which the rent actually demanded or received exceeded "applicable rent charged." Housing Providers' Brief at 12-13. Because nothing in the record demonstrates that the Housing Providers were prejudiced by the ALJ's failure to determine the rents charged for these two units, we affirm.

Before August 5, 2006, the Act regulated rents primarily by establishing a "rent ceiling" for each rental unit covered by the Rent Stabilization Program. *See* D.C. OFFICIAL CODE § 42-3502.06 (2001). Rent ceilings "operate[d] as an upper bound on the amount of rent that a housing provider [was] allowed to charge a tenant." *See* Sawyer Prop. Mgmt. of Md. v. D.C.

---

[14] The Housing Providers' challenge to the trebling of the rent refund is a separate issue addressed *infra* at 32.

Rental Hous. Comm'n, 877 A.2d 96, 110 (D.C. 2005). Under the rent ceiling system, if related services or facilities were unlawfully reduced, the proper remedy was for the Rent Administrator or an ALJ to reduce the legal rent ceiling by the monthly value of the service or facility. D.C. OFFICIAL CODE § 42-3502.11 (2001); Carmel Partners, LLC. v. Barron, TPs 28510, 28,521, & 28,526 (RHC Oct. 28, 2014). However, a rent refund was only available as a remedy if the "rent charged" exceeded the "applicable rent ceiling." *See* D.C. OFFICIAL CODE § 42-3509.01(a) (2001) (emphasis added); Barron, TPs 28510, 28,521, & 28,526 at 17-21 (finding plain error in awarding refund where tabulation of remedies showed that reduced rent ceilings exceeded rents actually charged); Smith Prop. Holdings Five (DC), LP v. Morris, RH-TP-06-28,794 (RHC Dec. 23, 2013) (remanding for recalculation of refund up to effective date of rent ceiling abolition legislation).

Since the abolition of rent ceilings, the Rent Stabilization Program now directly regulates rents charged, rather than establishing and adjusting a preserved, maximum legal rent. Fineman v. Smith Prop. Holdings Van Ness, LP, RH-TP-16-30,842 (RHC Jan. 18, 2018). The plain language of the Act appears to require that the rent charged must be established as an element of a claim for a rent refund. D.C. OFFICIAL CODE § 42-3509.01(a) (2012 Repl.).[15] However, the Commission has previously observed that the Act's requirement to determine "the amount by which the rent exceeds the applicable rent charged" is ambiguous and appears to assume a maximum legal limit that is not otherwise clearly established by the statute. *See* Fineman, RH-

[15] The Tenants contend that, under OAH Rule 2822.3, the burden of production of evidence of the rents charged should be placed on the Housing Providers "to promote fairness, equity, substantial justice, and sound judicial administration." Tenants' Brief at 33. "Allowing the Housing Provider to hide behind the legal fiction that it does not know how much rent those Tenants pay – while continuing to cash their rent checks – would defy any notion of fairness[.]" *Id.* The Commission does not address this contention because, as discussed herein, there is no apparent prejudice from the failure to take evidence of the rents charged on this record, but we note that the Tenants – who wrote the rent checks – should equally be capable of producing evidence of how much was paid.

TP-16-30,842 at 24-25. Moreover, the services and facilities provision of the Act now refers only to adjustments in "the rent charged" for a rental unit. D.C. OFFICIAL CODE § 42-3502.11 (2012 Repl.). Therefore, consistent with its prior interpretation of the Act in Fineman, RH-TP-16-30,842, the Commission determines that the monthly value of an unlawful reduction in related services or facilities is properly treated as a rent overcharge and that a rent refund in the entire amount of the overcharge is the appropriate remedy under D.C. OFFICIAL CODE § 42-3509.01(a).

Even assuming for the moment that the rents charged for Units 1 and 8 were not admitted into evidence on the record,[16] the Commission is not persuaded that the ALJ committed reversible error in awarding the rent refunds that she did. United Dominion Mgmt., 101 A.3d at 430; LCP, Inc. v. D.C. Alcoholic Beverage Control Bd., 499 A.2d 897, 903 (D.C. 1985) ("[R]eversal and remand is required only if substantial doubt exists whether the agency would have made the same ultimate finding with the error removed."); Sinai v. Polinger Co., 498 A.2d 520, 533 (D.C. 1985) (Nebeker, J., concurring) ("It is well settled that appellants bear the burden of affirmatively establishing prejudicial error."); *see* Barac Co. v. Tenants of 809 Kennedy St., N.W., VA 02-107 (RHC Sept. 27, 2013) at n.15 (defining "harmless error" as "[a]n error which is trivial . . . and was not prejudicial to the substantial rights of the party assigning it, and in no way affected the final outcome of the case") (quoting BLACK'S LAW DICTIONARY 646 (5th ed. 1975)).

[16] The parties dispute whether certain documents stating the rents for Units 1 and 8 were properly admitted into evidence as attachments to the Tenant Petition and if they were admitted for the purpose of proving the rents charged or for a narrower purpose. *See* Housing Providers' Brief at 13; Tenants' Brief at 31-32. The Commission does not address this contention because, for the reasons discussed herein, it is unnecessary to rely on those documents in these circumstances. We note, however, that the Tenant Petition alleges that the rent charged at the time of filing for Unit 1 was $745 and for Unit 8 was $869. Tenant Petition exhibit 1.

The ALJ determined the monthly value of reduced services and facilities for Units 1 and 8 using the same formula she applied to each affected unit in the Housing Accommodation, as noted *supra* at 18. An ALJ has broad discretion to determine the monthly value of related services and facilities, *see* Williams, TP 28,530, and the Housing Providers do not challenge any particular value determination made by the ALJ. The ALJ did not award any part of the rent refund to the Tenants of Units 1 and 8 based on a percentage reduction of the rent charged. *Compare supra* n.11 (some units' rents reduced by 50% for severe violations). Naturally, a valuation made based on a percentage reduction would require record evidence of the rent charged, but nothing in the Act, regulations, or Commission precedent either requires a reduction to be a percentage of the rent charged or prohibits the use of a fixed dollar amount. *See* 14 DCMR § 4211.9; 1754 Lanier, RH-SF-15-20,126. Accordingly, the only basis to reverse the rent refunds awarded by the ALJ would be if the total monthly value of the reductions exceeded the rent charged for the rental unit. *See* D.C. OFFICIAL CODE § 42-3509.01(a).[17]

The Housing Providers have not claimed on appeal, or anywhere in the record, that the rents charged for Units 1 and 8 were less than $80 and $235 per month, respectively. The uncontested rents charged for the other units in the Housing Accommodation are listed as ranging from $599 to $875 per month. Final Order at 458. The Housing Accommodation contains only efficiency and one-bedroom apartments. *Id.* at 18. Only Unit 6 is expressly described as an efficiency, with a monthly rent of $599; the next-lowest rent in the building is $661 for Unit 23. *Id.* at 182, 458. Unit 1 is not expressly described as a one-bedroom or an efficiency, but in passing is referred to as having a bedroom. *Id.* at 112-13.

---

[17] The Commission notes that the rent refunds were trebled, but D.C. OFFICIAL CODE § 42-3509.01(a) provides for trebling *after* determining the amount of the rent overcharge. *See also* 14 DCMR § 42117.1(a), (b). It therefore appears that a trebled rent refund may exceed the rent charged.

Unit 8 is expressly described in the Final Order as a one-bedroom unit. *Id.* at 214. The ALJ found that the rent charged for Unit 8 was $869. *Id.* The basis for this finding in the record is not apparent. However, RX 505V, a letter from the Housing Providers to Maria Torres at Unit 8, dated July 25, 2014, states in bold type, "Your rent will remain at $823.00." Tenant Torres further testified that, prior to a disputed rent increase, "Our increase[s] earlier had been $30, maybe $25 a year. Then I got the letter that I had to pay $1,280." Hearing Transcript (OAH Mar. 1, 2016) at 81:21. Her testimony was in refence to PX 221, a letter from Tenant Torres to the Housing Provider, refusing to pay a "31.2%" rent increase, indicating that the prior rent charged for the unit had been approximately $975.

In this context, it is not plausible that the rents charged for Units 1 and 8 were less than the monthly valuations of reduced services made by the ALJ. Substantial evidence in the record shows that the rent for Unit 8 was somewhere around and above $800, nearly four times the refund awarded. The refund for Unit 1 was only $80, less than one seventh of the lowest rent in the record for any other unit. Given these large differences and the absence of any suggestion at the evidentiary hearing or on appeal by the Housing Providers that the rents charged were, in fact, that low and so far out of step with the other units in the Housing Accommodation, the Commission is not persuaded that the Housing Providers were prejudiced by a failure of the Tenants to prove the rents charged for Units 1 and 8.[18]

Accordingly, the Final Order is affirmed on this issue.

---

[18] The Commission notes that the circumstances of this appeal are rather unusual. The fact that record contains the rents charged for so many other units in the same Housing Accommodation will likely distinguish this case from most claims brought by individual or small groups of tenants. The wide disparity between those rents and the rent refunds awarded for the units at issue also persuade the Commission that there was no prejudice to the Housing Provider. Given the implausibility that the Housing Providers were prejudiced by the (argued) failure of the Tenants to put on evidence of the rents charged, the Commission does not reverse on this issue. Nonetheless, future tenants and their representatives would be well-advised to assure that written evidence or live testimony of the rent charged for a rental unit comes into the record.

**4. Whether OAH erred in concluding that Tenant Benitez was a tenant of Unit 5 and that the Tenants' Association has standing to seek an award of a rent refund on her behalf.**

At the evidentiary hearing and on appeal, the Housing Providers have contended that Marceline Benitez, who resides in Unit 5 of the Housing Accommodation, is not a tenant within the meaning of the Act because she is not named in the written lease for the rental unit and her business with the Housing Providers was conducted in the name of Valentin Escobar, her brother-in-law and the named tenant in the written lease. Housing Providers' Brief at 13-17; Final Order at 170-72. Mr. Escobar is not a member of the Tenants' Association and did not appear at the evidentiary hearing, and the Housing Providers maintain, therefore, that no party to this case has standing to claim a rent refund for conditions in Unit 5. Because the facts found by the ALJ do not support the conclusion that Ms. Benitez and the Housing Providers had a landlord-tenant relationship under District of Columbia law before July 2015, we reverse in part.

Under the Act, only a tenant or a tenant association has standing to file a tenant petition. D.C. OFFICIAL CODE § 42-3502.16a; 14 DCMR § 4214.3. A tenant association has standing only where its members "have standing to assert a claim in their own right." D.C. OFFICIAL CODE § 42-3502.16a(a)(1). The Act defines a "tenant" as "a tenant, subtenant, lessee, sublessee, or other person entitled to the possession, occupancy, or the benefits of any rental unit owned by another person." D.C. OFFICIAL CODE § 42-3501.03(36) (emphasis added); *cf.* Redman v. Potomac Place Assocs., LLC, 972 A.2d 316, 319 (D.C. 2009) (interpreting identical language in Rental Housing Conversion and Sale Act to protect "*lawful* tenants").

Under the Act, a written lease is not required to be a tenant. *See* Woodner Apartments v. Taylor, RH-TP-07-29,040 (RHC Sept. 1, 2015) (unit leased to son while housing provider was aware rent was paid in part, then in full, by mother); Marguerite Corsetti Trust v. Segreti, RH-TP-06-28,207 (RHC Sept. 18, 2012) (affirming ALJ's finding that relative was a "tenant" under

the Act where the evidence demonstrated that he had paid rent, even though there was no lease agreement); Eastern Savings Bank v. Mitchell, RH-TP-08-29,397 (RHC Oct. 31, 2012) (determining that the essential requirement to establish "tenancy" under the Act is that a person "'continues to pay rent' for the housing accommodation at issue" (quoting Adm'r of Veterans Affairs v. Valentine, 490 A.2d 1165, 1169-70 (D.C. 1985))); Davenport v. Cowan, TP 20,709 & VA 20,199 (RHC Apr. 26, 1989) (noting that "if the leaseholder dies or vacates the rental unit and the housing provider accepts the rent from a person not on the lease and makes no attempt to remove the person that person is a de facto tenant."). Nonetheless, "[a] landlord-tenant relationship does not arise by mere occupancy of the premises; *absent an express or implied contractual agreement*, with both privity of estate and privity of contract, the occupier is in adverse possession as a 'squatter.'" Young v. District of Columbia, 752 A.2d 138, 143 (D.C. 2000) (emphasis added); *see* Simpson v. Jack Spicer Real Estate, Inc., 396 A.2d 212, 215 (D.C. 1978) ("We conclude that the tenancy arising from mere possession is not that which is referred to in the rent control statute[.]").

The DCCA has described "privity of contract" and "privity of estate" as follows:

> Privity of contract rests on agreement, whereas privity of estate rests on an interest in the leased premises. An original tenant, that is, one who acquires his lease directly from the owner of the property, is normally in privity of both contract and estate. His acquisition of the leasehold interest creates the privity of estate. His execution of the lease . . . creates privity of contract.
>
> If tenant assigns the lease his privity of estate thereby ends but privity of contract continues, that is, his right to possession ends but his liability under the lease continues . . . . The assignee acquires privity of estate. If the assignee assumes the tenant's obligations under the lease [s]he comes under privity of contract as well. . . . By receiving the assignment – regardless of landlord's consent thereto – the assignee acquires an interest in the premises that brings [her] into privity of estate with the owner and makes [her] liable to the owner for the payment of rent[.]

Sarete, Inc. v. 1344 U St., LP, 871 A.2d 480, 495 (D.C. 2005) (quoting 1 MILTON R. FRIEDMAN, FRIEDMAN ON LEASES § 7:5:1[A], at 7-98-7-99 & 7-103-7-104 (5th ed. 2004)). While there is no

dispute that Ms. Benitez had "privity of estate" through her possession of the rental unit, the question is whether "privity of contract" can be implied by the circumstances. In Young, the DCCA noted several, non-exhaustive factors for consideration in determining whether a person occupying real property is a tenant: the existence of a lease agreement, the payment of rent, and "other conditions of occupancy" between the parties. 752 A.2d at 143 (citing Anderson v. William J. Davis, Inc., 553 A.2d 648, 649 (D.C. 1989) (occupants were not tenants because occupancy was conditioned on employment by apartment building owner for property maintenance and management)).

The ALJ found that Ms. Benitez was a tenant because she paid rent to the Housing Providers, because the Housing Providers accepted rent for the unit for over 20 years without questioning the occupancy of the unit, and because the Housing Providers performed maintenance on the rental unit pursuant to maintenance requests she submitted. Final Order at 171 (citing Young, 752 A.2d at 143). The parties do not dispute that there was no express, oral or written lease between Ms. Benitez and the Housing Providers. The parties also do not appear to dispute that Ms. Benitez was the person who actually paid the rent for Unit 5. However, the Housing Providers point out that she paid the rent "in Mr. Escobar's name" by placing his name on money orders until July 2015. Housing Providers' Brief at 16-17. The Housing Providers also point out that Ms. Benitez's maintenance requests and other complaints as to housing conditions were also submitted using Mr. Escobar's name or simply the unit number. *Id.* at 16. The Tenants' Association counters that the ALJ properly considered the totality of the circumstances, including that Ms. Benitez paid rent for nearly 20 years, that the Housing

Provider accepted rent "directly from Ms. Benitez," and that Ms. Benitez made "numerous requests for repairs via telephone and in writing." Tenants' Brief at 35.[19]

The ALJ also concluded that "at a minimum, Ms. Benitez was a sublessee of Mr. [Escobar] who was entitled to possession of the rental unit . . . Ms. Benitez had an oral agreement with Mr. [Escobar] to occupy the apartment in exchange for regular monthly rental payments as Mr. [Escobar's] subtenant or co-tenant." Final Order at 171. The record does not clearly indicate when Mr. Escobar moved out of Unit 5 or contain any specific evidence as to an agreement with Ms. Benitez. Ms. Benitez testified at the 2016 evidentiary hearing that she had lived there for 24 years (*i.e.*, since 1992) and that Mr. Escobar had lived with her for the first five years before moving out (*i.e.*, in 1997). *See* Final Order at 163; Hearing Transcript (OAH Mar. 4, 2016) at 78-80. However, the most recent written lease in the record for Unit 5 was entered in December 1999 in Mr. Escobar's name. Final Order at 163; RX 538. The Commission also observes that, in this context, Ms. Benitez repeatedly described herself as "the one responsible" for the rental unit, but with no elaboration as to how she took on that responsibility. Hearing Transcript (OAH Mar. 4, 2016) at 78-79.

On this record, the Commission cannot determine what Ms. Benitez's legal relationship was to Mr. Escobar with respect to the rental unit. She may have been a subtenant, *see* Comedy

---

[19] The ALJ also considered that the Housing Providers could not have evicted Ms. Benitez from Unit 5 without court process to be a "condition of occupancy." Final Order at 171-72. The Housing Providers argue that this was an erroneous consideration because self-help eviction is broadly prohibited under District law regardless of the whether an occupant is a "tenant." Housing Providers' Brief at 16. The Tenants' Association does not defend the ALJ's consideration of this factor, relying instead on the other factors as sufficient to establish a tenancy. *See* Tenants' Brief at 36 n.74.

The DCCA has held that a common law claim for wrongful eviction "in no way depended on the Act generally or its definition of 'tenant' in particular." Segreti v. DeIuliis, 193 A.3d 753, 758 (D.C. 2018). The DCCA has also expressly left open the question as to "whether a wrongful eviction or breach of quiet enjoyment action may lie even if [a person's] occupancy constituted something less than some sort of tenancy." Wilson v. Hart, 829 A.2d 511, 515 n.9 (D.C. 2003). Ms. Benitez's general right against eviction without court process therefore appears to be irrelevant to her status as a "tenant" under the Act.

v. Vito, 492 A.2d 276, 279 (D.C. 1985), a roomer, *see* Harkins v. WIN Corp., 771 A.2d 1025, 1027 (D.C. 2001), or, after his departure, an assignee of his lease, *see* Sarete, Inc., 871 A.2d at 495. However, there is no substantial evidence of any written or oral contract, agreement, payment, or other arrangement between Ms. Benitez and Mr. Escobar.

Moreover, the record does not contain any substantial evidence, nor did the ALJ make a factual finding, that the Housing Providers were aware either that Ms. Benitez lived in the unit or that she was the person actually paying the rent. *See* Final Order at 163 ("Mr. Ford . . . is not personally familiar with Ms. Benitez and was not aware she was living in the apartment. . . . When Ms. Benitez made requests for repairs, she used the name Valentin Escobar or gave her unit number."). Ms. Benitez therefore does not appear to have been more than a mere occupant, lacking privity of contract with the Housing Providers. *See* Young, 752 A.2d at 143. Without substantial evidence in the record that the Housing Providers agreed to or knowingly acquiesced in Ms. Benitez's occupancy, the Commission cannot conclude that any "conditions" of her occupancy are sufficient to establish a tenancy.[20]

However, the Commission finds that there is substantial evidence in the record to establish that Ms. Benitez paid rent in her own name to the Housing Providers, who accepted the payment, in and after July 2015, and from which it can be concluded that she was a tenant under the Act from that time forward. *See* Taylor, RH-TP-07-29,040; Segreti, RH-TP-06-28,207;

[20] The Commission notes that its role is not to act as the fact-finder in contested cases. Were it, we might find it unlikely that, after 20 years, no agent of the Housing Providers knew that Ms. Benitez lived in Unit 5 or that she was the person really paying the rent. However, the ALJ made no such credibility determination or finding of fact that the Housing Providers did have such knowledge. *But see* Final Order at 450 ("There are many things about Mr. Ford's testimony and actions which I find disingenuous."). Nonetheless, the Housing Providers' inattentiveness to the condition of the Housing Accommodation is a recurring theme in the Tenants' complaints and the Final Order. It is therefore not entirely implausible that the Housing Providers paid no attention to who lived in its building as long as the rent was paid. Moreover, the ALJ did not rely on, the Tenants do not cite to, nor is the Commission aware of any statute or case law to suggest that the length occupancy alone creates an implied tenancy as a matter of law or that the Housing Providers would be otherwise estopped or time-barred from denying a tenancy after such a long period.

Mitchell, RH-TP-08-29,397; Davenport, TP 20,709 & VA 20,199. As the ALJ noted, Ms. Benitez began paying rent with money orders bearing her own name when the Tenant Petition was filed in July 2015. Final Order at 163-64; *see* Hearing Transcript (OAH May 10, 2016) at 153-57.[21] The ALJ awarded a rent refund for Unit 5 based on housing conditions that existed until the close of the evidentiary record in May 2016. Thus, $1,105 of the (pre-trebling) rent refund awarded was based on housing conditions that existed in or after July 2015. Final Order at 472 (Appx. D-2). The Commission is satisfied that there is no reversible error in awarding a rent refund to Tenant Benitez for that time period.

Accordingly, the Final Order is reversed in part and affirmed in part on this issue. The proper rent refund to Tenant Benitez for reductions in services and facilities in Unit 5 is calculated in Appendix A to this decision and order. Because this order modifies an order to pay a rent refund, the Commission also recalculates the award of interest under its rules, as also reflected in Appendix A. *See* 14 DCMR § 3826; Williams v. Thomas, TP 28,530 (RHC Dec. 24, 2015).

### 5. Whether OAH erred in finding that the Housing Providers acted in bad faith in failing to abate the housing code violations

Under the Act, rent refunds may be trebled when an ALJ finds that a housing provider's violation was in bad faith. D.C. OFFICIAL CODE § 42-3509.01(a) (person who knowingly violates rent stabilization provisions "shall be held liable . . . for the amount by which the rent exceeds the applicable rent charged or for treble that amount (in the event of bad faith)"). The Commission has consistently held that an award of treble damages requires the application of a

[21] The ALJ states in the Final Order that Ms. Benitez began putting her name on the rent checks "after the Tenant Petition was filed," but also that the Tenant Petition included a copy of a rent check with Ms. Benitez's name on it. Final Order at 163-64. Despite this contradiction, the Commission's review of the record reveals substantial evidence that Ms. Benitez put her name on a rent check on June 29, 2015, for the July 2015 rent, and that the Tenant Petition was then filed on July 2, 2015.

two-prong test: "first, there must be a determination that the housing provider acted knowingly; and second, the housing provider's conduct must be 'sufficiently egregious' to warrant a finding of bad faith." Palmer, RH-TP-13-30,431 (RHC Oct. 5, 2015) at 26 (quoting Gelman Mgmt. Co. v. Grant, TP 27,995, 27,997, 27,998, 28,002, & 28,004 (RHC Aug. 19, 2014)).[22] A finding of bad faith must be based on specific findings of fact that "demonstrate a higher level of culpability," such as "a deliberate refusal to perform without a reasonable excuse and/or manifest[ed] dishonest intent, sinister motive, or heedless disregard of duty." *Id.* (quoting Notsch v. Carmel Partners, LLC, RH-TP-06-28,690 (RHC May 16, 2014)).

The ALJ made the following determinations as to whether the Housing Providers' reductions of services required by the housing code were in bad faith, which we recite here for ease of reference:

> Tenants argue that Housing Providers acted in bad faith by failing to abate housing code violations in the Housing Accommodation. While the evidence establishes that Mr. Ford has made repairs to Tenant units following the issuance of NOVs, he has largely ignored individual Tenant complaints both oral and written. Mr. Kennedy, a Tenant Organizer with the LEDC, described the building as one of the worst he has seen out of over 100 buildings he has visited. He testified that he found Mr. Ford to generally be unresponsive to requests of both Tenants and the LEDC. All Tenants testified credibly that Mr. Ford, and formerly Barac Company, were generally unresponsive to Tenants' oral and telephone requests for repairs. Most Tenants testified that they repeatedly called to request repairs and no one would come. Tenant Vanessa Benitez testified that after Tenants started to include Rent Drop Letters with their rent, the staff in the SCF Management Office would not accept the letters and would only accept the rent payments. Therefore, Tenants began to mail their rent payments along with the Rent Drop Letters.
>
> Mr. Ford on the other hand, testified that he rarely received a phone call from a Tenant requesting repairs and that any request for repairs would have been logged in his computerized service request system, AFolio. I do not credit this testimony because, as demonstrated in the findings of fact, Mr. Ford's record keeping is

[22] As the Commission observed in Palmer, knowledge of the action or inaction that constitutes a violation of the Act is a prerequisite to the award of a base rent refund, which satisfies the "knowing" prong of the treble refund analysis. RH-TP-13-30,431 at 27. In cases of reductions in related services and housing code violations, the requirement to show a knowing violation of the Act is met by the notice prong of the three-part test. *See* Gelman Mgmt. Co. v Jolly, TP 21,451 (RHC Oct. 25, 1990).

unreliable. There were numerous invoices that Mr. [Ford] was unable to produce based on his notations made on the NOVs. Mr. Ford's testimony that he does not track written notices or NOVs in his computer system, but accurately logs all oral requests for repairs is not persuasive. As Mr. Ford does not speak Spanish, he is not the person who would receive and log requests received by telephone. Rather, Mr. Ford testified that his wife, Patricia, speaks Spanish and answers the phones. Tenants repeatedly testified that they reported problems to "Patricia."

When Housing Providers made repairs, they amounted to patch work and the serious problems, the roof leak and infestations, were not resolved. In many units, Housing Providers painted multiple times in one year. Repeatedly painting the walls does not alleviate the underlying problem that Tenants have continuously endured: leaks, cracks, mold, dampness and soft walls. No tenant should have to endure such conditions for long periods of time.

There are many things about Mr. Ford's testimony and actions which I find disingenuous. In particular, the photographs taken of Tenants' units in 2016, during the hearing, appear to have been lightened to conceal current damage. Mr. Ford testified that the purpose of having a photographer take photographs that day was to identify new problems in Tenants' units so that repairs could be made. However, there were no photographs offered of new problems. The photographs were all wide angle photographs of the rooms which did not document[] problems. All the photographs were offered to show that there were no problems in any unit. I credit the testimony and photographs of Tenants and Ms. Watson over that of Mr. Ford. Thus, I conclude that Mr. Ford had a dishonest intent when he directed photography in the units in March and April 2016. His intent was not to identify and address problems in the units. Rather, it was to create what amounted to misleading evidence to present in this hearing to refute Tenants' allegations.

I also found disingenuous Mr. Ford's testimony that he did not make any repairs to the units after receiving the LEDC's April 17, 2015, Letter, because he believed the letter to be duplicative of the violations listed in the December 8, 2014, NOVs. Mr. Ford testified that he compared the problems listed in the LEDC Letter to those in the NOVs and determined they were the same problems, all of which he had repaired as of March 2015. If all items were repaired as of March 2015, it certainly begs the question why the LEDC would send Housing Provider a 13 page list of problems in April 2015. Mr. Ford did not at that time even take the minimum steps of inspecting Tenants' units to determine if the Letter was accurately reporting current problems. Taking Unit 21 (Vaness[a] Benitez) as an example, the December 8, 2014, NOV cited 15 violations. PX 261. The LEDC's April 17, 2015, Letter listed 25 problems in the unit; only five of the problems listed in the LEDC Letter were also cited as housing code violations in the December 8, 2014, NOV. This discrepancy is consistently true for all the units. Another example is Unit 23 (Rosetta Archie). Unit 23 was <u>not</u> inspected by DCRA on December 8, 2014, and thus, no NOV was issued and there was no evidence of any repairs in that unit after September 2014. Despite the Tenant[s] sending Mr. Ford letters reporting problems in October, November, and December 2014, and February 2015. [sic] The LEDC's

April 17, 2015, Letter identified 29 problems in Unit 21 and no repairs were made. Mr. Ford was aware there were infestations of rodents, roaches, and bedbugs, when the December 8, 2014, NOV was issued and when he received the LEDC's April 17, 2015, Letter, but he did not arrange for building-wide extermination.

Most egregious was Housing Providers' failure to abate ongoing roach and rodent infestations over a period of three years, which I conclude demonstrated a heedless disregard of their duty to comply with the housing code. *See Caesar Arms, LLC v. Lizama*, RH-TP-07-29,063 at 28-31 (affirming the ALJ's finding of bad faith and imposition of treble damages where the housing provider had knowledge of an infestation that lasted several years); *Ahmed, Inc. v. Avila*, RH-TP-28,799 at 15 (affirming the ALJ's finding of bad faith where the housing provider's ongoing failure to abate the infestation for several years was "the product of a conscious choice[,] and demonstrates the housing provider was at least 'aware that it was violating a provision of the Rental Housing Act'."); *Cascade Park Apts. v. Walker*, TP 26,197 at 20 (holding that a housing provider's failure to abate severe rodent infestation for several years "far exceed the standard for the imposition of treble damages").

The Commission applied both prongs of the bad faith analysis in *Cascade Park Apts. v. Walker*. The tenants in *Cascade Park Apts.* were subjected to severe rodent infestations for several years and had regularly given notice of the rodent problem to the management. TP 26,197 at 20, 23. The Commission therefore held that the first prong of bad faith was met because "the housing provider knew that substantial housing code violations existed throughout the housing accommodation." *Id.* at 35. The Commission further held that the second prong of bad faith was met because "the record reveals a continuing, heedless disregard of the duty to keep the rental units and common areas in substantial compliance with the housing regulations." *Id.*

Here, the record contains substantial evidence that a rodent and roach infestation lasted three years, and Housing Providers did not abate the infestation despite being repeatedly informed about it. Tenants repeatedly identified roaches and rodents as problems in written letters. The Inspection Reports from Dixon's extermination in the common areas consistently reported an infestation of rats in the basement and around the exterior of the Housing Accommodation. Most egregious is that with the knowledge that there were rampant roaches and rodents, Housing Providers failed to provide extermination in any unit for a full year. Even before 2015, exterminations in individual units were far and few between. The fact that Tenants were given the phone number to Dixon's to call for extermination and did not, does not relieve Housing Providers of their obligation to maintain the building roach and rodent free. There was nothing preventing Mr. Ford from having all units exterminated monthly, in the same manner he exterminated the common areas monthly. If Tenants then refused extermination, Mr. Ford would have been relieved of his obligation. Housing Providers had knowledge of substantial housing code violations, and thus meet the first prong of bad faith. *See Cascade Park Apts. v. Walker*, TP 26,197 at 20 (citing *Fazekas v. Dreyfuss Bros., Inc.*, TP 20,394 (RHC

> April 14, 1989). Moreover, based on the nature of the violation, its length, and Housing Providers' enduring failure to abate the infestations despite knowing about their existence, I conclude the Housing Providers have evinced a continuing and heedless disregard of their duty not to reduce services. Thus, their failure to act meets the second prong of bad faith.

Final Order at 448-53.

The Housing Providers assert that the ALJ's finding of bad faith was unsupported by substantial evidence because: (1) repairs were frequently made to the building and a major rehabilitation was planned; (2) the Housing Providers reasonably relied on DCRA certifications that there were no housing code violations; (3) the Housing Providers made pest control services available to the Tenants, who did not utilize the services; and (4) any bad faith in failing to abate the pest infestations cannot be imputed to the other housing code violations and reductions in services in the building. Housing Providers' Brief at 18-20. We address each of these arguments in turn, and we affirm.

**a. Evidence of repairs**

First, the Housing Providers effectively ask the Commission to reevaluate the credibility of witness testimony or the weight of the conflicting evidence in the record. *See* Gary, 723 A.2d at 1209; Ahmed, Inc. v. Avila, RH-TP-28,799 (RHC Oct. 9, 2012) at 13-16. For example, the Housing Providers' Brief includes a seven-page chart of evidence in the record of invoices, work orders, and notices of repairs to individual rental units and the common areas of the Housing Accommodation. They argue that "[t]he record is replete with work orders and repair invoices which prove that the Housing Providers made consistent efforts to repair and maintain the Property." Housing Providers' Brief at 22. Although there is evidence of repairs being made to the Housing Accommodation and individual rental units, the ALJ found that "[w]hen Housing Providers made repairs, they amounted to patch work." Final Order at 449. The ALJ also observed that, to the extent repairs were made, they were largely done only after notices of

violation were issued by DCRA; oral and written tenant complaints were "largely ignored." *Id.* at 448. The ALJ could reasonably conclude from a pattern of making repairs only when caught by an enforcement authority that the Housing Provider was deliberately refusing to perform its obligations to the Tenants.

The Housing Providers further contend that the ALJ should have found they acted in good faith based on undisputed testimony that they "have tried for several years, without success, to reach an agreement with the tenants on a negotiated plan" for a substantial rehabilitation of the Housing Accommodation to correct major problems. Housing Providers' Brief at 19. In the Final Order, the ALJ noted that:

> Mr. Ford testified that Housing Providers intended to pay for the roof replacement from rent increases through a hardship petition. Tenants and Housing Providers have been embroiled in legal battles over three hardship petitions filed in the last four years that were granted by the Rent Administrator, then reversed or remanded by this administrative court. Each of those petitions, in turn, was withdrawn by Housing Providers. Housing Providers have now abandoned the hardship petitions in favor of filing a petition for substantial rehabilitation requiring Tenants to vacate the Housing Accommodation, which initiated another legal battle that is still ongoing.

Final Order at 27.

The Commission is not persuaded that the Housing Providers' efforts to secure consent or approval for *rent increases* preclude the ALJ's finding of bad faith in *reducing related services.* To begin, the Commission notes that the ALJ found that Mr. Ford's testimony generally lacked credibility. Final Order at 450 ("There are many things about Mr. Ford's testimony and actions which I find disingenuous."). Thus, the ALJ was not obligated to find that the Housing Providers had negotiated with the Tenants in good faith or that they actually intended to pay for the roof replacement with petition-based rent increases.

Further, a housing provider's duty to comply with the housing code and to maintain all related services and facilities is not (directly) conditioned on its financial situation. To the

contrary, a housing provider may only implement rent increases or obtain approval for certain rent adjustments when the subject housing accommodation is *already* in substantial compliance with the housing code. D.C. OFFICIAL CODE § 42-3502.08(a)(1)(A); Dorchester House Assocs., LP v. D.C. Rental Hous. Comm'n, 938 A.2d 696, 707 (D.C. 2007); *see also* D.C. OFFICIAL CODE § 42-3501.03(22) (for determining net income in hardship petitions, deductible "operating expenses" include costs of "maintenance and repairs").

The Commission acknowledges that substantial rehabilitation petitions appear to be implicitly exempt from this general requirement because they may be approved in consideration of "the degree to which any violations of the housing regulations in the rental unit or housing accommodation constitute an impairment of the health, welfare, and safety of the tenants." D.C. OFFICIAL CODE § 42-3502.14(c)(2). Although the Act provides this relief valve for the finances of buildings in a state of disrepair, the filing a substantial rehabilitation petition cannot excuse or provide cover for the process by which such conditions came to exist or have been allowed to persist. Moreover, the Commission's review of the record shows that the Housing Providers' negotiations with the Tenants over various potential petitions began at least in 2012, but a substantial rehabilitation petition was not actually filed until April 2016. *See* Hearing Transcript (OAH Apr. 26, 2016) at 53:1-19. Such an extensive delay in acting to repair the Housing Accommodation, even assuming petition-based rent increases were financially necessary to do so, reasonably permits the ALJ to find bad faith in allowing conditions to persist during that time.

The Housing Providers also suggest that, because the Tenants alleged many other reductions in services but did not prevail on those claims, the ALJ could not reasonably find bad faith with respect to the reductions that the Tenants did prevail on. *See* Housing Providers' Brief

at 19 ("OAH addressed roughly 292 complaints raised by Petitioners in the Final Order. Of those, the OAH found that many had been repaired at various points and that in total there were only 101 complaints (approximately 1/3) across the 15 units that were substantiated").

As previously described, tenants must meet a three-prong test to succeed on a claim of reduced services or facilities; failure of any one of those prongs is fatal, even if the other prongs were supported by substantial evidence. Drell, TP 27,433. For example, there is substantial evidence in the record of conditions that substantially violated the housing code but for which, at the evidentiary hearing, witnesses were unable to provide specific-enough dates to meet the duration prong. *See, e.g.,* Final Order at 101-04 (common area cracked and peeling paint). For some other claims, the Tenants were not awarded refunds because, despite being unsightly or uncomfortable, the conditions did not violate the housing code or amount to a substantial reduction in services or facilities under the Act. *See, e.g.,* Final Order at 33 (inability to control heat), 107 (exposed cable television wires). In light of the myriad reasons a tenant may fail to prove or may have no remedy for one or several particular claims, we cannot say that a finding of bad faith, with respect to claims on which a tenant has prevailed, is necessarily negated by the tenant failing on other claims.

At least arguably, the fact that some of the Tenants' claims failed on the notice prong suggests that the Housing Providers operated in good faith with respect to conditions at the building. For example, with respect to the building-wide heating system, the ALJ found no substantial evidence that the Housing Providers had more than a few hours' notice of a boiler breakdown before acting to repair the problem. Final Order at 32-33. The ALJ noted, however, that "[i]t was clear from the testimony of many Tenants that they often did not report problems to Housing Provider because they did not feel empowered to do so and because their experience

when they did complain led them not to expect a response from their complaints." Final Order at 34. Further, as described above, the ALJ found tenant complaints to have been largely ignored and repairs beyond patchwork to have been made only when DCRA was informed. *See id.* at 448. In that context, the ALJ could reasonably find that, despite a failure to prove notice to the Housing Provider of some specific conditions, or even prompt repair in a few cases, the Housing Provider had generally operated in bad faith with respect to the maintenance of the property. The Commission will not reweigh the substantial evidence relied on by the ALJ.

**b. DCRA inspection reports**

Second, the Housing Providers argue that they reasonably relied on inspection reports issued by DCRA on May 29, 2014 and October 29, 2014, which found no housing code violations in the building. Housing Providers' Brief at 19 (citing RX 515A).[23] They maintain that the ALJ abused her discretion by failing to consider these reports in analyzing the Tenant's claims of bad faith. *Id.* The Commission's review of the record, however, does not reveal any evidence that the Housing Provider actually relied on these certificates in delaying or failing to perform any repairs.

The certificate of compliance was issued following a proactive inspection by DCRA that the Housing Providers requested in connection with a hardship petition they had filed. Hearing Transcript (OAH Apr. 26, 2016) at 40-41. After their witness, Mr. Ford, was shown RX 515A, counsel for the Housing Providers proceeded to ask a series of questions regarding maintenance of the building. None of Mr. Ford's answers to those questions indicated that the management or

[23] The Tenants contend that RX 515A was not admitted into evidence. The Commission's review of the record shows that the exhibit was shown to Mr. Ford and, upon return from a brief recess, moved into evidence and admitted without objection. Hearing Transcript (OAH Apr. 26, 2016) at 40-41, 50.

the owners decreased maintenance services based on the DCRA certificate of compliance. *Id.* To the contrary, the following testimony was provided:

> Q. Okay. Mr. Ford, throughout this process again up until -- I think we're now in the 2013-2014 time frame period -- had the owners ever asked you not to spend money on repairs?
>
> A. No. The BARAC Company controlled the money at their office. Any repairs, anything that was done was paid by the BARAC Company. . . .
>
> Q. Did there ever come a time, Mr. Ford, w[h]ere you increased the number of repairs you were doing?
>
> A. Yes. Sometime in 2014.
>
> Q. Why -- why did that occur, Mr. Ford?
>
> A. During many of the settlement discussions, the tenants had made recommendations that -- that they felt that I should take over and receive all the calls and complaints, and they were requesting that I would take over managing the property. And that was all part of the tenant discussions and LEDC during the settlement discussions at that time.

Hearing Transcript (OAH Apr. 26, 2016) at 45:14-20, 47:15-48:3 (emphasis added). Because substantial evidence in the record does not support the Housing Providers' contention that they reduced maintenance expenditures, or took *any* particular action, in reliance on the DCRA certificate of compliance, the Commission is satisfied that the ALJ did not abuse her discretion by failing to consider the issuance of the certificate in evaluating the Tenants' allegations of bad faith.[24]

**c. Availability of pest control**

The Housing Providers further argue that the ALJ's finding of bad faith in failing to abate pest infestations is contradicted by her finding that:

---

[24] The Commission also observes that the second page of the DCRA certificate of compliance issued on October 29, 2014 explicitly states: "Please be aware that the Certificate of Compliance does not prevent tenants from requesting individual inspections for building code violations in individual units." RX 515A at 2. Thus, it does not appear likely that any actual reliance by the Housing Providers would have been reasonable.

> Housing Provider complied with the [Property Maintenance Code] requirement to make extermination available by providing Tenants with the telephone number for Dixon's Pest Control (Dixon's) to request extermination. However, no Tenant has contacted Dixon's to request extermination in the three years before the petition was filed, and thus Tenants have not fulfilled their responsibility to minimize the potential for infestation[.]

Final Order at 37. The Housing Providers maintain that "[i]n so far as the record supports the conclusion that the Tenants have not fulfilled their responsibility to minimize the potential for infestation and failed to even establish that there is an infestation, the Housing Providers should not incur a penalty for failure to abate the problem." Housing Providers' Brief at 20.

The Commission has consistently held that a housing provider's unsuccessful efforts to abate conditions do not excuse a failure to provide services required by the Act. *See, e.g.*, Lizama, RH-TP-07-29,063; Dejean v. Gomez, RH-TP-07-29,050 (RHC Aug. 15, 2013); Jonathan Woodner Co. v. Enobakhare, TP 27,730 (RHC Feb. 3, 2005). To be sure, an ALJ could find that a housing provider's unsuccessful efforts to abate a housing code violation show good faith and that treble damages are unwarranted. In such a case, the nature and extent of those efforts would be relevant. *See* Waller, RH-TP-16-30,764 (remanding for consideration of "record evidence relating to the extent, duration, and Housing Provider's knowledge or disregard of the housing codes violations").

Here, the ALJ found that the provision of extermination services through Dixon's was long-delayed and underutilized by the Housing Providers and that the length of the infestation was more significant to a determination of the Housing Providers' state of mind. *See* Final Order at 452-53 ("Most egregious is that with the knowledge that there were rampant roaches and rodents, Housing Providers failed to provide extermination in any unit for a full year."). Moreover, the ALJ also found that "Tenants do not call Dixon's because they do not believe that the poison used by Dixon's is effective." Final Order at 40. The record, viewed most favorably

to the Housing Providers, thus contains substantial evidence both for and against a finding of bad faith. It is not the Commission's function to reweigh evidence or reevaluate the credibility of witnesses, and we will not reverse where an alternative decision might also have been supported by substantial evidence. *See* Gary, 723 A.2d at 1209; Avila, RH-TP-28,799 at 13-16.

**d. Failure to make separate findings**

Finally, the Housing Providers argue that the ALJ erred by trebling the rent refunds for conditions other than the pest infestations, which she did not explicitly state were "egregious." Housing Providers' Brief at 20. The Commission has previously found that an ALJ erred by not separately addressing bad faith in relation to each of several challenged rent increases. *See* Pearson v. Brown, RH-TP-14-30,482 & RH-TP-14-30,555 (RHC May 3, 2018) at 46-47. In that case, three rent increases were taken in three separate years, and the ALJ relied on events surrounding later increases to find good faith in earlier increases, effectively ignoring the different circumstances in which each increase was taken. However, the Commission has in some cases found it appropriate, particularly in cases of housing code violations, for an ALJ to consider the totality of the circumstances in evaluating a housing provider's state of mind:

> The record revealed substantial evidence of chronic rodent infestation, constantly recurring trash, debris, and waste in the common areas, continual leaking pipes and collapsing ceilings, and the failure to provide air conditioning. Individually, these conditions evince a continuing and heedless disregard of the duty not to reduce services in a manner that affects the health, safety and security of the tenants. The evidence surrounding each reduced service is sufficiently egregious to warrant the additional finding of bad faith. In totality, the conditions under which the tenants lived, and the housing provider's failure to abate the conditions, far exceed the standard for the imposition of treble damages.

Walker, TP 26,197; *see also* Waller, RH-TP-16-30,764.

In this case, the ALJ's findings as to bad faith reflect an overarching pattern of disregard by the Housing Providers towards complaints about housing conditions. *See* Final Order at 448-53. These conclusions are supported by substantial evidence in the record. For example, many

of the specific housing code violations were found to have interrelated causes. *See, e.g.*, Final Order at 28 ("The pervasive leaks [in the roof] have caused substantial cracked, peeling, and bubbling paint in the units and damp walls which in turn have given rise to mold and unsanitary conditions. All Tenants were affected by these leaks in one way or another[.]"), 45 ("All Tenants at points over the last three years have experienced rats in their units because of the unabated rat problem in the basement."). Furthermore, of the 101 reductions in services for which rent refunds were awarded, in 90 instances the Housing Providers were found to have been on notice of the conditions for at least a year before making repairs, if repairs were made at all.[25] Such extensive delay may show not only the substantiality of a reduction in services, *see* Interstate General, 501 A.2d at 1263, but also a continuing, heedless disregard of duty on the part of the Housing Provider. Caesar Arms, LLC v. Lizama, RH-TP-07-29,063 (RHC Sept. 27. 2013) (the "record contained substantial evidence that a rodent infestation lasted for several years, still existed at the time of the 2008 hearing, and the Housing Provider did not abate the infestation despite being repeatedly informed about it starting in 2004."); Walker, TP 26,197. The Commission is satisfied that the ALJ could reasonably find from the totality of the circumstances that the Housing Providers generally acted (or failed to act) in bad faith with respect to the condition of the Housing Accommodation, and the trebling of all rent refunds rationally follows.

---

[25] Additionally, the radiator in Unit 22 appears to have, in fact, not worked for at least 12 months, but the Tenant's refund was limited to a shorter period because the housing code only requires heat to be supplied during winter months. *See* Final Order at 146-47. Three insect infestations appear to have been abated in less than 12 months because the Tenants treated their own apartments. *See* Final Order at 80 (Unit 24), 89 (Unit 25), & 94 (Unit 28). The shortest violation found was particularly egregious, when a tenant lacked water in his kitchen for 10 days. Final Order at 274 (Unit 12). The next-shortest two conditions, lasting for two months, were also the most severe: major water damage resulting from a roof collapse, which was repaired only after a local news story about the conditions was broadcast. *See* Final Order at 138 (Unit 2) & 310-11 (Unit 22). The remaining violations resulted in refunds for periods of four, five, and seven months. Final Order at 77 (Unit 22 – mice), 83 (Unit 24 – mice), 246 (Unit 11 – ceiling), 275 (Unit 12 – heat), and 338 (Unit 23 – refrigerator). In this context, the Commission cannot say that the ALJ erred by viewing even the relatively short-term violations that the Housing Provider was aware of to be part of a continuing disregard of duty.

Accordingly, the Final Order is affirmed on this issue.

**6. Whether OAH erred in finding that the Housing Providers willfully violated the Act.**

In the Final Order, the ALJ imposed two civil fines in the maximum statutory amount of $5,000: one for the prolonged "failure to abate the roach and rodent problems," and one for the "failure to repair the roof and the resultant damage it continuously caused." Final Order at 455-56; *see* D.C. OFFICIAL CODE § 42-3509.01(b) ("Any person who wilfully . . . fails to meet obligations required under this chapter shall be subject to a civil fine of not more than $5,000 for each violation."). A finding of willfulness requires substantial evidence that a housing provider "intended to violate or was aware that it was violating a provision of the Rental Housing Act." Miller v. D.C. Rental Hous. Comm'n, 870 A.2d 556, 559 (D.C. 2005). As the ALJ correctly observed, the standards of willfulness and bad faith have much in common, but "a determination of willfulness focuses more on the actor's knowledge that he is violating the law than on his motive for doing it." Final Order at 453; *see, e.g.*, Pearson, RH-TP-14-30,482 & RH-TP-14-30,555 at n.17 (not error to analyze fines and treble damages in same portion of final order where discussion contained "separate and distinct conclusions with regard to each alleged mental state").

The Housing Providers assert that the ALJ erred in finding the violations of the Act were willful because, as to the infestations, the Tenant's failed to fulfill their "responsibility to minimize the potential for infestation" by contacting Dixon's extermination services (citing Final Order at 37-38), because the Housing Providers reasonably relied on DCRA certifications that the Housing Accommodation was in compliance with the housing code, and because the record contains numerous work orders demonstrating efforts to repair and maintain the property. Housing Providers' Brief at 21-22.

For the reasons already discussed, the Housing Providers' arguments do not overcome either the underlying violations or the ALJ's related findings as to bad faith. With respect to the findings of willfulness, the ALJ concluded that Mr. Ford, as "an experienced property manager, is fully aware of his obligations" under the housing code and that the Housing Providers knew about the infestations and leaking roof for several years, demonstrating a "conscious choice" to allow the conditions to exist, and were aware that the conditions violated the Act and the housing code. Final Order at 454-55 (quoting Avila, RH-TP-28,799).[26] Specifically, the ALJ relied on, with respect to the pests, Mr. Ford's failure to provide regular extermination while knowing of the infestations, and, with respect to the roof collapse, his failure to replace the roof while knowing since a 2013 inspection that it needed to be completely replaced, rather than patched. *Id.* Even if another conclusion might have been supported by the evidence in the record, the Commission has no basis to say on appeal that the ALJ's findings were unsupported by substantial evidence or that the imposition of fines did not rationally follow under the applicable legal standard. *See* Gary, 723 A.2d at 1209; Avila, RH-TP-28,799 at 11-12.

Accordingly, the Final Order is affirmed on this issue.

## IV. CONCLUSION

For the foregoing reasons, the Commission affirms the Final Order on all issues raised by the Housing Provider and addressed in the Housing Providers' Brief, except to the extent that Tenant Benitez of Unit 5 was not shown to be a tenant under the Act prior to July 2015. The Commission's recalculation of the trebled rent refund and interest owed to Tenant Benitez is attached.

---

[26] The Housing Providers do not argue that Mr. Ford individually or the Housing Providers as corporate entities, being experienced in the rental housing business in the District of Columbia, were not aware of the requirements of the housing code or the Act.

The Commission notes that the Housing Providers established an escrow account in the amount ordered to be paid pursuant to the Final Order. Upon the expiration of the Housing Providers' time to seek reconsideration of this decision and order pursuant to 14 DCMR § 3823, if the Housing Providers have not done so, the Tenants may file a motion for the release of the escrowed funds.

**SO ORDERED.**

MICHAEL T. SPENCER, CHIEF ADMINISTRATIVE JUDGE

LISA M. GREGORY, ADMINISTRATIVE JUDGE

RUPA RANGA PUTTAGUNTA, ADMINISTRATIVE JUDGE

## MOTIONS FOR RECONSIDERATION

Pursuant to 14 DCMR § 3823 (2004), final decisions of the Commission are subject to reconsideration or modification. The Commission's rule, 14 DCMR § 3823.1 (2004), provides, "[a]ny party adversely affected by a decision of the Commission issued to dispose of the appeal may file a motion for reconsideration or modification with the Commission within ten (10) days of receipt of the decision."

## JUDICIAL REVIEW

Pursuant to D.C. OFFICIAL CODE § 42-3502.19 (2012 Repl.), "[a]ny person aggrieved by a decision of the Rental Housing Commission . . . may seek judicial review of the decision . . . by filing a petition for review in the District of Columbia Court of Appeals. Petitions for review of the Commission's decisions are filed in the District of Columbia Court of Appeals and are governed by Title III of the Rules of the District of Columbia Court of Appeals. The court may be contacted at the following address and telephone number:

D.C. Court of Appeals
Office of the Clerk
430 E Street, N.W.
Washington, D.C. 20001
(202) 879-2700

# CERTIFICATE OF SERVICE

I certify that a copy of the foregoing **DECISION AND ORDER** in RH-TP-15-30,690 was mailed, postage prepaid, by first class U.S. mail on this **18th day** of **February, 2020** to:

Carol Blumenthal, Esq.
Kathryn Erklauer, Esq.
Blumenthal & Cordone, PLLC
7325 Georgia Avenue, N.W.
Washington, D.C. 20012

Amanda P. Reeves, Esq.
Clayton D. LaForge, Esq.
David A. Zucker, Esq.
Latham & Watkins LLP
555 11th Street, N.W.
Washington, D.C. 20004

Blake A. Biles, Esq.
Arnold & Porter LLP
555 12th Street, N.W.
Washington, DC 20004

LaTonya Miles
Clerk of Court
(202) 442-8949

# APPENDIX A

## Unit 5 – Marceline Benitez: Recalculated Rent Refund with Interest

**Table A-1: Monthly Amount of Overcharge**

| Month | Reduction 1 | Reduction 2 | Reduction 3 | Reduction 4 | Monthly Amount of Overcharge | Trebled Damages |
|---|---|---|---|---|---|---|
| Jul-15 | $30 | $30 | $35 | $30 | $125 | $375 |
| Aug-15 | $30 | $30 | $35 | $30 | $125 | $375 |
| Sep-15 | $30 | $30 | $35 | $30 | $125 | $375 |
| Oct-15 | $30 | $30 | $35 | $30 | $125 | $375 |
| Nov-15 | $30 | $30 | $35 | $30 | $125 | $375 |
| Dec-15 | $30 | | $35 | $30 | $95 | $285 |
| Jan-16 | $30 | | $35 | $30 | $95 | $285 |
| Feb-16 | $30 | | $35 | $30 | $95 | $285 |
| Mar-16 | $30 | | $35 | | $65 | $195 |
| Apr-16 | $30 | | $35 | | $65 | $195 |
| May-16 | $30 | | $35 | | $65 | $195 |
| | | | | | | |
| **Total** | | | | | **$1,105** | **$3,315** |

**Table A-2: Interest on Overcharges**

| Date of Overcharge | Amount of Overcharge, Trebled (Table A-1) | Months Held (through Feb-20) | Monthly Interest Rate (Feb-20, 4% annual) | Interest Factor | Interest Due |
|---|---|---|---|---|---|
| Jul-15 | $375 | 55 | 0.3333% | 0.1833 | $68.75 |
| Aug-15 | $375 | 54 | 0.3333% | 0.1800 | $67.50 |
| Sep-15 | $375 | 53 | 0.3333% | 0.1767 | $66.25 |
| Oct-15 | $375 | 52 | 0.3333% | 0.1733 | $65.00 |
| Nov-15 | $375 | 51 | 0.3333% | 0.1700 | $63.75 |
| Dec-15 | $285 | 50 | 0.3333% | 0.1667 | $47.50 |
| Jan-16 | $285 | 49 | 0.3333% | 0.1633 | $46.55 |
| Feb-16 | $285 | 48 | 0.3333% | 0.1600 | $45.60 |
| Mar-16 | $195 | 47 | 0.3333% | 0.1567 | $30.55 |
| Apr-16 | $195 | 46 | 0.3333% | 0.1533 | $29.90 |
| May-16 | $195 | 45 | 0.3333% | 0.1500 | $29.25 |
| | | | | | |
| **Total** | **$3,315** | | | | **$561** |
| **Grand Total** | **$3,876** | | | | |