**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| **JEFFERSON-11TH STREET, LLC** | ) | **Case No: 22-00059-ELG** |
| | ) | **CHAPTER 11** |
| **DEBTOR.** | ) | |

**OPPOSITION TO THE ACTING UNITED STATES TRUSTEE'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO DIRECT THE APPOINTMENT OF A CHAPTER 11 TRUSTEE**

COMES NOW Jefferson-11th Street, LLC ("Debtor"), by and through counsel, McNamee Hosea, P.A., and files this Opposition to the *Acting United States Trustee's Motion to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. § 1112(b), or in the Alternative, to Direct the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a)* (the "Motion to Dismiss") and, in support thereof, states the following.

## INTRODUCTION

This Chapter 11 case presents complicated legal questions, including some that appear to be of first impression, certainly in this district. The primary argument of the UST is that the existence of a DC receivership renders the Debtor ineligible for Chapter 11. There is no basis in fact or law for this argument. Further, this Chapter 11 case by no means represents a bad faith filing. The case was filed after a four-year long receivership has failed to render the Debtor's property habitable, the Debtor continues to incur increasing costs to fund said receivership, and

Janet M. Nesse (D.C. Bar 358514)
Justin P. Fasano (DC Bar MD21201)
McNamee Hosea
6411 Ivy Lane, Suite 200
Greenbelt, MD 20770
(301) 441-2420
jnesse@mhlawyers.com
jfasano@mhlawyers.com
*Counsel to the Debtor*

the Debtor is unable to pay judgments entered against it without selling itself. There is no practical way for the Debtor to sell itself while in receivership. The Debtor is currently marketing its property with the goal of paying all allowed claims in full, and is also currently working with the people who lived in the Property to achieve a satisfactory resolution. The Debtor is less than two months into this case. Given the early stage of this case, the Debtor should be allowed to propose a plan that pays all creditors in full, preferably with their consent. The Motion to Dismiss is premature, unfounded in fact or law, and filed as an attempt to strong-arm the Debtor into waiving rights it may have in bankruptcy. It should, accordingly, be denied.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is core proceeding pursuant to 28 U.S.C. § 157.

2. Venue lies properly in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

3. On March 31, 2022, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

4. Debtor is a single asset real estate limited liability company organized under the laws of the District of Columbia with a principal place of business located in the District of Columbia.

5. Since 2009, the Debtor has owned 100 percent of the fee simple interest in a 26 unit two-story apartment building located at 2724 11th Street NW, Washington, D.C. (the “Property”). In the past, the Debtor owned other property.

6. Due to the Property’s age, condition, and location, as well as it being subject to rent control, the rental rates were among the lowest available in its area of Northwest Washington for

comparably sized units. Due to the low rents the Debtor could collect, the Property has not covered its expenses for over a decade.

7. Since at least 2015 it was absolutely clear that the Property needed a full renovation. The Property has plaster walls which are much more difficult and expensive to repair than plaster board. It is not unusual for plaster walls to crack when ground settles.

8. The Property was built approximately 100 years ago, so it is not surprising that its pipes were corroding and full-building boiler and radiator heat was uneven and not fully reliable. In order to make proper repairs, plaster walls would have to be removed—a much more complicated process than working with drywall. There was no question that the Property needed repairs and the renovation/rehabilitation could not be done with tenants in place.

9. Pursuant to District of Columbia law, a landlord cannot evict simply because a lease has ended; and, hence, leases essentially have no end date despite any language to the contrary in the lease itself. Tenants may not be required to move (barring material breach of lease) without going through a lengthy and expensive process through the DC Rent Administrator (and any appeals thereafter). Accordingly, the owner was forced into an expensive patch and repair mode that was not an ideal approach to resolving issues on a long term basis. The Debtor has made numerous attempts to resolve these matters, including offering $100,000 to each Tenant, all of which have been denied.

10. In 2014, a Certificate of Compliance was issued to the building by the District of Columbia certifying that the building met the requirements of the DC Housing Code. The certification lasted for 3 years.

11. The first Tenants' Association ("TA") action was filed in 2015. Oddly, it was an administrative action solely for rent relief (i.e. abatement and rollback) and attorney's fees. The

ALJ had no power to order repairs or otherwise grant injunctive relief. In Superior Court, a Judge could take productive action to order repairs or other injunctive relief, and could also order rent abatements based on past conditions and on an on-going basis until repairs were complete. The court, however, could not normally order attorney fees, nor rent rollbacks. Of course, reducing the rent and seeking attorney's fees did not help provide the Debtor funds available to make repairs.

12. On November 3, 2016, several tenants filed a complaint against several defendants, including the Debtor, for (1) breach of contract for alleged violations of the implied warranty of habitability; and (2) violation of the Air Quality Amendment Act of 2014 (the "Mold Statute"). Case No. 2016 CA 008084.

13. The Tenants' Association's 2015 suit resulted in a compensatory judgment of $70,926.00, or $4700 for each affected unit (15) over a three (3) year period. This is a little more than $1,500 per unit per year. The subsequent 2016 Mold case granted approximately $3,000.00 in compensatory damages. All of the rest of the very substantial monetary awards were punitive or statutory damages, interest, and/or attorneys' fees. From the period of 2013 through 2017, the Debtor and Tenants' Association, Inc. were in litigation concerning the Debtor's attempts to raise rents to fund care and upgrades to the Property and other landlord-tenant matters.

14. On or about April 24, 2017, the District of Columbia filed a complaint against the defendants, including Debtor, alleging violations of the Consumer Protection Procedures Act ("CPPA") and seeking the appointment of a receiver for the Property, amongst other relief. Case No. 2017 CA 002837.

15. The Property was cited by the District of Columbia on multiple occasions. As addressed at length in the 2015 administrative action, individual violation notices were addressed by management and abatements pursued. At some point the District of Columbia stopped issuing

abatement notices, but numerous inspections and follow-ups show that repairs were made, as they did not re appear in re-inspections. Many receipts for repair have been placed into evidence.

16. The Superior Court found that the repairs were not adequate and not permanent; such finding was inevitable given that all parties agreed that a full rehabilitation was required.

17. On November 17, 2017, Benjamin Gilmore was appointed as receiver limited to the duties conferred to him under D.C. Code § 42-3651.06 solely for the Property (the "Receiver"). *See* **Exhibit A** for the Order Appointing Benjamin Gilmore.

18. To fund the Receiver's abatement plan for the Property, the Debtor and Ellis Parker were found by the DC Superior Court to be responsible for funding the costs of the Receiver. To date, the Debtor has paid the required sums to the Receiver, which currently amount to $2,073,738 (the "Funds").

19. The Tenants' Association asserts that the Receivership is to require the owner to comply with District of Columbia law. The Property has been stripped down by the Receiver, and the Debtor has not been in control of the funds or the Property since the appointment of the Receiver.

20. The Tenants' Association asserts that in 2018 there was a finding that Ellis Parker has binding authority of the Debtor's compliance with the housing code. In fact by that date, Mr. Parker had no control over the building at all.

21. Four years after the appointment of the Receiver, the Receiver has spent approximately $1.6 million, and the Property is not yet renovated.

22. The Debtor filed bankruptcy on March 31, 2022, to bring closure to these problems, and to sell the Property to raise funds to pay its debts.

23. On the Petition Date, the Debtor also filed its Schedules and Statements. The Debtor estimated that its assets totaled $5,531,267.15, with the belief that the Property's value is $5 million. The balance of assets are those cash deposits held by the Receiver, which were paid in pursuant to Court Order. The Debtor's known liabilities were estimated to be $1,931,368.90. There are a number of tenant related claims that have not been fully liquidated or monetized. It is possible that the Debtor's liabilities may be higher than those set out in the schedules. For example, one of the Tenant Association's counsel asserts that there are in excess of **TWO MILLION DOLLARS** in legal fees that are claimed.

24. On April 1, 2022, the Debtor filed its Motion to Employ Janet Nesse and the law firm of McNamee Hosea, P.A. Subsequently, on April 11, 2022, the Debtor filed its Motion to Employ Carol Blumenthal and Blumenthal, Cordone & Erklauer PLLC and Motion to Employ the Zupancic Group of Marcus & Millichap Real Estate Investment Services (collectively the "Retention Applications").

25. On April 4, 2022, the Debtor filed in its bankruptcy case a Motion to Turnover Funds and Records from the Receiver. Pursuant to the Motion, the Debtor sought to obtain the Funds still retained by the Receiver, as well as to obtain records and financial information.

26. On April 27, 2022, the Debtor filed a Motion to Approve Payment of Certain Business Expenses, seeking authority to pay certain ordinary business expenses from the Funds, including rent differentials.

27. Both the District of Columbia and the 2724 11th St. N.W. Tenants' Association, Inc. (the "Tenants' Association") objected to the Debtor's Motion to Turnover, arguing that the Funds were not property of the estate and were specifically ordered to pay the tenants' relocation costs and expenses and to address the conditions at the Property. Further, the District of Columbia and

the Tenants' Association objected to the Retention Applications noting their concern that the Debtor paid retainers from the Funds.

28. To resolve their issues revolving around the Receiver and the Funds, the Debtor entered into a stipulation with the District of Columbia and the Tenants' Association on May 13, 2022 (the "Stipulation").

29. Pursuant to the terms of the Stipulation, payments to counsel would not come from the Funds and that the payment to the Zupancic Group would not come from the Funds.

30. Further, the Debtor stipulated to opening a separate DIP account with a financial institution of its choice.

31. The Stipulation further laid out the specific actions that the Receiver could take, which are limited solely to:

a. Paying relocation costs and expenses, including rents, for the tenants in their current relocated locations;

b. Collecting rents from the tenants and using any combination of those rents and the Funds to pay relocation costs.

c. Using the Funds for routine maintenance, such as lawn care, payment of utilities, and other maintenance needs.

d. Retaining keys to the Property, but the Receiver must cooperate with the Debtor to ensure access to the Property upon reasonable notice.

32. Pursuant to the Stipulation, the Receiver is not authorized to make any rehabilitation of the Property without notice and an order of the Court.

33. On May 17, 2022, the Debtor filed a Motion Approving Post-Petition Financing and Approving Credit Agreement. As stated in the motion, the Debtor requested authority to

execute a Commercial Balloon Credit Line Promissory Note in the principal amount of $100,000 for the benefit of Mr. Francis Hill Parker. The loan would be used to fund the general operations of the Debtor and fees to the Office of the United States Trustee. Additionally, the motion notes that the funds may also be used to pay the costs and expenses of the Debtor's retained counsel and realtors.

34. At 11:00 p.m. on May 3, 2022, on the eve of a status conference, the Tenants' Association filed a Motion to Dismiss the Bankruptcy Case, or in the Alternative, Abstain (Docket No. 36). The District of Columbia also joined in this Motion (Docket No. 37). The Court held a status hearing on May 4, 2022 at which the Office of the United States Trustee was present. At the Court's direction, prior to setting a hearing date, Tenants' Association and the District of Columbia, and Debtor agreed to work together on a litigation schedule, anticipating a hearing in July.

35. On May 13, 2022, ten (10) days after the initial motion was filed, the Office of the United States Trustee filed a separate motion to dismiss (Docket No. 41, the "UST's Motion") which was also joined three (3) days later by the District of Columbia (Docket No. 47) and the Tenants' Association on May 16, 2022. The Office of the United States Trustee scheduled a hearing for June 7, 2022, less than sixty (60) days into the case. The date for response is Friday the 3rd of June. The Office of the United States Trustee did not confer with the Debtor about the hearing and it appears that the Motion is scheduled for a regular motions day.

36. The Tenants' Association and the District of Columbia have declined to enter into a scheduling Order in accordance with the Court's direction for their motions after the status hearing, although requested to do so by Debtor's counsel.

37. By Court order, the Debtor was authorized to retain a real estate broker, to sell the Property. Although all parties reserved all rights to object to any sale, it is clear, and the Debtor has specifically stated, that it hopes to sell the Property and use the proceeds to resolve issues with the people who lived in the building. As discussed at the status hearing that resolution could include various options including, but not limited to, return to the building, move to another building, cash payments and rent support.

38. The Property has now been listed for less than two weeks and approximately a dozen showings have occurred with an equal number scheduled.

## LEGAL ARGUMENT

### A. The Receiver is not in Control of the Debtor and there are no Grounds Under § 105(b) to Dismiss or Appoint a Chapter 11 Trustee

The Acting United States Trustee (the "UST") has asserted that the Receiver is currently in control of the Debtor, which is in violation of section 105 of the Bankruptcy Code. The UST appears to conflate the maintenance of the Property by a state-appointed receiver with control over the Debtor itself. This is incorrect and ignores the cases presided over by this Court in which a state-appointed receiver worked with the debtor to facilitate recovery and assets to creditors.

The Motion to Dismiss relies primarily on *In re Roxwell Performance Drilling, LLC,* 2013 WL 6799118 (Bankr. N.D. Tex. 2013) for the proposition that (1) under section 543, the authority to manage the debtor's assets and affairs lies with the debtor or a chapter 11 trustee and (2) that permitting the Receiver to remain in possession and control of the sole asset of the Debtor is the functional equivalent of appointing the Receiver in violation of both sections 105(b) and 543. However, *In re Roxwell* is inapposite to the current case.

In *Roxwell,* the state-appointed Receiver was authorized to take "complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets

owned by the Receivership Estate." *In re Roxwell*, 2013 WL 6799118 *2. This control of the receivership estate authorized the receiver to "to retain or remove any officer, director, employee, or agent of the Receivership Estate; and to generally perform 'all acts necessary to conserve, hold, manage, and preserve the value of the Receivership Estate.'" *Id.* Further, the order appointing the receiver authorized him to file bankruptcy on behalf of the receivership estate. *Id*. The problem presented to the court lies not in the fact that there is a receiver present in the bankruptcy estate, but that the receiver "testified that it was his intention to propose a plan of reorganization" and for continued management of the debtor.

The UST interprets the Stipulation as giving the Receiver control over the Property and thus, over the Debtor, and argues that this is the same control that the *Roxwell* receiver held. However, the UST misunderstands the Stipulation, as well as overstates the authority that has been granted to the Receiver through the state court.

Under the order appointing Mr. Gilmore as receiver, his authority to make decisions related to the Property were limited to "abating the D.C. Code violations and threats to life, safety, and security at the Property." *See* **Ex. A** at 1. To meet his duties, the Receiver was authorized under the order to employ professionals to assist in the performance of his duties, make payments and disbursements, and collect rents from the tenants. *Id.* Unlike the *Roxwell* receiver, who could remove or retain officers of the debtor and who had sole control over all assets (including funds) and property of the debtor, the Mr. Gilmore's control of the Property was limited solely to abating and rehabilitating the Property. The Stipulation did not expand on the Receiver's authority, rather, it further limited actions that could be taken by the Receiver. Under the Stipulation, the Receiver can only take actions towards maintenance of the Property, collecting rents and making relocation payments, and keeping the physical copy of the key. The Receiver is not authorized to make any

rehabilitative actions towards the Property without further notice to the bankruptcy court. There is no authority for the Receiver to control any aspect of the Debtor except the maintenance of the building. This is an entirely different scenario than that of the *Roxwell* case. In the case at bar, the Debtor filed bankruptcy on its behalf, the Parkers have not been replaced as stakeholders or managers of the Debtor, and the Debtor has been filing its own motions and appearing on its behalf.

The UST further argues that the Debtor is unable to fulfill its obligations and duties under the Bankruptcy Code; however, the UST does not specifically point what these obligations and duties consist of. Rather, the UST merely states that the Receiver cannot exercise the rights of a trustee or a debtor-in-possession, without stating what exactly the Receiver is exercising. It is unclear why the appointment of a Chapter 11 Trustee would affect the UST's position. Section 1107 provides that "[s]ubject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation . . . , powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter." A debtor in possession has all the functions and duties of a trustee. Accordingly, the UST has no basis for suggesting the appointment of a Chapter 11 Trustee resolves the non-existent receivership issue.

The presence of and inclusion of a state-appointed receiver is not a new concept to this Court. In *Eads, LLC*, Case No. 20-00480, the Court granted the District of Columbia's motion seeking to continue the retention and funding of the state-appointed receiver. In *Eads*, the debtor had issues concerning the safety and habitability of its property, which prompted the appointment of Benjamin Gilmore as the receiver. During the course of the bankruptcy, the District of Columbia filed a motion to allow for the retention and funding of the state-court receiver. The UST, utilizing

the same arguments of the Motion to Dismiss, argued that continuing the retention of the receiver was not permitted under the Bankruptcy Code. On March 19, 2021, this Court entered an order granting the motion to continue retaining and funding the receiver. *See* **Exhibit B.** Similar to the Stipulation in this case, the Court's order authorized the receiver to provide day-to-day management of the property, the ability to employ personnel, repair and maintain the property without further court order, and provides that the receiver was a party-in-interest and had standing under section 1109(b). Even when the case was converted to a chapter 7, this Court allowed for the continued retention of the receiver with some adjustments to the receiver's authority. *See* **Exhibit C**.

A similar arrangement was approved in *In re 5001 SHR, L.C.*, Case No. 12-11287 (Bankr. D. Md.) (Catliota, J.). In that case, the debtor, a single-asset real estate entity, filed bankruptcy to stall a foreclosure. Pre-petition, the Debtor's lender had appointed a third party "property manager" who collect all rents and controlled the building. The continued appointment of the property manager was approved by the Bankruptcy Court and the Office of the United States Trustee. **See Exhibit D.** The bankruptcy case allowed the Debtor time to negotiate with its lenders and reach a settlement agreement, while also paying off other pre-petition claims.

As the *Eads* and *5001 SHR* case demonstrate, it is viable for a receiver or "property manager" and a debtor to work together for the benefit of the estate and its creditors. The Receiver has not ever, and will not, have control over the Debtor itself. In respect to the decision of the state court, the Debtor is cooperating and will continue to work with the Receiver concerning the Property.

Further, section 105(b) only prohibits the post-petition appointment of a receiver over the entirety of the Debtor, not a pre-petition receiver of property. Section 105(b) of the Bankruptcy

Code provides: "Notwithstanding subsection (a) of this section, a court may not appoint a receiver in a case under this title." *In re 400 Madison Ave. Ltd. P'ship*, 213 B.R. 888, 894 (Bankr. S.D.N.Y. 1997) ("stating "the bankruptcy court is expressly prohibited from appointing a receiver, *see* Code § 105(b), although the bankruptcy court can continue a prepetition receiver's appointment under Code § 543(d)(1)."). The appointment of a receiver for a specific piece of property does not violate 11 U.S.C. § 105(b). *In re Mem'l Ests., Inc.*, 797 F.2d 516, 520 (7th Cir. 1986).

**B. The Case was filed in Good Faith and Not Filed to Circumvent Litigation.**

The UST simply adopts the arguments made by the Tenants' Association in its Motion to Dismiss, and argues that the Debtor has filed the case in bad faith and to circumvent litigation. This an unfounded remark made based on conclusory statements, rather than statements of fact. More importantly, the UST has not shown that both subjective bad faith and objective futility are present.

In *In re Franklin Mortg. & Inv. Co., Inc.*, this Court discussed what needs to be shown to dismiss based on bad faith. 143 B.R. 295 (Bankr. D.D.C. 1992). In situations in which a one-asset entity has been created or revitalized on the eve of foreclosure to isolate the insolvent property (also referred to as "new debtor syndrome") and the resultant unfair delay to creditors is present, objective futility need not be shown. *Id.* at 302. However, in "other single asset cases not involving the 'new debtor syndrome' . . . [i]t makes sense to require objective futility before dismissing the case." The Debtor does not fall within the category of "new debtor syndrome." The Debtor has been incorporated since June 24, 1996 and has owned and operated the Property starting in 2009 as well as a number of other properties prior. This is not a case where a debtor has been created for the sole purpose of isolating the Property. The Debtor has determined that it is impractical to

continue owning and operating the Property, and it would be in the best interest of the estate and of creditors to sell the Property.

Since this is not a case of 'new debtor syndrome,' under the standard set by this Court in *In re Franklin*, the UST must prove that there is objective futility. However, the UST alleges only subjective bad faith, and, as such, does not even plead its burden for a dismissal based on bad faith.

However, assuming *arguendo* that the UST need not show objective futility (which it does following the cases of this Court), what the UST has argued as subjective as bad faith are merely conclusory statements and misinterpretation of facts. As held by this Court and the 4th Circuit, the "court must look to the totality of all the facts and circumstances in making this determination." *In re Franklin*, 143 B.R. at 299 (citing *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989)). There is no one singular factor that will necessarily lead to bad faith, nor is there a difference in weight given to any particular factor. *Id.*

The UST appears to have blindly adopted arguments put forth in the Tenants' Association's Motion to Dismiss, arguing that the Debtor is attempting to circumvent the Receivership Action and its obligations under the orders entered by the state court. However, the UST fails to cite with specificity what exactly the Debtor has done to circumvent the Receivership Action and the litigation conducted in the state court.

The Debtor and the Receiver have been able to achieve positive steps in terms of tackling issues the Property currently faces that may affect recovery for the estate and creditors. In terms of asset recovery, the Debtor and Receiver are working to resolve an overcharge issue associated with a water bill issued by WASA and the potential overcharge from the District of Columbia's categorization of the Property as vacant and abandoned for punitive tax purposes. Further, as required under the Stipulation, the Receiver has timely provided the Debtor with financial

information so that it may file monthly reports. The Debtor has also worked with the Receiver to supplement what he could not obtain; for example, the Receiver had liability insurance but was unable to obtain building insurance, which the Debtor obtained.

The UST cites to one specific instance which he claims is a violation of the Receivership Order. However, the UST is misinterpreting the facts. As the email attached as Exhibit A to the Motion to Dismiss clearly shows, the Debtor was complying with the concerns of the Receiver to board up the Property to ensure that vandalism or other harm would befall the Property. It is disingenuous to claim that the lockbox and keys were "taken over" by agents of the Debtor. The Receiver gave access to the lockbox, and the Debtor's agents entered the building with the sole intent to board up the Property as requested by the Receiver. Once finished the keys were returned to the lockbox, and counsel to the Debtor suggested that the code to the lockbox be changed so no one other than the Receiver could have access to the Property. This is not an example of post-petition misconduct.

The UST's arguments that the Debtor is seeking some litigation advantage by filing bankruptcy and is seeking to avoid its obligations to the tenants are similar to those raised by the Tenants' Association. As the Debtor has argued in its opposition to the Tenants' Association's Motion to Dismiss, it appears that the Tenants' Association's filing is itself a litigation tactic to attempt to strong-arm the Debtor into waiving its rights under the Bankruptcy Code. Seeking to file bankruptcy to be able to leverage its assets and pay creditors is not bad faith.

The UST's Motion to Dismiss is an attempt to cut the Debtor's legs out from underneath it, so that the Debtor cannot present creditors and the Court will the full array of options that marketing the Property would provide. This is a litigation tactic the Court should not countenance.

The Debtor should be given the necessary time it needs to market the Property in order to prepare a confirmable plan of reorganization.

WHEREFORE, for the foregoing reasons, the Debtor respectfully requests that the Motion to Dismiss be denied, and that the Court grant such other and further relief as it deems appropriate and proper.

Date: June 3, 2022

Respectfully submitted,

/s/ *Janet M. Nesse*

Janet M. Nesse (DC Bar 358514)
Justin P. Fasano (DC Bar MD21201)
McNamee Hosea, P.A.
6411 Ivy Lane, Suite 200
Greenbelt, Maryland 20770
(301) 441-2420
jnesse@mhlawyers.com
jfasano@mhlawyers.com
*Counsel to the Debtor*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 3rd day of June 2022, a copy of the foregoing was served electronically via the Court's ECF system.

/s/ *Janet M. Nesse*
Janet M. Nesse